FILED

AUG 1 2 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

TIM REAM, CA BAR #283971
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
(415) 632-5315
tream@biologicaldiversity.org

SUSAN JANE BROWN, OSB #054607, **applicant *pro hac vice***
JOHN MELLGREN, OSB # 114620, **applicant *pro hac vice***
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
(541) 485-2471
brown@westernlaw.org
mellgren@westernlaw.org

PAUL KAMPMEIER, WSBA #31560, **applicant *pro hac vice***
WYATT GOLDING, WSBA #44412, **applicant *pro hac vice***
Washington Forest Law Center
615 Second Avenue, Suite 360
Seattle, WA 98104
(206) 223-4088
pkampmeier@wflc.org
wgolding@wflc.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

NC

KLAMATH-SISKIYOU WILDLANDS CENTER, )
CENTER FOR BIOLOGICAL DIVERSITY, and )
KLAMATH FOREST ALLIANCE, nonprofit )
corporations, )
)
　　　　　　　　　　Plaintiffs, )
)
v. )
)
NATIONAL OCEANIC AND ATMOSPHERIC )
ADMINISTRATION NATIONAL MARINE )
FISHERIES SERVICE and UNITED STATES )
FISH AND WILDLIFE SERVICE, )
)
　　　　　　　　　　Defendants. )

Civ. No. 13 3717

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

ADMINISTRATIVE PROCEDURE
ACT CASE

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1

1    **I.**   **INTRODUCTION**

2          1.     This is an action against the National Oceanic and Atmospheric Administration

3  National Marine Fisheries Service, a federal agency within the United States Department of

4  Commerce, and the United States Fish and Wildlife Service, a federal agency within the United

5  States Department of the Interior (collectively "the Services"). Plaintiffs allege the Services

6  violated the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ('APA"), the Endangered

7  Species Act, 16 U S.C. § 1531 *et seq.* ("ESA"), and the National Environmental Policy Act, 42

8  U.S.C. § 4321 *et seq.* ("NEPA") in issuing incidental take permits to the Fruit Growers Supply

9  Company.

10        2.     Because logging operations can injure or kill northern spotted owls and Southern

11  Oregon/Northern California Coast coho salmon, actions the Endangered Species Act prohibits,

12  the Fruit Growers Supply Company ("Fruit Growers" or "FGS") developed and obtained federal

13  approval for a habitat conservation plan. *See* 16 U.S.C. §§ 1538(a), 1539(a). The Fruit Growers

14  Supply Company Multi-Species Habitat Conservation Plan ("the HCP") is a comprehensive

15  forest management plan that covers approximately 152,000 acres of Fruit Growers' forestland in

16  Siskiyou County, California and includes management strategies for both aquatic and terrestrial

17  species affected by logging. After approving the HCP, the United States Fish and Wildlife

18  Service ("FWS") and the National Oceanic and Atmospheric Administration National Marine

19  Fisheries Service ("NMFS") issued Fruit Growers permits authorizing the incidental take of coho

20  salmon and northern spotted owls that will occur as the result of logging in accordance with the

21  HCP.

22        3.     Plaintiffs bring this lawsuit because although the logging and harm to listed

23  species is certain to occur, the claimed benefits of the HCP are speculative, not certain to occur,

24  and not certain to avoid jeopardy to listed species, as required by the ESA. There are numerous

25  problems with the Services' approval of the permits, but two examples highlight plaintiffs' core

26  concerns.

27        4.     In issuing incidental take permit coverage for northern spotted owls, the FWS

28  relied on the speculative future action of the United States Forest Service ("Forest Service")

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2

1    when calculating and weighing the HCP's supposed conservation benefits for northern spotted
2    owls. The HCP's northern spotted owl conservation strategy requires Fruit Growers to limit
3    timber harvesting operations on certain FGS lands that are close to Forest Service lands with
4    northern spotted owls. The FWS assumed that the Forest Service will never log in those areas
5    and that by preserving spotted owl habitat on nearby FGS lands the HCP will contribute to
6    preservation of the northern spotted owls living in the nearby national forest. But the Forest
7    Service is not a party to the HCP and is not bound by it or Fruit Growers' incidental take permits.
8    There is no basis for concluding that the Forest Service will protect those spotted owl sites ·
9    throughout the term of Fruit Growers' incidental take permit—for the next 50 years or more.
10   The FWS's conclusion that the HCP will benefit northern spotted owls is fundamentally flawed
11   because it improperly relied on the speculative future action of the Forest Service when
12   calculating and weighing the HCP's supposed conservation benefits.

13        5.        NMFS made a similar mistake in issuing Fruit Growers incidental take permit
14   coverage for Southern Oregon/Northern California Coast coho salmon. NMFS relied on Fruit
15   Growers' promise to reduce the potential for sediment delivery to streams from logging roads by
16   fifty percent within fifteen years of issuance of the permit. But because neither Fruit Growers
17   nor NMFS know how much sediment is being discharged now, or the extent of harm that
18   sediment is causing to coho salmon, the Services can have no idea how much damage will be
19   done to coho during the intervening fifteen years nor can they know whether reducing the
20   potential for sediment delivery by fifty percent will avoid jeopardy to those fish. NMFS'
21   conclusion that the HCP will avoid jeopardy to coho salmon is fundamentally flawed because it
22   has no ascertainable basis in fact.

23        6.        For these and other reasons, plaintiffs seek declaratory and injunctive relief to
24   redress the injuries caused by the alleged violations of law.

25        7.        Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees
26   as authorized by the ESA, 16 U.S.C. § 1540(g), and the Equal Access to Justice Act, 28 U.S.C. §
27   2412.

28

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 3

1

## II. JURISDICTION

2     8.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 (federal question) and 16

3   U.S.C. §1540(g) (ESA citizen suit provision).

4     9.     Plaintiffs have satisfied the jurisdictional requirements for bringing their ESA

5   citizen-suit claims. As required by 16 U.S.C. § 1540(g), by certified letter dated and postmarked

6   April 19, 2013, plaintiffs notified the Secretary of the Interior, the Secretary of Commerce, the

7   Director of the FWS, and the Administrator of the National Oceanic and Atmospheric

8   Administration ("NOAA") of alleged ESA violations committed by FWS and NMFS and of

9   plaintiffs' intent to sue for those violations (hereinafter "Notice Letter"). A copy of the Notice

10   Letter is attached to this complaint as Exhibit 1.

11     10.     More than sixty days have passed since the Notice Letter was served. The

12   Secretary of the Interior received a copy of the Notice Letter on April 24, 2013. The Secretary of

13   Commerce received a copy of the Notice Letter on April 24, 2013. FWS received a copy of the

14   Notice Letter on April 25, 2013. NOAA received a copy of the Notice Letter on April 23, 2013.

15   The violations complained of in the Notice Letter are continuing or reasonably likely to continue

16   to occur.

17     11.     Neither the Secretary of the Interior nor the Secretary of Commerce has

18   commenced an action to impose a penalty, pursuant to 16 U.S.C. §1540(a), for the ESA

19   violations alleged herein. The United States has not taken any action to redress the ESA

20   violations alleged in this lawsuit.

21     12.     This Court has the authority to grant the relief requested pursuant to 16 U.S.C. §

22   1540(g) (ESA); 5 U.S.C. §§ 701-06 (APA); 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. §

23   2202 (injunctive relief); and 28 U.S.C. § 2412 (Equal Access to Justice Act).

24     ## III. INTRADISTRICT ASSIGNMENT

25     13.     Venue is proper in this judicial district under 28 U.S.C. § 1391(1)(B) and 16

26   U.S.C. § 1540(g)(3)(A). NMFS personnel in the Arcata, California office developed or helped to

27   develop the HCP, one of the biological opinions, the implementation agreement, one of the

28   incidental take permits, and the environmental impact statement that are the subject of this

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 4

1  lawsuit. Venue is also proper in this Court under 28 U.S.C. § 1391(e) because plaintiffs Center

2  for Biological Diversity and Klamath Forest Alliance have their principal place of business in

3  this district and there is no real property involved in this action.

## IV.    PARTIES

5  14.    Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is suing

6  on behalf of itself and its members. KS Wild is a domestic non-profit corporation organized and

7  existing under the laws of the State of Oregon. KS Wild's main offices are in Ashland, Oregon.

8  KS Wild has 3,500 members in over 10 states, with most members concentrated in southern

9  Oregon and northern California. On behalf of its members, KS Wild advocates for the forests,

10  wildlife, and waters of the Rogue and Klamath Basins and works to protect and restore the

11  extraordinary biological diversity of the Klamath-Siskiyou region of southwest Oregon and

12  northwest California. KS Wild uses environmental law, science, education, and collaboration to

13  help build healthy ecosystems and sustainable communities. Through its campaign work, KS

14  Wild strives to protect the last wild areas and vital biological diversity of the Klamath region.

15  KS Wild is a leader in protection of California's national forests and routinely participates in

16  commenting, monitoring, and litigation affecting public lands in California. KS Wild also has an

17  extensive history of advocacy relating to private industrial timber harvest in Oregon and

18  California, including on lands owned by Fruit Growers Supply Company. KS Wild is a

19  membership organization and has members who are injured by defendants' violations.

20  15.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is suing on

21  behalf of itself and its members. The Center is a California nonprofit public benefit corporation

22  with more than 48,000 members dedicated to the preservation, protection, and restoration of

23  biodiversity and ecosystems in northern California and throughout the world. On behalf of its

24  members, the Center works to insure the long-term health and viability of animal and plant

25  species and to protect the habitat those species need to survive. The Center also has a procedural

26  interest in the proper management of these lands in full compliance with mandatory public land

27  and environmental laws and regulations. The Center is a membership organization and has

28  members who are injured by defendants' violations.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 5

16.   Plaintiff KLAMATH FOREST ALLIANCE ("KFA") is suing on behalf of itself and its approximately 300 members and supporters who reside in northern California. KFA is a California corporation and a non-profit, grassroots organization based in the center of the Klamath-Siskiyou bioregion in Orleans, California. On behalf of itself and its supporters, KFA promotes sustainable ecosystems and sustainable communities with the goal of defending and protecting the biodiversity, wildlife, waters and old growth forests in Klamath-Siskiyou bioregion. Since 1989, KFA has a history of vigilance in seeing that management agencies adhere to laws that safeguard the outstanding values of public and private lands, while working in collaboration with local federal land managers, Native Tribes, regional allies, and local communities. KFA has members who are injured by defendants' violations.

17.   Plaintiffs have standing to bring this lawsuit. Plaintiffs are organizations whose purposes are dedicated to the protection and enjoyment of forests, birds, fish, and their natural habitats. Plaintiffs' members use national forest lands in the immediate vicinity of the area subject to the HCP, waters that flow through and downstream of FGS lands, and Fruit Growers' lands where Fruit Growers allows public access, for a variety of pursuits including birding, hiking, observing wildlife, backpacking, botanizing, canoeing, fishing, photography, and other personal and professional activities. Plaintiffs and their members intend to continue all of these activities in the future. Logging and related activities under the HCP will adversely impact plaintiffs' and their members' ability to pursue and enjoy those activities. The aesthetic, recreational, scientific, educational, and other interests of plaintiffs and their members have been, and will continue to be, adversely affected by the defendants' violations of the ESA, APA, and NEPA. The relief sought in this lawsuit can redress the injuries to plaintiffs' and their members' interests.

18.   Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION NATIONAL MARINE FISHERIES SERVICE is an agency within the U.S. Department of Commerce and a subdivision of the National Oceanic and Atmospheric Administration. NMFS is responsible for administering the ESA as it applies to threatened and endangered ocean-going aquatic species, including Southern Oregon/Northern California Coast coho salmon. NMFS

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6

1  personnel in the Arcata, California office developed or helped to develop the HCP, one of the
2  biological opinions, the implementation agreement, one of the incidental take permits, and the
3  environmental impact statement that are the subject of this lawsuit.

4  19.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("FWS") is an
5  agency within the U.S. Department of the Interior and is responsible for administering the ESA
6  as it applies to threatened and endangered terrestrial species, including northern spotted owls.
7  FWS personnel in the Yreka, California office developed or helped to develop the HCP, one of
8  the biological opinions, the implementation agreement, one of the incidental take permits, and
9  the environmental impact statement that are the subject of this lawsuit.

10  20.    NMFS and FWS are agencies within the meaning of the Administrative Procedure
11  Act, 5 U.S.C. § 551 *et seq*.

12  ## V.    LEGAL BACKGROUND

13  A.    The Endangered Species Act.

14  21.    Congress enacted the Endangered Species Act "to provide a means whereby the
15  ecosystems upon which endangered species and threatened species depend may be conserved ...
16  [and] to provide a program for the conservation of such endangered species and threatened
17  species...." 16 U.S.C. § 1531(b). Before a species receives protection under the ESA, the
18  Services must list the species as either "threatened" or "endangered." 16 U.S.C. § 1533(a) & (c).
19  A "threatened species" is one that is "likely to become an endangered species within the
20  foreseeable future through all or a significant portion of its range." 16 U.S.C. § 1532(20).

21  22.    Section 9 of the ESA makes it unlawful for any person to "take" an endangered
22  species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). Regulations adopted by the Services
23  apply the ESA's take prohibition to threatened species, including northern spotted owls and
24  Southern Oregon/Northern California Coast coho salmon. 50 C.F.R. § 17.31; 50 C.F.R. §
25  222.301(b). The term "take" is defined broadly as "to harass, harm, pursue, hunt, shoot, wound,
26  kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §
27  1532(19). The Services' regulations define "harm" to include "significant habitat modification
28  or degradation where it actually kills or injures wildlife by significantly impairing essential

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 7

1  behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; 50 C.F.R. §
2  222.102.

3      23.    All "persons," including any "corporation, partnership, trust, association, or any
4  other private entity" are subject to the ESA's take prohibition. 16 U.S.C. § 1532(13).

5      24.    Section 10 of the ESA creates a limited exception to the ESA's take prohibition
6  by authorizing the Services to permit the take of listed species that incidentally results from
7  otherwise lawful activities. 16 U.S.C. § 1539(a)(1)(B). A permit issued pursuant to ESA section
8  10(a)(1)(B) is referred to as an "incidental take permit."

9      25.    To obtain an incidental take permit, an applicant must submit to NMFS or the
10 FWS a habitat conservation plan that specifies the impacts that will likely result from the
11 expected taking; the steps the applicant will take to minimize and mitigate such impacts; a
12 description of what alternative actions to such taking the applicant considered; and the reasons
13 why such alternatives are not being utilized. 16 U.S.C. § 1539(a)(2)(A).

14     26.    The ESA requires the Services to provide the public with an opportunity to
15 comment on an applicant's habitat conservation plan and application materials before the
16 Services issue an incidental take permit. 16 U.S.C. §§ 1539(a)(2)(B), (c).

17     27.    Before issuing an incidental take permit, the Services must find among other
18 things that the expected taking will be incidental; that the applicant will, to the maximum extent
19 practicable, minimize and mitigate the impacts of such taking; that the applicant has assured
20 adequate funding for its HCP; and that the taking will not appreciably reduce the likelihood of
21 the survival and recovery of listed species in the wild. 16 U.S.C. § 1539(a)(2)(B).

22     28.    Before issuing an incidental take permit the Services must also initiate and
23 complete consultation under ESA section 7. ESA Section 7 requires federal agencies to evaluate
24 expected impacts to listed species and designated critical habitat before authorizing, funding, or
25 taking any discretionary action. 16 U.S.C. § 1536(a)(2). For terrestrial species such as northern
26 spotted owls, the ESA requires federal agencies to consult with the FWS. For marine or
27 oceangoing species such as Southern Oregon/Northern California Coast coho salmon, the ESA
28 requires federal agencies to consult with NMFS.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 8

1      29.      When a proposed agency action is likely to adversely affect a listed species, FWS
2   or NMFS must prepare a biological opinion. Biological opinions must be based on the best
3   available science and must analyze whether the proposed agency action is likely to jeopardize
4   any listed species or adversely modify any designated critical habitat. 16 U.S.C. § 1536(a)(2). If
5   a proposed agency action will jeopardize a listed species or adversely modify designated critical
6   habitat, NMFS or FWS must suggest reasonable and prudent alternatives that will avoid jeopardy
7   and adverse modification of designated critical habitat. 16 U.S.C. § 1536(b)(3)(A).

8      30.      The Services must issue an incidental take statement to the action agency if after
9   consultation they conclude that the proposed action will result in take but is not likely to
10   jeopardize a listed species or adversely modify critical habitat. 16 U.S.C. § 1536(b)(4).
11   Incidental take statements authorize the incidental take of listed species that will occur as a result
12   of the action agency's proposed action. They also limit the allowed level of incidental take and
13   impose terms and conditions on the proposed action. 16 U.S.C. § 1536(b)(4)(C)(iv). If, when
14   implemented, the action exceeds the level of authorized take, either the action agency or the
15   appropriate Service must reinitiate consultation under Section 7(a)(2) of the ESA. 50 C.F.R. §
16   402.16.

17      31.      If unlisted species will be covered by an incidental take permit in the event they
18   become listed, the Services must process the incidental take permit application as if the unlisted
19   species were currently listed.

20      32.      An incidental take permit provides regulatory certainty to the holder of the permit.
21   Under the Services' "No Surprises" policy, if circumstances change after issuance of an
22   incidental take permit the Services often may not require the commitment of additional resources
23   or management restrictions without the consent of the holder of the permit. 50 C.F.R. §
24   17.32(b)(5); 50 C.F.R. § 222.307(g).

25      B.      The National Environmental Policy Act.

26      33.      The National Environmental Policy Act is the Nation's basic charter for the
27   protection of the environment. NEPA's purposes are to "help public officials make decisions
28   that are based on [an] understanding of environmental consequences, and to take actions that

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 9

1 | protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

2 | 34. To accomplish those purposes, NEPA requires all agencies of the federal
3 | government to prepare an environmental impact statement ("EIS") for all "major federal actions
4 | significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

5 | 35. NEPA's disclosure goals are two-fold: (1) to insure that the agency has carefully
6 | and fully contemplated the environmental effects of its action; and (2) to insure that the public
7 | has sufficient information to challenge the agency's action.

8 | 36. The Council on Environmental Quality's uniform regulations, which implement
9 | NEPA and are binding on all federal agencies, state that "major federal actions" that require an
10 | EIS include actions approved by permit. 40 C.F.R. § 1508.18(b)(4).

11 | 37. An EIS must describe: (1) the environmental impact of the proposed action; (2)
12 | any adverse environmental effects that cannot be avoided should the proposal be implemented;
13 | (3) alternatives to the proposed action; (4) the relationship between local short-term uses of the
14 | environment and the maintenance and enhancement of long-term productivity; and (5) any
15 | irreversible or irretrievable commitment of resources that would be involved in the proposed
16 | action should it be implemented. 42 U.S.C. § 4332.

17 | 38. An agency preparing a final EIS must assess and consider comments and must
18 | respond to comments in the final environmental impact statement. 40 C.F.R. § 1503.4(a).

19 | 39. An EIS is a "detailed written statement" that "provide[s] full and fair discussion
20 | of significant environmental impacts and shall inform decision makers and the public of the
21 | reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality
22 | of the human environment." 40 C.F.R. §§ 1508.11, 1502.1.

23 | 40. An EIS must consider both direct and indirect environmental impacts of the
24 | proposed action. 40 C.F.R. § 1508.8. Direct effects are caused by the action and occur at the
25 | same time and place as the proposed project. Id. § 1508.8(a). Indirect effects are caused by the
26 | action and are later in time or farther removed in distance, but are still reasonably foreseeable.
27 | Id. § 1508.8(b).

28 | 41. NEPA also requires federal agencies to assess the cumulative environmental

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 10

1  effects of proposed agency actions. 40 C.F.R. § 1508.7. Cumulative effects are defined as the

2  impact resulting from the incremental impact of the proposed action when added to other past,

3  present, and reasonably foreseeable future actions. Id. Cumulative impacts can result from

4  individually minor but collectively significant actions taking place over a period of time. Id.

5  42.    Perhaps most importantly, agencies that prepare an EIS must take a hard look at

6  the impacts of the action and "ensure that environmental information is available to public

7  officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §

8  1500.1(b). The purpose of this requirement is to ensure that the public has the information it

9  needs to question and understand an agency's decision before it is finalized.

10                          **VI.    FACTUAL BACKGROUND**

11      A.    Fruit Growers' Land and Logging Activities.

12      43.    Fruit Growers' HCP applies to approximately 152,000 acres of Fruit Growers'

13  forest land in Siskiyou County, California. Much of Fruit Growers' land in northern California

14  supports mid- to high-elevation mixed conifer forests, predominantly made up of Douglas fir,

15  white fir. and montane hardwood.

16      44.    Fruit Growers manages its land in northern California in three management units:

17  the Klamath River Management Unit in the Klamath River watershed; the Grass Lake

18  Management Unit in the Shasta River watershed; and the Scott Valley Management Unit in the

19  Scott River watershed. Fruit Growers' lands in its Klamath River and Scott Valley Management

20  Units are in many locations adjacent to lands in the Klamath National Forest, which is managed

21  by the U.S. Forest Service, or to lands managed by the federal Bureau of Land Management.

22      45.    FGS harvests timber and conducts related operations on its lands in northern

23  California. Fruit Growers' timber harvesting and related operations impact forest ecosystems

24  and the species that live there, including northern spotted owls, Southern Oregon/Northern

25  California Coast coho salmon, Yreka phlox, Upper Klamath and Trinity Rivers Chinook salmon,

26  and Klamath Mountains Province steelhead.

27      46.    FGS logging has eliminated most of the mature and old-growth forest stands on

28  its lands in northern California. Most of the remaining mature and old-growth forest on FGS

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 11

1     lands in northern California is suitable northern spotted owl habitat. FGS cannot continue to log

2     mature and old-growth forests on its lands in northern California without an incidental take

3     permit because doing so would take northern spotted owls and Southern Oregon/Northern

4     California Coast coho salmon in violation of Section 9 of the ESA.

5       B.     Northern Spotted Owls.

6       47.     In 1990, the FWS listed the northern spotted owl (*Strix occidentalis caurina*) as a

7     "threatened" species under the ESA. *Determination of Threatened Status for the Northern*

8     *Spotted Owl*, 55 Fed. Reg. 26,114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).

9       48.     Northern spotted owls are dark to chestnut brown with round or oval white spots

10    and dark eyes. The average adult owl is about 18 inches tall, with a wing span of approximately

11    48 inches. They are endemic to the Pacific Northwest and can live up to 10 years in the wild.

12      49.     Northern spotted owls ("NSO") occupy late-successional and old growth forests

13    from southern British Columbia through western Washington, Oregon, and northern California

14    as far south as Marin County.

15      50.     Northern spotted owls rely on older forests because they generally contain the

16    structures and characteristics required for their essential biological functions of nesting, roosting,

17    foraging, and dispersal. In general, northern spotted owls inhabit forests that contain a multi-

18    layered and multi-species tree canopy dominated by large overstory trees; moderate to high

19    canopy closure; a high incidence of trees with large cavities and other types of deformities;

20    numerous large snags; an abundance of large, dead wood on the ground; and open space within

21    and below the upper canopy for owls to fly. Forested stands with high canopy closure provide

22    thermal cover as well as protection from predation.

23      51.     Northern spotted owls are site-tenacious and generally live their entire adult lives

24    in a home range territory. Within an owl's home range, large amounts of forest habitat are

25    necessary to support an owl's life needs. Northern spotted owls are generally intolerant of

26    habitat disturbances.

27      52.    Loss of habitat has been a primary cause of the decline in northern spotted owl

28    populations. In its final listing rule, the FWS noted that the northern spotted owl is threatened

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 12

1  throughout its range "...by the loss and adverse modification of suitable habitat as the result of
2  timber harvesting and exacerbated by catastrophic events such as fire, volcanic eruptions, and
3  wind storms." 55 Fed. Reg. at 26,151.

4      53.   Since the FWS listed the northern spotted owl as threatened in 1990, the amount
5  of suitable northern spotted habitat has continued to decline throughout the owl's range, in part
6  because of logging on private lands in California. It is estimated that logging has eliminated 80-
7  85% of the old-growth forests in the Pacific Northwest. Studies indicate that northern spotted
8  owl populations have continued to decline since 1990.

9      54.   Logging can adversely impact northern spotted owls by removing their habitat,
10 creating noise disturbance, increasing forest fragmentation, and altering landscape characteristics
11 to create habitat conditions that support barred owls. The destruction of northern spotted owl
12 habitat injures individual territorial owls by eliminating areas where they can nest, roost, forage,
13 and raise their young. Additionally, northern spotted owls that have to travel over large expanses
14 of unsuitable habitat to forage are at a significantly higher risk of predation and starvation.

15     55.   The destruction of suitable owl habitat also makes it more difficult for dispersing
16 owls to establish new territories. Spatial separation between blocks of owl habitat makes it more
17 difficult for dispersing owls to find habitat in which they can establish a home range. And as
18 owl habitat becomes increasingly scarce, competition for the remaining habitat increases. Large-
19 scale destruction of spotted owl habitat disconnects spotted owl subpopulations and can cause
20 genetic bottlenecks that increase the likelihood that isolated subpopulations will be extirpated.
21 Large-scale habitat loss also exacerbates harm to northern spotted owls from other threats.

22     56.   Protecting and restoring sufficient habitat for northern spotted owls now and into
23 the future is essential to spotted owl recovery. The continued destruction of suitable spotted owl
24 habitat decreases the likelihood that the species will recover in the wild.

25     C.   Southern Oregon/Northern California Coast coho salmon and other affected
26         salmonids.

27     57.   In May 1997, NMFS listed the southern Oregon/northern California coast
28 evolutionarily significant unit of coho salmon ("SONCC coho salmon") as threatened under the

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 13

1 ESA. *Endangered and Threatened Species; Threatened Status for Southern Oregon/Northern*
2 *California Coast Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg. 24588
3 (May 6, 1997).

4       58.     SONCC coho salmon are anadromous. When adult SONCC coho salmon reach
5 sexual maturity, at around 3 years old, they migrate from saltwater into freshwater streams to
6 spawn before dying. To spawn, female salmon clear small circles of coarse gravel (known as
7 redds) in which they lay eggs. After being fertilized by male SONCC coho salmon, the eggs
8 incubate in redds over the winter. Salmon fry emerge from redds between February and mid-
9 May. Juvenile SONCC coho may spend 1 to 2 years rearing in freshwater or they may migrate
10 downstream to an estuary. Migration from streams to the estuary and ocean generally takes
11 place from March through May.

12       59.     SONCC coho salmon spawn and rear in small, relatively low gradient streams and
13 headwater creeks. They require abundant, cool, well-oxygenated water that flows year-round
14 and contains little suspended sediment. Females lay eggs on gravel stream bottoms with
15 minimal deposited fine sediment because the spaces between pieces of stone allow oxygenated
16 water to sustain eggs and fry. The empty spaces in gravel substrate also support benthic
17 organisms, the primary food source of juvenile salmon.

18       60.     Rearing juveniles require a complex stream morphology of pools, riffles, and
19 backwaters created by large downed trees in the stream channel. That habitat structure helps
20 protect juvenile SONCC coho salmon from predators and high water flows that can occur during
21 the winter.

22       61.     Past logging and logging-related activities have harmed SONCC coho salmon and
23 their habitat. NMFS described logging as one of the "major activities responsible for the decline
24 of coho salmon in Oregon and California." 62 Fed. Reg. at 24592. The Federal Register notice
25 announcing the rule that listed SONCC coho salmon as a threatened species states: "Forestry has
26 degraded coho salmon habitat through removal and disturbance of natural vegetation,
27 disturbance and compaction of soils, construction of roads, and installation of culverts." 62 Fed.
28 Reg. at 24593. Logging, timber hauling, and road maintenance and construction can adversely

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14

1    impact SONCC coho salmon by altering water quantity, water quality, stream velocity, and other
2    stream features that provide SONCC coho salmon habitat or support SONCC coho salmon
3    survival.

4        62.    Sediment generated by logging activities is particularly harmful to SONCC coho
5    salmon and their habitat. In the western United States, logging roads are the primary source of
6    sediment delivered to streams from forestry activities. Logging roads generally use road grade,
7    ditches, channels, and culverts to move stormwater off the road. Stormwater associated with
8    logging roads often contains sediment. Landslides generated from improperly maintained
9    logging roads, and landslides caused by logging activities on steep and unstable slopes, also
10    deliver sediments to streams. Sediment delivered to fish-bearing streams can harm fish by
11    smothering salmonid eggs, reducing inter-gravel oxygen, increasing turbidity in the water
12    column, interfering with sight-feeding, burying macroinvertebrate insects and their habitat, and
13    aggrading streambeds throughout the stream network.

14        63.    SONCC coho salmon habitat in the Klamath and Scott rivers is presently
15    degraded. Sediment levels in Klamath-area streams exceed levels that inhibit salmonid survival
16    and reproduction. The Klamath and Scott Rivers are listed as impaired for sediment under
17    Section 303(d) of the Clean Water Act. The State of California's North Coast Regional Water
18    Control Board has indicated that sediment levels in the Scott River exceed those stated in the
19    Total Maximum Daily Load for that river.

20        64.    Klamath and Trinity Rivers Chinook salmon and Klamath Mountains Province
21    steelhead also inhabit streams in the Klamath region and also require cold, clean water for
22    migration, spawning, and juvenile rearing. But these two fish species are also different in
23    important ways from SONCC coho salmon. Adult Klamath and Trinity Rivers Chinook salmon
24    are particularly vulnerable to increased water temperatures because after returning to their natal
25    streams they spend a full summer in freshwater before spawning. Similarly, adult Klamath
26    Mountains Province steelhead are particularly vulnerable to degraded water quality in headwater
27    streams because they spawn farther upstream in drainages than coho salmon or Chinook salmon.

28        D.    The Fruit Growers Supply Company's Habitat Conservation Plan.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 15

1      65.    In November 2009 the Services announced that Fruit Growers had submitted a

2  draft HCP to FWS and NMFS for its logging and related activities on certain FGS lands in

3  northern California. *Multi-species Habitat Conservation Plan*, 74 Fed. Reg. 58602 (Nov. 13,

4  2009). Fruit Growers' HCP was an application for permits that would authorize the incidental

5  take of northern spotted owls and SONCC coho salmon that occur as a result of Fruit Growers'

6  timber harvesting and related operations. Fruit Growers' permit application also sought

7  incidental take permit coverage for Upper Klamath and Trinity Rivers Chinook salmon (*O.*

8  *tshawytscha*) and Klamath Mountains Province steelhead (*O. mykiss*), anticipating that those

9  species might also be listed as endangered or threatened in the next several decades.

10      66.    The HCP allows FGS to log thousands of acres of mature and old-growth forest

11  that provide habitat for northern spotted owls and that Fruit Growers would not be allowed to log

12  without an incidental take permit.

13            **1.    The HCP's Terrestrial Species Conservation Strategy.**

14      67.    Chapter 5.3 of the HCP includes a terrestrial species conservation strategy

15  ("TCS") that includes provisions for northern spotted owls. Fruit Growers estimated that its

16  logging activities under the HCP could impact 82 different northern spotted owl site centers that

17  support approximately 158 northern spotted owls. The incidental take permit authorizes Fruit

18  Growers to take 83 northern spotted owls. Fruit Growers designed its TCS to help preserve 48

19  northern spotted owls.

20      68.    The TCS is designed: (1) to provide demographic support to northern spotted

21  owls in accordance with the 2011 Revised Recovery Plan for the Northern Spotted Owl; (2) to

22  promote improved habitat conditions for the owl across the FGS ownership; (3) to avoid direct

23  take of owls through incidental take avoidance and minimization measures; and (4) to manage

24  known threats to northern spotted owls. On page 5-37, the HCP indicates that the measures in

25  the TCS "…reflect all the binding, enforceable commitments FGS will make to satisfy the

26  requirements of Section 10(a) of the Endangered Species Act" for northern spotted owls.

27      69.    In an effort to provide demographic support to northern spotted owls, the TCS

28  establishes 24 Conservation Support Areas ("CSAs") on Fruit Growers' lands in northern

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 16

1   California. The CSAs are designed to provide demographic support to northern spotted owls that

2   do not live on FGS lands. Within each CSA the HCP requires Fruit Growers to promote and

3   maintain certain general conditions and habitat features on its ownership.

4         70.    The HCP also restricts timber harvest on FGS lands within CSAs: FGS and FWS

5   must ensure that northern spotted owl core areas and home ranges will meet post-harvest habitat

6   thresholds for nesting, roosting, and foraging habitat before Fruit Growers can harvest timber in

7   those areas. In many of the CSAs, FGS lands comprise only a small percentage of the land

8   within a northern spotted owl home range.

9         71.    On page 5-42 the HCP states: "Upon evaluation and written concurrence by the

10   USFWS, exceptions may be made on a case-by-case basis for CSAs that lack the acreage or site

11   potential to meet this requirement." Additionally, FGS and FWS expect high-intensity, stand-

12   replacing fires to occur in the Plan Area during the permit term. But if owl habitat in a CSA or

13   in the areas of the Klamath National Forest surrounding CSAs is diminished due to fire, the HCP

14   does not require the protection of replacement northern spotted owl habitat.

15         72.    The activity centers for all or nearly all of the northern spotted owls that the FWS

16   expects to be preserved by the CSAs are on lands managed by the Forest Service on the Klamath

17   National Forest.

18         73.    The Forest Service is not a party to the HCP. Neither the HCP nor the incidental

19   take permits require the Forest Service to avoid take of the northern spotted owls covered by the

20   CSAs. The Forest Service sometimes authorizes the logging of northern spotted owl habitat.

21   The Forest Service sometimes authorizes logging activities that incidentally take northern

22   spotted owls.

23         74.    During the term of Fruit Growers' incidental take permits, the Forest Service must

24   revise the management plan for the Klamath National Forest.

25         75.    Outside of the CSAs, the TCS includes two provisions related to improving

26   spotted owl habitat conditions across FGS's lands.

27         76.    First, the TCS requires Fruit Growers to manage riparian areas in accordance with

28   the Aquatic Species Conservation Strategy in the HCP.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 17

1    77.    Second, the TCS states that FGS will "promote forest management practices that
2    develop and maintain dispersal habitat across its ownership to provide connectivity between the
3    CSAs and nearby federal lands." On page 5-44 the HCP states: "The stand-level and landscape-
4    level attributes of forests needed to facilitate successful dispersal have not been thoroughly
5    evaluated (Buchanan 2004) and a more complete description of dispersal habitat may be
6    determined in the future." On page 7-16 the HCP states: "Because FGS will maintain a forested
7    landscape on its ownership, the biological objective for dispersal habitat will be met. No
8    compliance monitoring or additional reporting is required to document compliance with this
9    measure."

10   78.    In an effort to minimize direct take of northern spotted owls, the TCS prohibits
11   FGS from conducting timber operations or creating noise disturbances within 0.25 mile of active
12   northern spotted owl nest sites during the breeding season beginning February 1 and ending
13   August 31. The HCP defines the term "Active northern spotted owl nest site" as the nest tree of
14   a pair of nesting northern spotted owls. The TCS does not restrict direct take of northern spotted
15   owls that are not currently breeding. Outside of CSAs and outside the breeding season the TCS
16   does not restrict direct take of breeding northern spotted owls. Road use and maintenance within
17   0.25 mile of an active northern spotted owl nest site may occur even during the breeding season.

18   79.    In an effort to manage known threats to northern spotted owls, the TCS requires
19   Fruit Growers to monitor its lands within CSAs for barred owls (*Strix varia*). If a barred owl is
20   detected on FGS lands, FGS is required to locate and monitor the barred owl and notify the FWS
21   within 10 days of detection. The HCP also requires FGS to facilitate implementation of barred
22   owl control measures deemed appropriate by FWS.

23   80.    Fruit Growers anticipates that the majority of the authorized take of northern
24   spotted owls will occur within the first ten years after issuance of the incidental take permits.
25   FWS expects FGS to log over 18,000 acres of suitable northern spotted owl habitat in the first
26   ten years of implementation of the HCP. The incidental take permit allows FGS to log over
27   39,000 acres of suitable northern spotted owl habitat over the life of the permit.

28        **2.    The HCP's Aquatic Species Conservation Strategy.**

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 18

1    81.    Section 5.2 of the HCP includes an aquatic species conservation strategy (ACS)
2  intended to reduce logging-related impacts to SONCC coho salmon, Upper Klamath and Trinity
3  Rivers Chinook salmon, and Klamath Mountains Province steelhead. The ACS is intended to: 1)
4  limit alteration of stream hydrology; 2) preserve riparian shading; 3) maintain the recruitment of
5  large woody debris into streams; and 4) control sediment delivery to streams.

6    82.    In an effort to achieve those goals the ACS divides Fruit Growers lands into Class
7  A, Class B, and Class C lands. Borrowing heavily from California forestry regulations, the ACS
8  prescribes different limitations on logging activities for each land Class. The ACS prescriptions
9  address a wide variety of logging-related activities including the maintenance of riparian buffers,
10  logging on steep slopes, timber harvest methods, building and maintenance of stream crossings,
11  and road construction and maintenance.

12    83.    "Class A" lands are those Fruit Growers' lands that are located in its Klamath
13  River and Scott Valley Management Units and that currently support or historically supported
14  SONCC coho salmon. For Class A lands the ACS requires Fruit Growers to comply with the
15  State of California's "Protection Measures in Watersheds with Coho Salmon," 14 CCR 936.9.1,
16  and California's "Measures to Facilitate Incidental Take Authorization in Watersheds with Coho
17  Salmon," 14 CCR 936.9.2.

18    84.    "Class B" lands are those Fruit Growers lands that are located in watersheds that
19  are within the historical range of SONCC coho salmon but that Fruit Growers concluded do not
20  currently support SONCC coho salmon and have little potential to do so in the future. For Class
21  B lands the ACS requires Fruit Growers to comply with California's "Protection Measures in
22  Watersheds with Coho Salmon."

23    85.    Class C lands are those Fruit Growers lands that are located above long-standing
24  barriers to anadromous fish or that have no direct connection to streams supporting anadromous
25  fish. On Class C lands the ACS requires Fruit Growers to comply with current California
26  forestry regulations.

27    86.    The ACS also requires Fruit Growers to comply with a Road Management Plan
28  on Class A and Class B lands. The Road Management Plan requires FGS to complete road

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 19

1  inventories on all Class A and B lands. A road inventory evaluates the potential of a logging
2  road to deliver sediment to streams. The Road Management Plan requires FGS to reduce the
3  potential for sediment delivery to streams from some roads. The Road Management Plan does
4  not require FGS to reduce the actual delivery of sediment to streams from any road.

5        87.     On five high-priority Class A lands, FGS must complete road inventories within
6  five years of issuance of the incidental take permits and then take steps to reduce the potential for
7  sediment delivery to streams from those roads by fifty percent within ten years of issuance of the
8  incidental take permits. On all other Class A lands FGS must complete road inventories within
9  ten years of issuance of the incidental take permits and then take steps to reduce the potential for
10  sediment delivery to streams from those roads by fifty percent within fifteen years of issuance of
11  the incidental take permits. On Class B lands the ACS requires Fruit Growers to inventory its
12  logging roads within fifteen years of issuance of the incidental take permits but does not require
13  Fruit Growers to take steps to reduce the potential for sediment delivery to streams from logging
14  roads. The Road Management Plan does not apply to Class C lands.

15       88.     There are at least two problems with the Road Management Plan: 1) it delays road
16  repairs in critical watersheds until after an expected spike in logging and timber hauling; and 2)
17  there is no way to know whether the Road Management Plan meets or will meet ESA
18  requirements.

19       89.     The Services anticipate that Fruit Growers will dramatically increase timber
20  harvest in the first ten years of incidental take permit coverage as compared to expected timber
21  harvest levels without the incidental take permits. Increased logging by Fruit Growers will result
22  in increased timber hauling by Fruit Growers. Increased timber hauling by Fruit Growers will
23  result in increased delivery of sediment to streams on or near FGS lands.

24       90.     Rather than reducing or eliminating the potential for sediment delivery to streams
25  before Fruit Growers increases its logging and timber hauling, the Road Management Plan
26  delays potentially helpful actions until after the increase in logging and timber hauling and
27  resulting harm to aquatic species. Fruit Growers could have done more in the HCP to reduce
28  sediment delivery from logging roads to streams. Section 10 of the ESA requires Fruit Growers

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20

1    to do more in the HCP to reduce sediment delivery from logging roads to streams.

2        91.    There is no way for NMFS to determine whether implementation of the Road
3    Management Plan meets or will meet ESA requirements. When NMFS issued the SONCC coho
4    salmon incidental take permit to Fruit Growers, it did not know how much sediment logging
5    roads or logging activities on Fruit Growers' lands were delivering to streams. When NMFS
6    issued the SONCC coho salmon incidental take permit to Fruit Growers it did not know the
7    extent of harm that sediment delivered to streams from Fruit Growers' logging roads or logging
8    activities was causing SONCC coho salmon.

9        92.    The Road Management Plan requires Fruit Growers to reduce the potential for
10   sediment delivery to streams from logging roads on Class A lands by fifty percent. But because
11   NMFS did not know how much sediment Fruit Growers' logging roads or logging activities were
12   delivering to streams when NMFS issued the incidental take permit, NMFS will never be able to
13   determine whether Fruit Growers has met that obligation. Similarly, because NMFS did not
14   know how much harm sediment from Fruit Growers' logging activities was causing listed fish,
15   NMFS could not determine whether Fruit Growers' actions would meet the requirements of the
16   ESA.

17       93.    The Road Management Plan itself demonstrates the problems with NMFS'
18   analysis. The fact that Fruit Growers needs to inventory its roads to determine where it needs to
19   reduce sediment delivery demonstrates that NMFS did not know: 1) where and how Fruit
20   Growers was polluting streams; 2) how that sediment pollution was affecting listed fish; 3) how
21   much reduction in sediment delivery would be required to minimize or eliminate harm to listed
22   fish; or 4) how much it would cost Fruit Growers to accomplish that reduction in sediment
23   delivery. Without that information NMFS had no basis for concluding: 1) that the ACS
24   minimizes and mitigates the impacts of the taking to the maximum extent practicable; or 2) that
25   the ACS will avoid jeopardy to listed fish.

26       94.    . The HCP does not include a monitoring program that will measure the effects of
27   implementation of the Road Management Plan on SONCC coho salmon habitat. To measure the
28   impacts of implementation of the HCP, the HCP includes effectiveness monitoring programs to

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 21

1  measure some impacts of implementation of the HCP on salmon habitat. The monitoring
2  programs in the HCP will not yield data that will allow Fruit Growers or NMFS to determine
3  whether Fruit Growers has reduced the delivery of sediment from logging roads to streams. The
4  fine sediment effectiveness monitoring program in the HCP, termed "channel substrate
5  monitoring," requires Fruit Growers to sample some streambeds annually for five years after
6  issuance of the incidental take permits. But because the Road Management Plan does not require
7  Fruit Growers to take steps to reduce the amount of sediment delivered from logging roads to
8  streams until ten to fifteen years after issuance of the incidental take permits, the sediment
9  effectiveness monitoring program in the HCP will not measure the effects of the implementation
10 of the Road Management Plan on SONCC coho salmon habitat.

11  95.  Even if monitoring of implementation of the HCP demonstrates that changes to
12 the HCP are necessary to avoid jeopardy to listed aquatic species, the Services may not require
13 changes to the HCP based on the results of that monitoring because the Implementation
14 Agreement grants "No Surprises" assurances to Fruit Growers. For example, the HCP limits
15 temperature increases in some waters, but NMFS cannot require any management changes if
16 monitoring demonstrates that the temperature limits have been exceeded.

17  96.  The HCP does not include an adaptive management program that requires Fruit
18 Growers to alter management of its lands in response to data about the impacts of logging on
19 listed species.

20  E.  The Public Review Process and the Services' Final Decisions Approving the
21     Incidental Take Permits.

22  97.  On November 13, 2009, the Services published in the Federal Register a notice
23 inviting public comment on a draft environmental impact statement ("DEIS") for Fruit Growers'
24 HCP, a draft HCP, and a draft implementation agreement. *Multi-species Habitat Conservation
25 Plan*, 74 Fed. Reg. 58602 (Nov. 13, 2009).

26  98.  By letter dated February 11, 2010, Region IX of the U.S. Environmental
27 Protection Agency ("EPA") submitted comments to the Services on the draft HCP and DEIS.
28 EPA's comments stated that the draft HCP raised "environmental concerns" and that the analysis

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 22

1  and conclusions contained in the DEIS were based on "insufficient information." Specifically,
2  EPA explained that streams in the Plan Area already suffered from impaired water quality caused
3  by sediment pollution, and requested that the Services "quantitatively model the impacts of
4  project alternatives on sediment delivery." EPA called for "road decommissioning and
5  maintenance, which are sediment controlling activities, to be pursued concurrent with, if not in
6  advance of, timber harvest and other sediment-loading activities." EPA also noted that the draft
7  HCP and DEIS relied on undisclosed financial targets as part of the application for the incidental
8  take permits.

9       99.    By letter dated February 11, 2010, the State of California's North Coast Regional
10  Water Quality Control Board ("the Board") submitted comments on the draft HCP and DEIS.
11  The Board stated that implementation of the draft HCP would cause Fruit Growers to violate the
12  Clean Water Act and a regional water quality control plan. The Board also noted that the draft
13  HCP's Road Management Plan—Operations Guide is "unclear and ambiguous" and that it
14  contained 19 specific flaws, including inconsistent or deficient road maintenance timelines,
15  inadequate erosion control measures, and lack of regulation of road-related landslides.

16       100.    By letter dated February 3, 2010, plaintiffs submitted comments on the DEIS,
17  draft HCP, and proposed implementation agreement to NMFS and the FWS. Plaintiffs'
18  comments raised numerous concerns with the draft HCP and DEIS, specifically including: 1)
19  FWS' improper reliance on Forest Service lands for the terrestrial species conservation strategy;
20  2) the lack of data and analysis supporting the aquatic species conservation strategy and road
21  management plan; 3) deficiencies in the HCP's monitoring programs; and 4) insufficient
22  cumulative effects analysis in the DEIS.

23       101.    On February 11, 2010, plaintiff Center for Biological Diversity submitted
24  additional comments focused on the failure of the DEIS and the HCP to address the impacts of
25  climate change over the 50-year term of the incidental take permits.

26       102.    Hundreds of plaintiffs' members also sent letters to the Services urging those
27  agencies to require greater protections for northern spotted owls and salmonids.

28       103.    In April 2012, FWS issued a biological opinion that analyzed some expected

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 23

1 impacts of implementation of the HCP on northern spotted owls, Pacific fisher, and Yreka phlox.

2     104.   The FWS assumed in its biological opinion that the Forest Service and private

3 landowners in the Klamath region would not log any suitable northern spotted owl habitat during

4 the 50-year term of Fruit Growers' ITP. The FWS assumed in its biological opinion that no

5 suitable northern spotted owl habitat would be lost to fire, blow-down, disease, or other natural

6 disturbances during the 50-year term of Fruit Growers' ITP. On page 105 of its biological

7 opinion the FWS states: "As part of the HCP development process, FGS worked with the Service

8 to produce a GIS layer that represents current northern spotted owl habitat in the Action Area

9 and the region." On page 106 of its biological opinion the FWS then states: "Habitat on Federal

10 and private non-FGS land over the term of the ITP is represented by the owl habitat layer to

11 avoid speculating on the types of changes that may occur on these lands over time."

12     105.   In its biological opinion, FWS concluded that implementation of the HCP is not

13 likely to jeopardize the continued existence of the northern spotted owl, impede that species'

14 recovery, or adversely modify designated critical habitat.

15     106.   FWS included an incidental take statement in its biological opinion on issuance of

16 the northern spotted owl incidental take permit to FGS. Although the FWS determined that Fruit

17 Growers was only likely to take 61 northern spotted owls during the permit term, the FWS'

18 incidental take statement authorizes the take of up to 83 northern spotted owls. The FWS

19 indicated "...that the take of owls will occur across the Action Area over the permit term and not

20 be based solely on the current activity centers."

21     107.   In May 2012, NMFS issued a biological opinion that analyzed some of the

22 expected impacts of implementation of the FGS HCP on salmonids. NMFS did not determine

23 how much sediment will be delivered to streams during implementation of the HCP. NMFS did

24 not determine how many listed fish would be adversely affected by implementation of the HCP.

25 NMFS did not evaluate the effects to salmonids that would occur during 3-5 year time periods.

26     108.   Instead NMFS considered environmental effects over the entire term of the HCP

27 before determining that habitat conditions would gradually improve during implementation of

28 the HCP. In doing so, NMFS relied upon its belief that Fruit Growers' would change its logging

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 24

.1  activities in response to data gathered during Fruit Growers' implementation of the monitoring.

2  programs in the HCP. The HCP does not require Fruit Growers to monitor sediment inputs or

3  water quality impacts contemporaneously with its logging activities. The HCP does not require

4  Fruit Growers to change its logging activities in response to monitoring results. The Services'

5  No Surprises policy prevents NMFS from forcing Fruit Growers to change its logging activities.

6  in response to monitoring data gathered under the HCP.

7      109.   NMFS concluded that the level of anticipated incidental take is not likely to

8  jeopardize SONCC coho salmon, Upper Klamath and Trinity Rivers Chinook salmon, or

9  Klamath Mountains Province steelhead.

10     110.   At the conclusion of its biological opinion NMFS issued an incidental take

11  statement that described its view of the expected level of incidental take resulting from

12  implementation of the HCP. On page 168 of the incidental take statement NMFS stated:

13  "NMFS cannot predict with any accuracy the degree to which stressors would result in exposure

14  that reduce the fitness levels of exposed individuals." The incidental take statement instead used

15  adverse impacts to habitat as a proxy for describing the authorized amount of incidental take.

16     111.   On June 22, 2012, the Services published in the Federal Register a notice inviting

17  public comment on the Final Environmental Impact Statement for the Fruit Growers HCP

18  ("FEIS"), the final HCP, and the final implementation agreement. *Multi-Species Habitat*

19  *Conservation Plan*, 77 Fed. Reg. 37656 (June 22, 2012).

20     112.   By letter dated August 6, 2012, on behalf of plaintiffs and other organizations, the

21  Washington Forest Law Center submitted to the Services comments on the FEIS, HCP,

22  implementation agreement, and biological opinions. Plaintiffs' August 6, 2012 comments raised

23  numerous concerns under ESA Sections 7 and 10 and specifically questioned the Services'

24  failure to assess the impacts of increased timber harvest during the first ten years of

25  implementation of the HCP; the Services' reliance on speculative and uncertain measures in the

26  HCP; and the Services' failure to provide financial information that the agencies were relying

27  upon as part of Fruit Growers' permit application.

28     113.   In November 2012, FWS and NMFS issued Records of Decision, which

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 25

1  documented completion of the NEPA analysis, and made the findings required by ESA Section
2  10.

3      114.  On November 27, 2012, FWS issued Fruit Growers Supply Company an
4  incidental take permit for northern spotted owls.

5      115.  On November 28, 2012, NMFS issued Fruit Growers Supply Company an
6  incidental take permit for Southern Oregon/Northern California Coasts coho salmon, Upper
7  Klamath and Trinity Rivers Chinook salmon, and Klamath Mountains Province steelhead.

8      116.  Issuance of the FEIS, records of decision, biological opinions, incidental take
9  statements, and incidental take permits, as well as the approvals of the HCP, all constitute "final
10  agency action" for purposes of judicial review under the APA.

11  ## VII.  CLAIMS FOR RELIEF

12  ### FIRST CLAIM FOR RELIEF

13  Violation of ESA Section 10 and the Administrative Procedure Act:

14  FWS's Unlawful Issuance of Incidental Take Permit

15  117.  Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

16  118.  Before issuing an incidental take permit, FWS must find that the expected taking
17  will be incidental; that the applicant will, to the maximum extent practicable, minimize and
18  mitigate the impacts of such taking; that the applicant has assured adequate funding for its
19  habitat conservation plan; and that the taking will not appreciably reduce the likelihood of the
20  survival and recovery of listed species in the wild. 16 U.S.C. § 1539(a)(2)(B).

21  119.  FWS's Section 10 findings on issuance of the incidental take permit to Fruit
22  Growers Supply Company are deficient for a variety of reasons, including but not limited to the
23  fact that the findings: 1) lack a rational connection between the facts found and the conclusions
24  made and lack support in the administrative record; 2) fail to consider all of the effects of the
25  agency action; 3) fail to consider short-term impacts to listed terrestrial species; 4) fail to
26  consider impacts on a timeframe relevant to the impacted species; 5) rely on measures that are
27  uncertain, speculative, voluntary, or to be carried out by a third party; 6) rely on flawed
28  environmental analyses in the Final Environmental Impact Statement and biological opinions; 7)

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 26

1  rely on financial and other information that was not disclosed to the public as required; 8) rely on
2  measures already in place as mitigation for the impacts of allowed incidental take; 9) fail to
3  consider alternatives with greater degrees of conservation benefit; and 10) incorrectly interpret
4  the relevant legal standards.

5     120.   FWS's Section 10 findings on issuance of the incidental take permit to Fruit
6  Growers Supply Company are therefore arbitrary, capricious and in violation of the
7  Administrative Procedure Act, 5 U.S.C. § 706(2), and the Endangered Species Act, 16 U.S.C. §
8  1539.

9                        SECOND CLAIM FOR RELIEF

10          Violation of ESA Section 7 and the Administrative Procedure Act:

11          FWS's Failure to Prepare a Legally Sufficient Biological Opinion

12     121.   Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

13     122.   The ESA requires the FWS to prepare a biological opinion that uses the best
14  scientific and commercial data available to evaluate whether issuance of an incidental take
15  permit is likely to jeopardize the continued existence of any endangered species or threatened
16  species or destroy or adversely modify designated critical habitat.

17     123.   FWS's biological opinion on issuance of the incidental take permit to Fruit
18  Growers Supply Company is deficient for a variety of reasons, including but not limited to the
19  fact that the biological opinion: 1) is not based on the best scientific and commercial data
20  available; 2) lacks critical information necessary to a rational conclusion and lacks support in the
21  administrative record; 3) lacks a rational connection between the facts found and the conclusions
22  made; 4) fails to consider all of the effects of the agency action; 5) fails to consider short-term
23  impacts to listed terrestrial species; 6) fails to consider impacts on a timeframe relevant to the
24  impacted species; and 7) relies on conservation measures that are uncertain, speculative,
25  voluntary, or to be carried out by a third party.

26     124.   The FWS's biological opinion on issuance of the incidental take permit to Fruit
27  Growers Supply Company is therefore arbitrary, capricious and in violation of the
28  Administrative Procedure Act, 5 U.S.C. § 706(2), and the Endangered Species Act, 16 U.S.C. §

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 27

1   1536.

2       125.   Because the FWS relied on a flawed biological opinion in issuing the incidental

3   take permit, and because the FWS relies on uncertain and voluntary mitigation to insure a lack of

4   jeopardy to a listed species, FWS has also violated its substantive obligations under the

5   Endangered Species Act, 16 U.S.C. § 1536(a)(2).

6                               THIRD CLAIM FOR RELIEF

7                   Violation of ESA Section 7 and the Administrative Procedure Act:

8               FWS's Failure to Prepare a Legally Sufficient Incidental Take Statement

9       126.   Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

10      127.   The Endangered Species Act requires the FWS to provide an incidental take

11  statement that sets forth a limit on the amount of authorized take. FWS can use habitat as a

12  proxy to limit incidental take only if the agency explains in the incidental take statement why it

13  was impracticable to state a numerical limit on take and only if the habitat limit is specific

14  enough that the agency can determine when it must reinitiate consultation.

15      128.   The FWS's incidental take statement for issuance of the incidental take permit to

16  the Fruit Growers Supply Company is deficient for a variety of reasons, including but not limited

17  to the fact that the incidental take statement: 1) lacks critical information necessary to a rational

18  conclusion and lacks support in the administrative record; 2) lacks a rational connection between

19  the facts found and the conclusions made; 3) sets a take limit that is higher than the amount of

20  take expected from implementation of the HCP; 4) fails to specify the location of allowed take;

21  5) establishes a take limit that the agency is unable to accurately measure to determine whether

22  and when it must reinitiate consultation; and 7) relies on conservation measures that are

23  uncertain, speculative, voluntary, or to be carried out by a third party.

24      129.   FWS's incidental take statement on issuance of the incidental take permit to Fruit

25  Growers Supply Company is therefore arbitrary, capricious and in violation of the

26  Administrative Procedure Act, 5 U.S.C. § 706(2), and the Endangered Species Act, 16 U.S.C. §

27  1536.

28                              FOURTH CLAIM FOR RELIEF

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 28

Violation of ESA Section 10 and the Administrative Procedure Act:

NMFS's Unlawful Issuance of Incidental Take Permit

130. Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

131. Before issuing an incidental take permit, NMFS must find that: 1) the expected taking will be incidental; 2) that the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; 3) that the applicant has assured adequate funding for its habitat conservation plan; and 4) that the taking will not appreciably reduce the likelihood of the survival and recovery of listed species in the wild. 16 U.S.C. § 1539(a)(2)(B).

132. NMFS Section 10 findings on issuance of the incidental take permit to Fruit Growers Supply Company are deficient for a variety of reasons, including but not limited to the fact that the findings: 1) lack support in the record; 2) lack a rational connection between the facts found and the conclusions made; 3) fail to consider all of the effects of the agency action on each species covered by the permits; 4) fail to consider short-term impacts to listed aquatic species; 5) fail to consider impacts on a timeframe relevant to the impacted species; 6) rely on measures that are uncertain, speculative, or voluntary; 7) rely on flawed environmental analyses in the Final Environmental Impact Statement and biological opinions; 8) rely on financial and other information that was not disclosed to the public as required; and 9) incorrectly interpret the relevant legal standards.

133. NMFS' Section 10 findings on issuance of the incidental take permit to Fruit Growers Supply Company are therefore arbitrary, capricious and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Endangered Species Act, 16 U.S.C. § 1539.

FIFTH CLAIM FOR RELIEF

Violation of ESA Section 7 and the Administrative Procedure Act:

NMFS's Failure to Prepare A Legally Sufficient Biological Opinion

134. Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

135. The ESA requires NMFS to prepare a biological opinion that uses the best scientific and commercial data available to evaluate whether issuance of an incidental take

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 29

1  permit is likely to jeopardize the continued existence of any endangered species or threatened
2  species or destroy or adversely modify designated critical habitat.

3      136.   NMFS' biological opinion on issuance of the incidental take permit to Fruit
4  Growers Supply Company is deficient for a variety of reasons, including but not limited to the
5  fact that the biological opinion: 1) is not based on the best scientific and commercial data
6  available; 2) lacks critical information necessary to a rational conclusion and lacks support in the
7  administrative record; 3) lacks a rational connection between the facts found and the conclusions
8  made; 4) fails to consider all of the effects of the agency action; 5) fails to consider short-term
9  impacts to listed aquatic species; 6) fails to consider impacts on a timeframe relevant to the
10 impacted species; 7) relies on measures that are uncertain, speculative, or voluntary; and 8) fails
11 to sufficiently analyze impacts to distinct evolutionarily significant units of salmonids.

12     137.   NMFS' biological opinion on issuance of the incidental take permit to Fruit
13 Growers Supply Company is therefore arbitrary, capricious and in violation of the
14 Administrative Procedure Act, 5 U.S.C. § 706(2), and the Endangered Species Act, 16 U.S.C. §
15 1536.

16     138.   Because NMFS relied on a flawed biological opinion in issuing the incidental take
17 permit, and because it relied on uncertain and voluntary mitigation to insure a lack of jeopardy to
18 a listed species, NMFS has also violated its substantive obligations under the Endangered
19 Species Act, 16 U.S.C. § 1536(a)(2).

20                            SIXTH CLAIM FOR RELIEF

21              Violation of ESA Section 7 and the Administrative Procedure Act:

22          NMFS's Failure to Prepare a Legally Sufficient Incidental Take Statement

23     139.   Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

24     140.   The Endangered Species Act requires NMFS to provide an incidental take
25 statement that sets forth a limit on the amount of authorized take. NMFS can use habitat as a
26 proxy to limit incidental take only if the agency explains in the incidental take statement why it
27 was impracticable to state a numerical limit on take and only if the habitat limit is specific
28 enough that the agency can determine whether and when it must reinitiate consultation.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30

141. NMFS incidental take statement for issuance of the incidental take permit to Fruit Growers Supply Company is deficient for a variety of reasons, including but not limited to the fact that it: 1) lacks critical information necessary to a rational conclusion and lacks support in the administrative record; 2) lacks a rational connection between the facts found and the conclusions made; 3) fails to sufficiently explain why a numerical take limit was impracticable; 4) fails to set forth a habitat surrogate with enough specificity to allow the agency to know whether and when it must reinitiate consultation; 5) fails to specify the authorized impacts to the differing habitats of each of the covered salmonid ESUs; 6) establishes a take limit that the agency is unable to accurately measure to determine whether reinitiation of consultation is required; and 7) relies on conservation measures that are uncertain, speculative, voluntary, or to be carried out by a third party.

142. NMFS' incidental take statement on issuance of the incidental take permit to Fruit Growers Supply Company is therefore arbitrary, capricious and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the Endangered Species Act.

### SEVENTH CLAIM FOR RELIEF

Violation of ESA Section 10 and the Administrative Procedure Act:

The Service's Failure to Disclose Application Materials

143. Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

144. The Endangered Species Act requires the Services to make available to the public at every stage of the proceeding all information received by the Services as part of an application for an incidental take permit. 16 U.S.C. §§ 1539(a)(2)(B), (c).

145. FWS and NMFS violated the Endangered Species Act by failing to provide the public with an opportunity to review and comment upon all information received by the Services as part of Fruit Growers application for incidental take permits, including financial data and targets that Fruit Growers provided to the Services and that the Services relied upon in their decisions to issue incidental take permits to Fruit Growers.

146. The Services' issuance of incidental take permits to Fruit Growers Supply Company are therefore arbitrary, capricious and in violation of the Administrative Procedure

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 31

Act, 5 U.S.C. § 706(2), and the Endangered Species Act, 16 U.S.C. § 1539.

EIGHTH CLAIM FOR RELIEF

Violation of NEPA and the Administrative Procedure Act:

Failure to Disclose Environmental Information

and Consequences of the Proposed Action

147.    Plaintiffs allege and incorporate by reference all of the preceding paragraphs.

148.    NEPA requires the Services to disclose and analyze the environmental effects of issuing incidental take permits to the Fruit Growers Supply Company before the Services issue incidental take permits.  40 C.F.R. § 1500.1(b).

149.    The Final EIS and Record of Decision for the HCP fail to disclose key pieces of information and thereby make an accurate assessment of the environmental consequences of the proposed project impossible.

150.    For example, the Final EIS expressly does not disclose financial information about FGS, its harvest plans, business models, and other information that are necessary to determine whether the minimal beneficial aspects of the HCP will be funded and implemented.

151.    The Final EIS also fails to quantify the direct, indirect, and cumulative impacts of the HCP on natural resources, instead only conducting a comparative analysis to the status quo, which precludes meaningful analysis of the environmental impact of the proposed action.

152.    The Services' failure to disclose the quantitative impact of the proposed action on the natural resources in the planning area is arbitrary, capricious and in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the National Environmental Policy Act.

NINTH CLAIM FOR RELIEF

Violation of NEPA and the Administrative Procedure Act:

Failure to Consider the Cumulative Impacts of the Proposed Action

153.    Plaintiffs incorporate by reference all preceding paragraphs.

154.    The Services are required to discuss the direct, indirect, and cumulative effects of the proposed action on the environment.  40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25(c)(3), 1508.27(b)(7).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 32

1    155.   Cumulative effects are defined as "the impact on the environment which results
2    from the incremental impact of the action when added to other past, present, and reasonably
3    foreseeable future actions regardless of what agency (Federal or non-Federal) or person
4    undertakes such other actions. Cumulative impacts can result from individually minor but
5    collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

6    156.   There are several "incidental" activities covered under the HCP that are not
7    analyzed in the Final EIS that are likely to have synergistic effects on the environment.

8    157.   For example, the Services and FGS expect that "changed and unforeseen
9    circumstances" may occur during the 50 year life of the HCP, but those circumstances are not
10   discussed or analyzed in the Final EIS or Record of Decision.

11   158.   FGS also expects to apply herbicides to its lands and withdraw water for various
12   applications, but those synergistic effects – especially on salmonids – are not discussed or
13   analyzed in the Final EIS or Record of Decision.

14   159.   The effects of adjacent federal timber harvest on the Klamath National Forest, as
15   well as other private land harvest, are not discussed or analyzed in the Final EIS or Record of
16   Decision.

17   160.   The Services' failure to discuss all the direct, indirect, and cumulative effects of
18   the proposed action on the environment in the planning area is arbitrary, capricious and in
19   violation of the Administrative Procedure Act, 5 U.S.C. § 706(2), and the National
20   Environmental Policy Act.

21                        **VIII.   PRAYER FOR RELIEF**

22   Plaintiffs respectfully request that this Court:

23   A:     Declare that the Services' Final Environmental Impact Statement, Records of
24   Decision, Biological Opinions, Incidental Take Statements, ESA Section 10 Statements of
25   Findings and Recommendations, and issuance of Incidental Take Permits to the Fruit Growers
26   Supply Company violate the Endangered Species Act, the National Environmental Policy Act,
27   the Administrative Procedure Act, and their implementing regulations;

28   B.     Vacate and remand back to the Services the Final Environmental Impact

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33

1  Statement, Records of Decision, Biological Opinions, Incidental Take Statements, ESA Section

2  10 Statements of Findings and Recommendations, and Incidental Take Permits issued to the

3  Fruit Growers Supply Company;

4      C.    Enjoin the Services and its agents from taking any action previously authorized by

5  the Final Environmental Impact Statement, Records of Decision, Biological Opinions, Incidental

6  Take Statements, ESA Section 10 Statement of Findings and Recommendations, and Incidental

7  Take Permits at issue in this case unless and until the violations of federal law set forth herein

8  have been corrected to the satisfaction of this Court;

9      D.    Order the Services to carry out and/or require remedial relief for any harm to

10  species already caused by implementation of the HCP;

11      E.    Award Plaintiffs their costs of suit and attorneys' fees; and

12      F.    Grant Plaintiffs such other and further relief as the Court deems just and

13  equitable.

14

15  Dated: August 12, 2013                          Respectfully submitted,

16

17

18                                                 Tim Ream

19

20                                                 *Attorneys for Plaintiffs*

21

22                                                 TIM REAM, CA BAR #283971
                                                   Center for Biological Diversity
23                                                 351 California Street, Suite 600
                                                   San Francisco, CA 94104
24                                                 (415) 632-5315
                                                   tream@biologicaldiversity.org
25

26                                                 SUSAN JANE BROWN, OSB #054607
                                                   JOHN MELLGREN, OSB # 114620
27                                                 Western Environmental Law Center
                                                   1216 Lincoln Street
28                                                 Eugene, OR 97401

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 34

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(541) 485-2471
brown@westernlaw.org
mellgren@westernlaw.org

PAUL KAMPMEIER, WSBA #31560
WYATT GOLDING, WSBA #44412
Washington Forest Law Center
615 Second Avenue, Suite 360
Seattle, WA 98104
(206) 223-4088
pkampmeier@wflc.org
wgolding@wflc.org

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 35

# EXHIBIT 1



## WASHINGTON FOREST LAW CENTER

615 Second Avenue, Suite 360
Seattle, WA 98104
www.wflc.org

Tel: 206.223.4088
Fax: 206.223.4280

April 19, 2013

**Via Certified Mail—Return Receipt Requested—Nos. 7001 0110 0002 2257 9798,**
**7011 0110 0002 2257 9828, 7011 0110 0002 2257 9811, 7011 0110 0002 2257 9804**

Dr. Rebecca M. Blank
Deputy Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, D.C. 20230

Ms. Sally Jewell
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Dr. Kathryn D. Sullivan, Administrator
National Oceanic and Atmospheric Administration
1315 East West Highway
Silver Spring, MD 20910

Mr. Daniel Ashe, Director
U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, D.C. 20240

Dear Deputy Secretary Blank, Secretary Jewell, Administrator Sullivan, and Director Ashe:

We represent the non-profit conservation organizations Klamath-Siskiyou Wildlands Center, PO
Box 102, Ashland, OR 97520, the Center for Biological Diversity, 351 California Street, Suite
600, San Francisco, CA 94104, and the Klamath Forest Alliance, PO Box 21, Orleans, CA
95556. This letter provides you, the U.S. Department of Commerce, the U.S. Department of the
Interior, the National Oceanic and Atmospheric Administration, the National Marine Fisheries
Service, and the U.S. Fish and Wildlife Service with notice that Klamath-Siskiyou Wildlands
Center, the Center for Biological Diversity, and the Klamath Forest Alliance (collectively,
"Conservation Groups") intend to file a citizen suit alleging claims against you under the
Endangered Species Act, 16 U.S.C. § 1540. The Conservation Groups will also allege additional
claims against you under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, for violations

1

of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.*, and the National Environmental Policy Act, 42 U.S.C. § 4321, *et seq.* Because the U.S. Department of the Interior delegated responsibility for administering the Endangered Species Act to the U.S. Fish and Wildlife Service, and because the U.S. Department of Commerce delegated responsibility for administering the Endangered Species Act to the National Marine Fisheries Services, you, the U.S. Department of the Interior, the U.S. Fish & Wildlife Service, the National Oceanic and Atmospheric Administration, and the National Marine Fisheries Services are collectively referred to herein as the "Services." As described below, the Conservation Groups intend to sue the Services for numerous alleged violations of the Endangered Species Act arising from the Services' approval of a habitat conservation plan ("HCP") and issuance of incidental take permits ("ITPs") to the Fruit Growers Supply Company ("FGS").

The Conservation Groups intend to challenge the approval of the HCP because implementation of the HCP will allow immediate increases in impacts to barely surviving ecosystems in exchange for promises of speculative conservation benefits decades in the future. The imperiled species of northern California cannot afford to be further sacrificed for short-term revenue gains. While the approval of the HCP as written violates the ESA, the Conservation Groups intend that this letter serve as both a notification that we are prepared to file suit and an invitation to engage in productive discussions. We welcome the opportunity to work with the Services and FGS to improve the HCP and increase protection of public resources.

## I. Introduction and Factual Background.

### A. Fruit Growers Supply Company's History of Unsustainable Logging.

The land at issue is 152,178 acres of forestland owned by Fruit Growers Supply Company in northern California (the "Plan Area").[1] The Plan Area is broken into three management units in three different watersheds: the Klamath River Management Unit in the Klamath River watershed; the Grass Lake Management Unit in the Shasta River watershed; and the Scott Valley Management Unit in the Scott River watershed. The Plan Area consists of mid- to high-elevation mixed conifer forests, predominantly made up of Douglas-fir, White Fir, and Montane hardwood. Those forests include mature stands that serve as nesting, foraging, and dispersal habitat for threatened northern spotted owls. The streams that run through the property provide habitat for threatened Southern Oregon/Northern California Coast Coho salmon, as well as for declining runs of Upper Klamath and Trinity Rivers Chinook salmon and Klamath Mountains Province steelhead. Myriad other species, including the West Coast distinct population segment of the fisher (determined by U.S. Fish and Wildlife Service to warrant listing under the ESA, *see* 69 FR 18770), inhabit the Plan Area.

FGS has long carried out commercial timber harvest operations in the Plan Area, including logging, log sorting, log hauling, road construction, road maintenance, chemical application, and construction of stream crossings. The legacy of FGS' management is a patchwork of clearcuts, plummeting populations of protected species, and streams impaired for sediment, dissolved oxygen, and temperature. As described in the U.S. Fish and Wildlife Service ("FWS") incidental

---

[1] The HCP and associated referenced documents are available at http://www.fws.gov/yreka/Information.html. A map of the plan area is provided at Fig. 4-1 of the HCP.

take statement, FGS has already likely violated the Endangered Species Act: "many of the [northern spotted owl] activity centers in the Action Area currently have less habitat than what is currently understood to be the minimum required to avoid take."[2] Dozens of northern spotted owl activity centers on the FGS property "are deficient in nesting/roosting and foraging habitat as a result of multiple harvest entries over the past 25 year[s]."[3] The main stems of the Scott and Klamath Rivers are lethal to salmonids in the summer and fall due to elevated temperatures.[4] The Scott River is already on the 303(d) listed for sediment and temperature, and the Clean Water Act requires that there be no additional input of sediment into the Klamath. Some watersheds in the Plan Area contain over seven miles of logging road per square mile, which is greater than the density of highways and arterial streets in the San Francisco metropolitan area.[5]

FGS' history of aggressive timber harvest has been both biologically and economically unsustainable. FGS has aggressively logged its holdings until there is little unprotected forest remaining on the Plan Area.[6] The Draft EIS admits as much, stating that "[o]ver time, it is expected that overall harvest levels would decrease as insufficient timber volume would remain on the forest landscape to maintain current harvest levels."[7] Faced with a reduction in timber supply resulting from decades of unsustainable harvest driven by short-term profits, FGS has not reduced its harvest levels. Instead, FGS developed plans to increase logging in the Plan Area, and sought immunity from the Endangered Species Act's take prohibition in order to do so. The HCP process at issue in this letter followed.

B. The Habitat Conservation Plan Allows Increased Logging in an Already Heavily Impaired Landscape.

In 2008, FGS submitted applications to both FWS and NMFS for 50-year incidental take permits covering the take of species by timber harvest activities in the Plan Area. 73 Fed. Reg. 9776 (February 22, 2008). The company requested coverage from FWS for northern spotted owl and Yreka phlox, and from NMFS for the Southern Oregon/Northern California Coasts Coho salmon Evolutionarily Significant Unit ("ESU"). The company also requested coverage under the ITP for the unlisted Klamath and Trinity Rivers Chinook salmon ESU and the Klamath Mountains Province steelhead ESU. Should these unlisted covered species become listed under the ESA during the term of the permit, take authorization for those species would become effective upon

---

[2] FWS BiOp at 187.

[3] FWS Findings at 7-8.

[4] Belchik, Michael, 2003. *Use of Thermal Refugial Areas on the Klamath River by Juvenile Salmonids; Summer 1998*, available at:
http://www.yuroktribe.org/departments/fisheries/documents/thermalrefugiareportFINAL1998_000.pdf.

[5] The FEIS provides road density information at 3-11. The well-established link between logging road density and impacts to water quality and salmonids is described in the linked report prepared for the EPA:
http://wildlandscpr.org/files/Forest%20Road%20BMP%20final%20report%2012%2004%2008%20rev1%20%283%29.pdf. The road density in some watersheds on FGS lands is greater than in any major metropolitan area in the United States, except for Los Angeles and Detroit. *See* Figure 4.1,
http://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG748.pdf.

[6] DEIS, at 4-55.

[7] DEIS, at 2-3.

listing. Accordingly, the Services must process an incidental take permit application for unlisted species as if those species were currently listed.[8]

In 2009, FWS and NMFS published notification of the availability of a draft environmental impact statement ("DEIS") and HCP in the Federal Register for public notice and comment at 74 Fed. Reg. 58602. The Conservation Groups submitted several comment letters explaining their opposition to issuance of the ITPs, providing recommendations for changes to the HCPs, and raising many concerns with the lack of analysis in the DEIS. The United States Environmental Protection Agency also commented, noting that the DEIS provided "no information on FGS' ability to sustainably manage the forest stands on its ownership." EPA further described the already heavily impaired water quality conditions in the Plan Area, and requested that NMFS provide quantitative modeling demonstrating how the HCP would not further violate TMDL sediment allocations.[9] The California Regional Water Quality Control Board predicted that the HCP will allow violation of the Clean Water Act and the basin management plans.[10]

In 2012, FWS and NMFS published notification of the availability of the Final EIS ("FEIS") and HCP, at 77 Fed. Reg. 37656. The revised EIS and HCP contained few substantive changes. The Washington Forest Law Center, on behalf of the Conservation Groups, submitted a comment letter explaining violations of the ESA that would result from approval of the HCP as written.

In November of 2012, FWS and NMFS completed some of the findings required by ESA Section 10 and recommended issuance of ITPs. The Services also issued Records of Decision explaining the choice of the HCP from a set of alternatives. FWS issued the ITP for Yreka phlox and northern spotted owls on November 27, 2012, and NMFS issued the ITP for three ESUs of salmonids on November 28, 2012.

The HCP operates by trading significant increases in short-term environmental impacts in exchange for some conservation measures that may, or may not, provide increased protections late in the permit term. Without the HCP, FGS would not be able to take any northern spotted owls, while with the HCP FGS is allowed to take up to 83 owls (approximately half of the existing population in the Plan Area) within the first ten years of implementation. Similarly, the HCP allows immediate increases in logging and hauling in exchange for a commitment to conduct road inventories and potential sediment reduction ten to fifteen years into permit implementation. The Conservation Groups plan to sue the Services because allowing certain, intense, short-term impacts to already vulnerable species in exchange for speculative long-term benefits is a bad deal for the species and violates the ESA.

## II.  Legal Claims Arising Under the Endangered Species Act.

The citizen-suit provision of the ESA, 16 U.S.C. § 1540(g), requires that a potential plaintiff provide notice of violations of the ESA to the Secretary and any violator at least 60-days prior to filing suit in district court. 16 U.S.C. § 1540(g)(2)(A). The notice letter requirement only

---

[8] 50 C.F.R. § 17.3; *see also* "Habitat Conservation Planning and Incidental Take Permit Processing Handbook" at 4-4, available at http://www.nmfs.noaa.gov/pr/pdfs/laws/hcp_handbook.pdf.

[9] FEIS Vol. II at 210-15.

[10] FEIS Vol. II at 232-36.

pertains to claims that must be brought under the citizen-suit provision; it does not apply to violations of the ESA subject to challenge via the Administrative Procedure Act ("APA"). *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124-25 (9th Cir. 1997); *Or. Natural Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 850 (9th Cir. 1987). While the Conservation Groups provide full notice of all of the described claims as ESA violations subject to citizen suit, we may ultimately bring some of the described claims, as well as additional claims, under the APA.

A.  Violations of ESA Section 7, 16 U.S.C. § 1536(a)(2).

ESA Section 7 imposes a substantive obligation on each Federal agency to "insure that any action authorized, funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary…to be critical." 16 U.S.C. § 1536(a)(2).

FWS' approval of the HCP and issuance of the associated ITP violates Section 7 of the ESA because implementation of the permit will jeopardize the continued existence of the northern spotted owl and adversely modify designated northern spotted owl critical habitat. Allowing the take of 83 owls in a short time period will likely cause the exacerbation of an ongoing genetic bottleneck and result in jeopardy to the species.[11] Allowing logging on the borders of designated critical habitat on federal lands will fragment that habitat and impact its ability to support northern spotted owls.

NMFS' approval of the HCP and issuance of the associated ITP will jeopardize the continued existence of the Southern Oregon/Northern California Coasts Coho salmon. Conditions in many streams in the Plan Area are already lethal to the species for much of the year. Allowing increased hauling and timber harvest in riparian areas and on steep slopes will increase the temperature and sediment in streams in the Plan Area and downstream of the Plan Area. The HCP would provide insufficient protection even if conditions remained static for the fifty-year permit term. But temperatures are likely to rise over the coming decades, and by NMFS' own admission, the riparian buffers provided in the HCP are insufficient to provide functional habitat in a warming climate.[12] Increasingly degraded habitat conditions will cause jeopardy to the Southern Oregon/Northern California Coasts Coho salmon.

The Services also violated Section 7 of the ESA by relying on mitigation that is uncertain, voluntary, and/or speculative. The text of Section 7(a)(2) requires that the Services "insure" that jeopardy will not occur, which means that any mitigation included in the Services' jeopardy analysis must be reasonably certain to occur. The Services may not rely on the unenforceable actions of others to avoid jeopardy. *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987). In conducting Section 7 analyses, the Services unlawfully relied on uncertain measures, including but not limited to: the development of an uncertain, yet to be determined "Maximum Sustainable Production" analysis under California state law; unspecified reductions in

---

[11] *See Genetics Show Current Decline and Pleistocene Expansion in Northern Spotted Owls* (Funk et al., 2008), available at http://pubs.usgs.gov/of/2008/1239/.
[12] NMFS BiOp at 160.

clearcutting of dispersal habitat; voluntary conservation measures by the permittee; a road maintenance plan with ambiguous and voluntary prescriptions; and monitoring programs that cannot result in mandatory management changes due to the Services' "no surprises" policy. To the extent that the Services relied on uncertain measures in their approval of the HCP, that reliance also constitutes a violation of Section 10 of the ESA, as detailed below.

Finally, the Services violated Section 7(a)(2) by not considering short-term impacts to the affected species. In order to insure a lack of jeopardy, the Services must consider impacts on a time scale appropriate to the lifespan of the species and the expected future habitat conditions. *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005); *Pacific Coast Fed'n of Fishermen's Ass'ns v. National Marine Fisheries Service*, 265 F.3d 1028, 1037 (9th Cir. 2001); *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 935-936 (9th Cir. 2008). NMFS violated the ESA by failing to consider short-term impacts of increased logging and hauling on the already impacted salmonids, and FWS violated the ESA by failing to consider short-term impacts of increased logging of northern spotted owl habitat. The Services unlawfully considered average impacts over time. To the extent that the Services failed to consider short-term impacts in their approval of the HCP, that reliance also constitutes a violation of Section 10 of the ESA, as detailed below.

B. Violations of ESA Section 10, 16 U.S.C. § 1539.

Section 10 of the ESA establishes the process that the applicant and the Services must follow in developing an HCP and the standards that the Services must apply in determining whether to approve an HCP and issue an associated ITP. After providing opportunity for public comment on the entire application, 16 U.S.C. § 1539(c), the Secretary must make a series of findings, a subset of which are at issue here. The Secretary must find that: "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," "the applicant will ensure that adequate funding for the plan will be provided," and "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild." 16 U.S.C. 1539(a)(2) (B)(ii)-(iv). The Secretary must also receive adequate assurances that the HCP will be fully implemented. 16 U.S.C. § 1539(a)(2)(B). Finally, prior to permit approval, the Secretary must publish findings in the Federal Register that the applicant exercised good faith, that that the permit will not disadvantage the species, and that the permit complies with the broad policy goals of the ESA. 16 U.S.C. § 1539(d).

This section proceeds by detailing the violations of ESA Section 10 committed by FWS and NMFS in the order that the applicable provision appears in the ESA.

### 1. The Services failed to provide public notice and comment on the entire FGS application.

The ESA requires the potential permittee to submit an application detailing "what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps." 16 U.S.C. § 1539(a)(2)(A)(ii). The ESA then requires the Secretary to make the information in the application available for public comment prior to making the required findings. 16 U.S.C. § 1539(a)(2)(B). Section 10(c) emphasizes that "Information received by the

Secretary as a part of any application shall be available to the public as a matter of public record at every stage of the proceeding." 16 U.S.C. 1539(c). By approving the HCP, the Services allow FGS to reap private profit while imposing significant adverse impacts on public resources such as clean water and intact ecosystems. Both the ESA and sound public policy require the public to have a full and fair opportunity to ensure that the implementation of the permit will actually occur, that public resources will be protected to the greatest extent practicable, and that the implementation will actually provide the maximum mitigation practicable.

The Services violated Section 10 by either not requiring FGS to submit a complete application, or by failing to provide public notice and comment on the aspects of FGS' application for an HCP relating to the "adequate funding" finding, 16 U.S.C. 1539(a)(2)(B)(iii), the "minimize and mitigate" finding, 16 U.S.C. 1539(a)(2)(B)(ii), and the finding that FGS will implement the HCP, 16 U.S.C. § 1539(a)(2)(B).

In regards to the findings that FGS would both adequately fund and implement the HCP, the Services claim to have completed an independent financial analysis of FGS' ability to fund the HCP based on timber revenues over time. However, the Services never provided the data analyzed or the referenced analysis for public comment. Because the Services did not publicize those portions of the application, it is impossible for the public and the Conservation Groups to know if the application was complete or whether it formed a reliable basis for the Services' findings. The fact that FGS' unsustainable business model is likely the very reason for the HCP application makes the lack of disclosure all the more troubling. The Conservation Groups are not alone in our concerns about lack of transparency in the permit approval process. In comments on the DEIS, EPA Region IX decried the apparent reliance on financial data in the Section 10 findings without publication of that data.[13] The failure to disclose some portion of the application necessary for approval violated the public notice and comment requirement. 16 U.S.C. § 1539(a)(2)(B); 16 U.S.C. § 1539(c); *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002).

The Services' failure to publish the entire application further violates the ESA by undermining public comment on the minimization and mitigation findings, because the analyses to make those findings relied on undisclosed financial information. In making the finding on whether the HCP minimizes and mitigates impacts to the maximum extent practicable, FWS found that: 1) a certain amount of harvest is necessary to meet financial targets and maintain the viability of the company; 2) that attaining those targets by logging northern spotted owl habitat would allow the company to log less across the Plan Area, providing conservation benefits; and 3) that financial constraints rendered further minimization and mitigation impracticable. For example, when determining whether FGS met the HCP approval criteria, FWS considered "the benefit to the Covered Species that would be provided by additional economic investment (i.e., the biological value of the next increment of mitigation relative to the economic cost of implementation)," and did not require additional protections because "providing additional Conservation Support Areas ("CSAs") could compromise the long-term sustainability of forest management in the Plan Area by unnecessarily restricting timber harvest in these areas."[14] Those conclusions rely on information not available to the public, which made it impossible for the Conservation Groups to fully comment on the HCP and IA. Similarly, NMFS violated the ESA by relying on disclosed

---

[13] FEIS Vol. II at 210-11.
[14] HCP at 9-14 to 9-15.

financial information in its minimization and mitigation findings. NMFS determined that the riparian buffer prescriptions, sediment controls, road management plan, and monitoring efforts would require "substantial monetary commitment by FGS," and that those plans were the maximum practicable because additional investment "could compromise FGS' ability to sustainably manage the forest stands on its ownership."[15]  Finally, the Services' failure to disclose financial data undermines the required finding that FGS will implement the HCP, 16 U.S.C. § 1539(a)(2)(B), because implementation of the HCP relies on projected continued revenues from timber harvest.

### 2. The Services violated ESA Section 10(a)(2)(B)(ii) by relying on uncertain mitigation.

In making findings under Section 10, the Services unlawfully relied on mitigation measures that are uncertain, speculative, and/or voluntary. Section 10(a)(2)(B)(ii) requires the Secretary to make a finding that the "the applicant **will**, to the maximum extent practicable, minimize and mitigate the impacts of such taking." 16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added). Two district court cases have held that minimization and mitigation measures must be certain to occur. In *Southwest Center for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118 (S.D. Cal. 2006), FWS approved an ITP that relied in part on commitments to "avoid" vernal pool habitat.  The Court rejected reliance on these commitments as mitigation because they were "uncertain," "inadequate," and allowed the permittee to define the scope of the obligation. 470 F. Supp. at 1141. Similarly, *Sierra Club v. Babbit*, 15 F. Supp. 2d 1274 (S.D. Al. 1998) provides, in the context of mitigation, that the FWS' reliance on speculative future mitigation by others does not satisfy ESA mandates. 15 F. Supp. at 1282 (citing *Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987); *NWF v. Coleman*, 529 F.2d 359 (5th Cir. 1976) *cert. denied*, 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587; *Southwest Center for Biological Diversity v. Babbitt*, 939 F. Supp. 49 (D.D.C. 1996)).  Similarly, the "jeopardy" analysis of Section 10(a)(2)(B)(iii) requires that the Services only rely on certain mitigation. *See Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir. 1987). The violations described in this section of the letter also constitute violations of ESA Section 7 where reliance on the same uncertain and/or voluntary measures was incorporated in the Biological Opinions.

FWS violated Section 10 by relying on uncertain mitigation in the Section 10 Findings, including, but not limited to, reliance on voluntary timber harvest projections and on protection of northern spotted owl habitat extending beyond the life of the permit.  FWS explicitly relies on the "changes in timber management practices identified in the proposed HCP" that are expected to increase foraging and dispersal habitat across FGS lands due to a "decrease in clearcutting and other even-aged management practices."[16]  However, the HCP contains no restrictions outside of owl CSAs and riparian buffers, and suggests only that FGS "promote forest management practices that develop and maintain dispersal habitat."[17]  This reliance on speculation that FGS will reduce logging elsewhere as a result of gaining access to log suitable NSO habitat is unlawful, because the HCP only uses voluntary terms such as "promote" and "indicate" rather than firm, certain requirements.

---

[15] HCP at 9-11 to 9-12.

[16] USFWS Findings at 8.

[17] HCP at 5-44.

FWS further violated the ESA by relying on the development of forest stands in "Conservation Support Areas" that will not provide northern spotted owl habitat until the very end of the permit term. In order for this mitigation to actually provide conservation benefit, FGS must voluntarily either renew the permit or continue to protect that habitat after the permit term is complete, neither of which is required by the terms of the HCP.

NMFS violated Section 10 by relying on uncertain mitigation in the Section 10 Findings, including, but not limited to, reliance on monitoring programs without adaptive management and on voluntary commitments to reduce harvest levels and hauling in the future. In the Section 10 Findings, NMFS relies on monitoring programs that will only result in conservation benefit through voluntary measures.[18] The HCP's effectiveness monitoring program evaluates whether biological goals of the HCP are being met, and includes ongoing study of water temperature, LWD recruitment, fine sediments, and channel morphology. The programs are represented in charts, which describe the objectives as demonstrating that the HCP's goals have been met.[19] However, the IA, 4.2.2, extends "No Surprises" assurances to the permittee, which means that the Services may not impose additional mitigation measures without the consent of the permittee. 50 C.F.R. 17.22(b)(5); 50 C.F.R. 17.32(b)(5). Those assurances render any response to monitoring voluntary and reliance on voluntary mitigation violates the ESA.

NMFS further violated Section 10 by relying on the uncertain mitigation required for reduction of road-related erosion and sediment. The HCP provides for a one-time sediment reduction after ten to fifteen years of permit implementation.[20] It is uncertain what minimization and mitigation will occur before or after that sediment reduction. Any minimization rests on a future, harvest plan-by-harvest plan subjective assessment of existing conditions. The prescriptions required are almost entirely at the discretion of the permittee: "FGS will develop reasonable and feasible erosion prevention and control prescriptions for each source of treatable erosion that is identified in the field."[21] Fish passage barriers must only be identified, but because there is no requirement to remove them, any mitigation provided is voluntary.[22] Periodic inspections are required, but resulting maintenance occurs at the discretion of the permittee within three to five years.[23] Efforts to reduce road density are entirely aspirational, as the HCP states that FGS will "use existing roads wherever feasible" and "strive to minimize total mileage" but fails to include maps of the roads, limits on new road construction, limits on overall road density, or requirements to decommission unused roads. Because NMFS relied on the erosion and sediment control measures in the HCP to make Section 10 findings, but those measures are uncertain and voluntary, NMFS violated ESA Section 10.

---

[18] NMFS Findings at 8.

[19] HCP table 7-1.

[20] HCP at 5-31.

[21] HCP at 5-32.

[22] HCP at 5-32, B-4; *see also* FEIS Vol. II at 209 (EPA comments).

[23] HCP at B-25.

### 3. The HCP does not "to the maximum extent practicable, minimize and mitigate the impacts of the taking" as required by 16 U.S.C. § 1539(a)(2)(B)(ii).

FWS violated the ESA in concluding that the FGS HCP will minimize and mitigate the impacts of the taking of northern spotted owls to the maximum extent practicable. The FWS' conclusion that preserving only 24 out of 82 northern spotted owl activity centers in the Action Area fully minimizes and mitigates for the allowed take lacks basis in the record. The take of approximately half of a population of a threatened species within a decade does not minimize impacts to the maximum extent practicable because it allows dramatically greater impacts than what is otherwise allowed under State and federal law. Moreover, FWS appears not to have separately considered minimization and mitigation, as required by the language of the ESA. 16 U.S.C. § 1539(a)(2)(B)(ii) ("minimize **and** mitigate") (emphasis added).

FWS employed a series of algorithms that measured the conservation value of the "Conservation Support Areas" against the northern spotted owl habitat to be logged under the HCP. The Conservation Groups do not agree with that methodology or the results. But regardless of the methodology, the FWS analysis is flawed because it does not address whether FGS will mitigate to the maximum extent practicable. Mitigation requires sufficient affirmative habitat replacement and development steps.[24] FWS violated the ESA Section 10 by not finding that the FGS HCP "to the maximum extent practicable," will "mitigate the impacts" of the allowed take. 16 U.S.C. § 1539(a)(2)(B)(ii).

NMFS violated the ESA in concluding that reducing potential sediment on logging roads would minimize and mitigate the impacts of taking. There is no basis in the record justifying the choice of a fifty percent reduction of potential sediment as the target. *See National Wildlife Federation v. Babbitt*, 128 F. Supp. 2d 1274, 1292 (E.D. Cal. 2000) (holding that the Service must consider an alternative involving greater mitigation in order to determine whether the HCP provides the maximum practicable); *see also Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1282 (S.D.Ala.1998) ("The Administrative Record must contain some analysis of why the level or amount [of mitigation] selected is appropriate for the particular project at issue."). The other road management measures are vague and substantially similar to what is already required. NMFS provided no modeling or quantitative analysis to demonstrate projected decreases in sediment over the permit term. NMFS' lack of rationale, data, modeling, or analysis violated the ESA because it is impossible to rationally conclude that impacts were minimized or mitigated to the maximum extent practicable without understanding what those impacts are.

Both NMFS and USFWS violated the ESA by only requiring minimization and mitigation well after the taking occurs. While the HCP allows extensive take of listed species in the first decade of implementation, many of the "Conservation Support Areas" will only develop into habitat until much later in the permit term. Similarly, sediment reduction measures and road management will not occur until years after the greatest impacts to imperiled fish species. As the EPA noted in comments, the Services should have required FGS to decommission and maintain roads concurrently with, or in advance of, timber harvest.[25] While future habitat development and

---

[24] The HCP Handbook, 3-21 to 3-22, discusses habitat replacement mitigation as affirmative actions, with examples such as habitat acquisition and restoration.

[25] FEIS Vol. II at 209-10.

sediment reduction may provide conservation benefits, it is not directly related to "the impacts of such taking," as is required by the ESA. 16 U.S.C. § 1539(a)(2)(B)(ii).

### 4. NMFS did not find that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild" for each covered ESU as required by ESA Section 10(a)(2)(B)(iii) and ESA Section 7(a)(2).

The language of Section 10(a)(2)(B)(iii) is nearly identical to the requirements of ESA Section 7, and as a result NMFS simply incorporates its Biological Opinion as analysis for the required finding. NMFS violated the ESA, both Section 7 and Section 10, by failing to analyze impacts to each ESU of salmonid. NMFS reliance on analysis of impacts to Coho violates the species-specific conservation mandate of the ESA. *Northwest Environmental Advocates v. EPA*, 855 F. Supp. 2d 1199, 1222-23 (D. Or. 2012).

### 5. The Services violated ESA Section 10(a)(2)(B)(iii) by failing to analyze short-term impacts to the species.

FWS and NMFS both incorporate the agencies' respective Biological Opinions to satisfy the obligations of Section 10(a)(2)(B)(iii). Those analyses both violate the ESA because they fail to take into account short-term impacts, and instead dilute impacts by spreading them over the 50-year permit term.

NMFS violated the ESA by failing to consider impacts in the three- to five-year timeframe of the salmon lifecycle. As noted above, the HCP envisions increased logging over the first ten years of implementation. A chart in the BiOp demonstrates that in several drainages that support Coho, a large percentage of the forest in the drainage is projected to be logged within the first ten years. For example, forty-nine percent of the Patterson Creek drainage is projected to be logged within the first ten years.[26] Despite these short-term impacts, the analysis of sedimentation and road use, as well as the analysis of salmon population viability, focuses on impacts distributed over the permit term and assumes general improvement in habitat conditions. This violates the ESA. *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005).

The FWS BiOp analyzes the take of sixty-one northern spotted owls because the FWS believes that is how many owls will be taken by implementation of the HCP, even though the ITP allows the take of eighty-three owls. The BiOp further indicates that the take of sixty-one owls constitutes a 44 percent reduction in the northern spotted owl population in the Action Area. FWS violated the ESA by assuming that take would be spread out over the fifty-year permit term, and averaging the impacts over time. FWS further violated the ESA by failing to analyze the short-term impacts of take as required, and by failing to fully analyze the impact of taking the actual number of owls allowed by the permit (eighty-three). While owls have a much longer life-span than the salmon that are the focus of precedential case law, they face similar short-term concerns due to rapidly declining populations and genetic bottlenecks.[27]

---

[26] NMFS BiOp at 10-11.

[27] *See Genetics Show Current Decline and Pleistocene Expansion in Northern Spotted Owls* (Funk et al., 2008), available at http://pubs.usgs.gov/of/2008/1239/.

### 6. The Services violated ESA Section 10(a)(2)(B) by failing to receive the necessary assurances that the plan will be implemented.

ESA Section 10(a)(2)(B) requires that the Secretaries of the Services must receive "such assurances as he may require that the plan will be implemented." 16 U.S.C. § 1539(a)(2)(B). The Services violated the ESA by relying solely on FGS' commitment of funds to develop the HCP as a demonstration of the ability to implement the plan.[28] If developing an HCP was sufficient to satisfy ESA Section 10(a)(2)(B), that provision would be meaningless, for it is only triggered after the development of an HCP. Statutes must be construed to avoid such surplusage. *Duncan v. Walker*, 533 U.S. 167, 174 (2001). The Services' findings also violate the ESA because they fail to take into account FGS' inability to maintain sustainable logging practices in the past, and fail to take into account that FGS has already demonstrated a willingness to violate the ESA when logging northern spotted owl habitat. Indeed, the Findings detail how FGS likely committed take with "multiple harvest entries" into spotted owl habitat over the last twenty five years, but has no explanation for why FWS expects these unlawful behaviors to change.[29]

### 7. The Services violated ESA Section 10(d) by failing to publish required findings in the Federal Register.

ESA Section 10(d) requires that prior to issuing an ITP, the Services must publish findings in the Federal Register that the permits were applied for in good faith, will not operate to the disadvantage of the species, and are consistent with the policies of Section 2 of the ESA. 16 U.S.C. § 1539(d). The Services violated the ESA by failing to publish the required findings. As previously noted, FGS has likely already violated the ESA by logging northern spotted owl habitat, and now seeks to continue that behavior under the protection of a permit. This behavior calls into question whether the Services could make the required findings.

## III. Conclusion.

For all of the reasons stated in this letter, the Conservation Groups are prepared to sue you over your approval of the Fruit Growers' Supply Company HCP. Increased logging will push already severely damaged ecosystems past the point of possible recovery. FGS' long history of unsustainable logging has eliminated nearly all of the mature forests in the Plan Area; now is the time for the Services to enforce the Endangered Species Act, not provide an exemption. While the Conservation Groups oppose the HCP as written, we recognize that it is possible to craft HCPs that provide both meaningful conservation benefits and regulatory certainty. We welcome an opportunity to work with the Services and FGS to make the changes to the HCP necessary to ensure ESA compliance and a path to recovery for listed species. Please consider this letter as an invitation to engage in productive discussions.

Thank you for your time and consideration. If you have any questions or comments, please contact Wyatt Golding at the Washington Forest Law Center, by phone at 206-223-4088 or email at wgolding@wflc.org.

---

[28] NMFS Findings at 9; FWS Findings at 12.
[29] FWS Findings at 7-8.

Sincerely,

Wyatt Golding

Wyatt Golding
Paul Kampmeier
Staff Attorneys
Washington Forest Law Center

Susan Jane Brown
John Mellgren
Staff Attorneys
Western Environmental Law Center

*On behalf of:*

George Sexton
Conservation Director
Klamath Siskiyou Wildlands Center
P.O. Box 102
Ashland, OR 97520

Kimberly Baker
Forest and Wildlife Coordinator
Klamath Forest Alliance
PO Box 21
Orleans, CA 95556

Justin Augustine
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104

cc: Mr. Rodney R. McInnis, Regional Administrator, National Marine Fisheries Service
    Mr. Eric Schwaab, Assistant Administrator for NOAA Fisheries
    Ms. Alexandra Pitts, Deputy Regional Director, U.S. Fish and Wildlife Service