JUSTIN AUGUSTINE, CA BAR # 235561      THE HONORABLE NATHANAEL COUSINS
Center for Biological Diversity
351 California Street, Suite 600
San Francisco, CA 94104
PH: (415) 632-5315; FAX: (415) 436-9683
jaugustine@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

SUSAN JANE BROWN, OSB #054607, **appearance** *pro hac vice*
JOHN MELLGREN, OSB #114620, **appearance** *pro hac vice*
Western Environmental Law Center
1216 Lincoln Street
Eugene, OR 97401
PH: (541) 485-2471; FAX: (541) 485-2457
brown@westernlaw.org
mellgren@westernlaw.org

PAUL KAMPMEIER, WSBA #31560, **appearance** *pro hac vice*
WYATT GOLDING, WSBA #44412, **appearance** *pro hac vice*
Washington Forest Law Center
615 Second Avenue, Suite 360
Seattle, WA 98104
PH: (206) 223-4088; FAX: (206) 223-4280
pkampmeier@wflc.org
wgolding@wflc.org

*Attorneys for Plaintiffs Klamath-Siskiyou Wildlands Center,*
*Center for Biological Diversity and Klamath Forest Alliance*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, *ET AL.*, | ) Case No. 3:13-cv-3717-NC |
| | ) |
| Plaintiffs, | ) **PLAINTIFFS' MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| v. | ) |
| | ) |
| NOAA NMFS, *ET AL.*, | ) Hearing Date: November 14, 2014 at 1:00 |
| | ) p.m. in Courtroom A, 15th Floor |
| Defendants, | ) |
| and | ) |

FRUIT GROWERS SUPPLY COMPANY,  )
                               )
                               )
              Defendant-Intervenor.  )
                               )

1

2

**TABLE OF CONTENTS**

3

GLOSSARY OF ABBREVIATED and KEY TERMS ........................................................ x

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................... 3

      A.  The Endangered Species Act .......................................................... 3

      B.  The National Environmental Policy Act.......................................... 7

      C.  Fruit Growers' Land and Logging Activities.................................. 8

      D.  Logging Can Harm Northern Spotted Owls ................................... 9

      E.  Logging Can Harm Southern Oregon/Northern California Coast
          Coho Salmon.................................................................................. 11

      F.  The Fruit Growers Supply Company Habitat Conservation Plan.................. 12

          1.   The HCP's Terrestrial Species Conservation Strategy ...................... 12

               a.   Conservation Support Areas ...................................... 13

               b.   Dispersal habitat.......................................................... 16

          2.   The HCP's Aquatic Species Conservation Strategy .......................... 16

      G.  The Services' Issuance of Incidental Take Permits to Fruit Growers .......... 17

III.  JURISDICTION ................................................................................................ 19

IV.   ARGUMENT ..................................................................................................... 20

      A.  Standard of Review......................................................................... 20

      B.  Statement of Issues ........................................................................ 21

      C.  The FWS' "Minimize and Mitigate" Finding is Arbitrary and Capricious
          Because FWS Relied on Conservation Value Provided by an Entity Other
          Than "The Applicant"..................................................................... 22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

D. The FWS' Minimize and Mitigate Finding Is Arbitrary and Capricious Because FGS' Promise to Reduce Clearcutting is Illusory and Unenforceable ........................................................................................... 29

E. The FWS' Reliance on FGS' Unenforceable Promise to Reduce Clearcutting Renders the "No Jeopardy" Findings FWS Made in its Biological Opinion and Under Section 10(a)(2)(B)(iv) Arbitrary and Capricious ......... 31

F. The FWS' "No Jeopardy" Findings Are Arbitrary and Capricious Because FWS Relied on the Incorrect Assumption that Forests Surrounding FGS Lands Will Remain Unchanged During the 50-year Permit Term ............... 34

G. NMFS' "No Jeopardy" Findings are Arbitrary and Capricious Because NMFS Did Not Evaluate Short-Term Impacts to Fish at a Sufficiently Specific Spatial Scale ..................................................................................... 37

H. NMFS "Minimize and Mitigate" and "No Jeopardy" Findings Are Arbitrary and Capricious Because NMFS Relied on Voluntary and Unenforceable Mitigation .............................................................................. 39

I. NMFS' Minimize and Mitigate Finding is Arbitrary and Capricious Because Reducing Impacts Does Not Mean that FGS Will Minimize and Mitigate Impacts to the Maximum Extent Practicable ........................... 42

J. The Services Violated NEPA by Failing to Disclose Environmental Information and Consequences .................................................................... 44

K. The Services Violated NEPA by Failing to Analyze Cumulative Impacts ... 47

V. CONCLUSION ......................................................................................... 50

1

## TABLE OF AUTHORITIES

2

### <u>Cases</u>

3

*Anaheim Mem'l Hosp. v. Shalala,*
    130 F.3d 845 (9th Cir. 1997) ................................................................. 20

4

*Ariz. Cattle Growers' Ass'n v. Salazar,*
5
    606 F.3d 1160 (9th Cir. 2010) ................................................................ 6

6

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
    397 U.S. 150 (1970)................................................................................. 19

7

*Babbitt v. Sweet Home Chapter of Comtys. for a Great Or.,*
8
    515 U.S. 687 (1995)................................................................................... 3

9

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,*
    462 U.S. 87 (1983)..................................................................................... 7

10

*Burns v. Alcala,*
11
    420 U.S. 575 (1975)................................................................................. 23

12

*Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n,*
    449 F.2d 1109 (D.C. Cir. 1971) ............................................................ 45

13

*Citizens to Preserve Overton Park, Inc., v. Volpe,*
14
    401 U.S. 402 (1971)................................................................................. 21

15

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) ............................................................... 21

16

*Ctr. for Biological Diversity v. Bureau of Land Mgt,*
17
    698 F.3d 1101 (9th Cir. 2012) ............................................ 6, 31, 34, 39, 41

18

*Ctr. for Biological Diversity v. Rumsfeld,*
    198 F. Supp. 2d 1139 (D. Ariz. 2002) .................................................. 39

19

*Ctr. for Biological Diversity v. Salazar,*
20
    695 F.3d 893 (9th Cir. 2012) ................................................................. 44

21

*Conservation Cong. v. U.S. Forest Serv.,*
    720 F.3d 1048 (9th Cir. 2013) ............................................................... 36

22

*Ecology Ctr., Inc. v. Austin,*
23
    430 F.3d 1057 (9th Cir. 2005) ............................................................... 20

24

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.,*
　　255 F.3d 1073 (9th Cir. 2001) ..................................................... 20

*Friends of Endangered Species, Inc. v. Jantzen,*
　　760 F.2d 976 (9th Cir. 1985) ....................................................... 24

*Friends of the Earth v. Laidlaw,*
　　528 U.S. 167 (2000) ..................................................................... 19

*Gerber v. Norton,*
　　294 F.3d 173 (D.C. Cir. 2002) ............................................... 33, 43

*Greater Yellowstone Coal., Inc. v. Servheen,*
　　665 F.3d 1015 (9th Cir. 2011) ....................................................... 7

*Helgeson v. Bureau of Indian Affairs,*
　　153 F.3d 1000 (9th Cir. 1998) ..................................................... 21

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,*
　　387 F.3d 989 (9th Cir. 2004) ....................................................... 46

*Lamie v. U.S. Trustee,*
　　540 U.S. 526 (2004) ..................................................................... 25

*Lands Council v. Powell,*
　　395 F.3d 1019 (9th Cir. 2005) ..................................................... 48

*League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen,*
　　615 F.3d 1122 (9th Cir. 2010) ......................................... 36, 44, 46

*Marsh v. Or. Natural Res. Council,*
　　490 U.S. 360 (1989) ..................................................................... 20

*Motor Vehicles Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.,*
　　463 U.S. 29 (1983) ................................... 2, 21, 22, 28, 39, 43

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
　　177 F.3d 800 (9th Cir. 1999) ............................... 8, 48, 49, 50

*Nat'l Wildlife Fed'n v. Babbitt,*
　　128 F. Supp. 2d 1274 (E.D. Cal. 2000) ................................ 6, 29

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
　　524 F.3d 917 (9th Cir. 2008) ..................... 2, 6, 7, 31, 34, 39, 42

*Nat'l Wildlife Fed'n v. Norton,*
　　306 F. Supp. 2d 920 (E.D. Cal. 2004) ..................................... 42

*Nat'l Wildlife Fed'n v. Norton*,
    Civ. No. S-04-0579 DFL JF, 2005 WL 2175874 (E.D. Cal. 2005) ...................... 6, 28

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*,
    2014 WL 199093 (D. Or. Jan. 16, 2014) ................................................. 46

*Natural Res. Def. Council v. Kempthorne*,
    506 F. Supp. 2d 322 (E.D. Cal. 2007)........................................... 39, 40, 41

*Natural Res. Def. Council v. Jewell*,
    749 F.3d 776 (9th Cir. 2014) ................................................................ 19

*Natural Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ................................................................ 44

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
    137 F.3d 1372 (9th Cir. 1998) ......................................................... 46, 47

*Ocean Advocates v. U.S. Army Corps of Engineers*,
    402 F.3d 846 (2004).......................................................................... 44, 46

*Or. Natural Res. Council Fund v. Brong*,
    492 F.3d 1120 (9th Cir. 2007) ............................................................. 47

*Or. Natural Res. Council v. Lowe*,
    109 F.3d 521 (9th Cir. 1997) ............................................................... 28

*Or. Nat'l Res. Council v. U.S. Bureau of Land Mgmt.*,
    470 F.3d 818 (9th Cir. 2006) ............................................................... 36

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) ........................................... 6, 34, 37, 38, 39

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) .................................................. 3, 6, 20, 39

*Plum Creek Timber Co., Inc. v. Trout Unlimited*,
    255 F. Supp. 2d 1159 (D. Idaho 2003) .................................................. 24

*Seattle Audubon Soc. v. Lyons*,
    871 F. Supp. 1291 (W.D. Wash. 1994) *aff'd sub nom. Seattle Audubon Soc. v. Moseley*,
    80 F.3d 1401 (9th Cir. 1996) ............................................................... 44

*Sierra Club v. Babbitt*,
    15 F. Supp. 2d 1274 (S.D. Ala. 1998).................................... 4, 5, 23, 24

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ................................................................. 6, 24

*Sw. Ctr. for Biological Diversity v. Bartel*,
    470 F. Supp. 2d 1118 (S.D. Cal. 2006).............................. 2, 7, 29, 30, 31, 39, 41, 43

*Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dept. of the Interior*,
    608 F.3d 592 (9th Cir. 2010) ............................................................................. 8

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978)................................................................................ 4, 29

*W. Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) ........................................................................ 20

*WildEarth Guardians v. U.S. Fish and Wildlife Service*,
    622 F. Supp. 2d 1155 (D. Utah 2009)............................................................ 24

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ............................................................ 3, 35, 36, 37

## **Statutes**

5 U.S.C. § 706................................................................................................ 20

5 U.S.C. § 706(2)(A)........................................................................................ 20

16 U.S.C. § 1531(b) ........................................................................................... 3

16 U.S.C. § 1531(c)(1)..................................................................................... 24

16 U.S.C. § 1532(19) ......................................................................................... 4

16 U.S.C. § 1532(20) ......................................................................................... 4

16 U.S.C. § 1536(a)(2) .............................................................................. 3, 6, 34

16 U.S.C. § 1538(a)(1)........................................................................................ 4

16 U.S.C. § 1538(a)(1)(B) .................................................................................. 4

16 U.S.C. § 1539(a) ........................................................................................... 1

16 U.S.C. § 1539(a)(1)(B) .................................................................................. 4

16 U.S.C. § 1539(a)(1)(B)(iv)........................................................................... 19

16 U.S.C. § 1539(a)(2)(A) ................................................................ 5, 24

16 U.S.C. § 1539(a)(2)(A)(ii) .................................................................. 23

16 U.S.C. § 1539(a)(2)(B) ...................................................................... 5

16 U.S.C. §1539(a)(2)(B)(ii) ................................... 1, 2, 18, 22, 23, 25, 29, 42

16 U.S.C. § 1539(a)(2)(B)(iii) .................................................................. 5

16 U.S.C. §1539(a)(2)(B)(iv) .............................................................. 3, 19

16 U.S.C. § 1539(c) ............................................................................. 33

16 U.S.C. § 1540 ................................................................................. 4

16 U.S.C. § 1604(e) ............................................................................ 36

28 U.S.C. 1331 ................................................................................... 19

42 U.S.C. § 4332 .................................................................................. 8

42 U.S.C. § 4332(2)(c) ...................................................................... 7, 44

42 U.S.C. § 4342 .................................................................................. 7

## Regulations

40 C.F.R. §§ 1500 *et seq.* ..................................................................... 7

40 C.F.R. § 1500.1(b) ........................................................................... 8

40 C.F.R. § 1500.1(c) ........................................................................... 7

40 C.F.R. § 1502.1 .............................................................................. 7

40 C.F.R. § 1502.16 ........................................................................... 44

40 C.F.R. § 1508.7 .............................................................................. 8

40 C.F.R. § 1508.8(a) ........................................................................... 8

40 C.F.R. § 1508.8(b) ........................................................................... 8

40 C.F.R. § 1508.11 ............................................................................. 7

40 C.F.R. § 1508.18(b)(4) .................................................................................. 7

50 C.F.R. § 17.3 ................................................................................................. 4

50 C.F.R. § 17.11(h) ......................................................................................... 10

50 C.F.R. § 17.31(a) ........................................................................................... 4

50 C.F.R. § 17.32 ............................................................................................... 5

50 C.F.R. § 17.32(b)(5) ...................................................................................... 4

50 C.F.R. § 222.102 ........................................................................................... 4

50 C.F.R. § 222.301(b) ....................................................................................... 4

50 C.F.R. § 222.307 ........................................................................................... 5

50 C.F.R. § 222.307(g) ....................................................................................... 4

50 C.F.R. § 222.307(g)(2) ................................................................................. 40

50 C.F.R. § 222.307(g)(3) ................................................................................. 40

50 CFR § 402.1(c)(4) ....................................................................................... 48

50 C.F.R. § 402.02 ........................................................................................... 48

55 Fed. Reg. 26114 (June 26, 1990) ................................................................ 10

61 Fed. Reg. 63854 (Dec. 2, 1996) .................................................................... 5

62 Fed. Reg. 24588 (May 6, 1997) ................................................................... 12

65 Fed. Reg. 35242 (June 1, 2000) .................................................................... 5

73 Fed. Reg. 9776 (Feb. 22, 2008) .................................................................. 18

74 Fed. Reg. 58602 (Nov. 13, 2009) ................................................................ 18

77 Fed. Reg. 37656 (June 22, 2012) ................................................................ 18

77 Fed. Reg. 71876 (Dec. 4, 2012) ......................................................... 9, 11, 28

**Rules**

14 C.C.R. § 913.11 ................................................................................................ 33

14 C.C.R. § 913.11(a)(1) ..................................................................................... 33

14 C.C.R. § 913.11(a)(2) ..................................................................................... 33

Fed. R. Civ. P. 56(a) ............................................................................................ 20


**Other Authorities**

Black's Law Dictionary 1433 (5th Ed. 1979) ...................................................... 23

*Habitat Conservation Planning and Incidental Take Permit Processing Handbook*, U.S. Department of the Interior, Fish and Wildlife Service; U.S. Department of Commerce National Oceanic and Atmospheric Administration, National Marine Fisheries Service (November 4, 1996) ................................................................................. 5, 23, 42, 43

**GLOSSARY OF ABBREVIATED and KEY TERMS**

| Term | Description |
|---|---|
| ACS | Aquatic species conservation strategy.  Chapter 5 of the HCP sets forth the ACS. |
| BiOp | Biological opinion.  A federal agency prepares a biological opinion pursuant to 16 U.S.C. § 1536. |
| clearcutting | A method of logging whereby nearly every tree in a given stand is logged.  Sometimes referred to as "even-aged harvest" or "regeneration harvest." |
| CSA | Conservation Support Areas |
| dispersal habitat | Forests used by northern spotted owls to travel from the owl's home range to other areas. |
| EIS | Environmental impact statement |
| FEIS | Final environmental impact statement |
| FGS | Fruit Growers Supply Company |
| HCP | Habitat conservation plan.  An HCP is an application for an incidental take permit.  *See* 16 U.S.C. § 1539(a). |
| ITP | Incidental take permit.  An ITP authorizes take of species protected by the Endangered Species Act.  *See* 16 U.S.C. § 1539(a). |
| Salmonid | Refers to trout or salmon and includes coho and Chinook salmon as well as steelhead. |
| SONCC coho | Southern Oregon/Northern California Coast coho salmon |
| spotted owl circle | The area that represents a northern spotted owl's home range.  In the region of the HCP, it consists of a 1.3 mile radius circle with a 0.5 mile radius inner core. |
| suitable owl habitat | Refers to forested areas that are suitable for use by northern spotted owls for nesting, roosting, foraging. |
| TCS | Terrestrial species conservation strategy.  Chapter 5 of the HCP sets forth the TCS. |

1   Plaintiffs Klamath-Siskiyou Wildlands Center, Center for Biological Diversity, and Klamath

2 Forest Alliance (collectively "KS Wild") file this Motion for Summary Judgment challenging the U.S.

3 Fish and Wildlife Service's ("FWS") and the National Marine Fisheries Service's ("NMFS")

4 (collectively "the Services") issuance of incidental take permits to the Fruit Growers Supply Company

5 ("FGS"). The permits authorize the incidental take of northern spotted owls and Southern

6 Oregon/Northern California Coast coho salmon that will occur because of logging activities covered by

7 the *Fruit Growers Supply Company Habitat Conservation Plan* ("the HCP"), which FGS developed

8 pursuant to Section 10(a) of the Endangered Species Act, 16 U.S.C. § 1539(a). This motion is scheduled

9 for oral argument on November 14, 2014 at 1:00 p.m.

10   KS Wild requests that this Court enter judgment against the Services and invalidate and vacate

11 the incidental take permits, associated biological opinions, and environmental impact statement.

## I.   INTRODUCTION

13   The U.S. Fish and Wildlife Service's decision to issue the northern spotted owl permit is

14 arbitrary and capricious because it is based on a finding that vastly overstates the conservation

15 value FGS will provide to northern spotted owls. Before issuing an incidental take permit FWS

16 must find that "the applicant will, to the maximum extent practicable, minimize and mitigate the

17 impacts of such taking." 16 U.S.C. § 1539(a)(2)(B)(ii). To help it make the "minimize and

18 mitigate" finding at issue here, FWS compared the "conservation value" of the spotted owl home

19 ranges FGS will help conserve to the "conservation value" of the spotted owl home ranges FGS

20 will log. To ascertain the conservation value of the spotted owl home ranges, FWS developed a

21 formula that assigned high conservation values to spotted owl home ranges containing a high

22 percentage of federal land. Using those conservation values, FWS concluded that the

23 conservation value created by preserving about 7,000 acres of owl habitat will "outweigh" the

24 conservation value that will be lost when FGS logs over 36,000 acres of owl habitat. Looking

1   closely at the data demonstrates the absurdity of FWS' accounting method:  the conservation

2   value FWS awarded Fruit Growers for preserving 66 acres of habitat in one home range exceeds

3   the conservation value that will be lost when FGS logs over 18,000 acres of owl habitat in 23

4   other home ranges—logging that will harm up to 40 northern spotted owls.

5         FWS' "minimize and mitigate" finding is arbitrary and capricious because FWS gave Fruit

6   Growers credit for conservation value provided by other landowners, in violation of Section

7   10(a)(2)(B)(ii) of the ESA, 16 U.S.C. § 1539(a)(2)(B)(ii).  That Section only allows FWS to make the

8   "minimize and mitigate" finding based on what "the applicant" will do.  But by awarding FGS

9   conservation credit based on the conservation value of entire home ranges, instead of based on the actual

10   number of acres FGS will preserve in each home range, FWS awarded Fruit Growers credit for

11   preserving entire home ranges even though most of the land in those areas is owned by someone other

12   than FGS and even though those other landowners are not "applicants" for the permits.  In doing so,

13   FWS "relied on factors which Congress has not intended it to consider"—actions by someone other than

14   "the applicant"—rendering issuance of the permit arbitrary and capricious.  *Motor Vehicles Mfrs. Ass'n*

15   *of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

16         FWS compounded its error by concluding that FGS would mitigate some impacts by

17   "promoting" decreases in clearcutting and corresponding increases in dispersal habitat.  But FGS made

18   no such commitments, FWS lacks any means to enforce those illusory promises, and the HCP lacks any

19   monitoring program to determine whether those changes occur.  Reliance on that unenforceable

20   mitigation renders the permits and biological opinion invalid.  *Sw. Ctr. for Biological Diversity v. Bartel*,

21   470 F. Supp. 2d 1118 (S.D. Cal. 2006); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d

22   917, 935-36 (9th Cir. 2008).

23         Both agencies then exacerbated those problems by under-estimating the impacts of the HCP in

24   their "no jeopardy" findings.  Before issuing incidental take permits the Services must find that approval

of an HCP will not jeopardize the continued existence of any species or adversely modify or destroy any species' designated critical habitat.  *See* 16 U.S.C. §§ 1536(a)(2), 1539(a)(2)(B)(iv).  FWS' "no jeopardy" findings are arbitrary and capricious because FWS assumed that habitat conditions on nearby U.S. Forest Service lands would remain "static" throughout the permit term even though elsewhere in its biological opinion FWS documented region-wide spotted owl habitat declines on Forest Service lands due to fire, logging, insect infestation, and barred owls.  *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010) (reliance on contradictory conclusions renders a biological opinion arbitrary and capricious).  Similarly, NMFS' "no jeopardy" findings are invalid because NMFS failed to analyze impacts to coho salmon on the three-year time-frame relevant to the species, as required by the Ninth Circuit.  *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005).  Like FWS, NMFS also improperly relied on unenforceable mitigation measures such as road management measures that FGS need only implement where they deem it "feasible."

Finally, the Services' Environmental Impact Statement is unlawful because it failed to disclose and discuss FGS' financial targets even though those targets were the company's express justification for seeking the permits.  The EIS also failed to consider the cumulative effects on northern spotted owls of timber harvest on adjacent lands; the effects of herbicide and other chemical applications on FGS lands; and the effects of water withdrawals on salmonids.

## II.    BACKGROUND

A.    The Endangered Species Act.

 The ESA provides a comprehensive statutory scheme with the "broad purpose" of protecting and recovering populations of endangered and threatened species and the ecosystems on which those species depend.  16 U.S.C. § 1531(b); *Babbitt v. Sweet Home Chapter of Comtys. for a Great Or.*, 515 U.S. 687, 698 (1995).  The language, history, and structure of the ESA "indicate beyond doubt" that Congress intended protected species to be afforded "the highest of

priorities."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978).

The foundational provision of the ESA is the prohibition on actions that "take" endangered species.  *See* 16 U.S.C. § 1538(a)(1)(B).  Regulations adopted by the Services also apply the ESA's take prohibition to threatened species such as the northern spotted owl and Southern Oregon/Northern California Coast coho salmon ("SONCC coho").  16 U.S.C. § 1532(20); 50 C.F.R. § 17.31(a); 50 C.F.R. § 222.301(b).  The term "take" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering."  16 U.S.C. § 1532(19); 50 C.F.R. § 17.3; 50 C.F.R. § 222.102.

Section 10(a)(1)(B) of the ESA creates a limited exception to the ESA's take prohibition by authorizing the Services to permit the take of listed species that incidentally results from otherwise lawful activities.  16 U.S.C. § 1539(a)(1)(B).  In return for minimizing and mitigating the impacts of the authorized take, the permit holder gains long-term regulatory certainty including "permit shield" protections against civil and criminal liability under the ESA.  *See generally* 16 U.S.C. §§ 1538(a)(1), 1540.  Even if circumstances change after issuance of an incidental take permit, the Services' "No Surprises" policy prohibits the Services from imposing additional resource or management restrictions without the consent of the permit holder.  50 C.F.R. § 17.32(b)(5); 50 C.F.R. § 222.307(g).

Because the permit allows otherwise illegal harm to an imperiled species, Section 10 of the ESA sets forth a rigorous and detailed permit application process that the applicant and the Services must follow prior to permit issuance.  *Sierra Club v. Babbitt*, 15 F. Supp. 2d 1274, 1282 (S.D. Ala. 1998).  To apply for a permit the applicant must develop an HCP that specifies:  the impact that will likely result from the permitted taking; the steps the applicant will take to minimize and mitigate such impacts; the funding that will be available to implement such steps;

1    what alternative actions to such taking the applicant considered and the reasons why such

2    alternatives are not being utilized; and such other measures that the Secretary may require.  16

3    U.S.C. § 1539(a)(2)(A).  Before issuing the permit the Services must find that:  the permitted

4    taking will be incidental; the applicant will, to the maximum extent practicable, minimize and

5    mitigate the impacts of such taking; the applicant will ensure that adequate funding for the plan

6    will be provided; the taking will not appreciably reduce the likelihood of the survival and

7    recovery of the species in the wild; and that any additional measures required by the Service are

8    provided.  16 U.S.C. § 1539(a)(2)(B).  The Services' regulations largely reflect the statute.  *See*

9    50 C.F.R. § 17.32; 50 C.F.R. § 222.307.

10       There are two core and distinct components of the HCP application and approval process.

11   First, the Services must find that "the applicant" will minimize and mitigate the impacts of the

12   taking "to the maximum extent practicable."  16 U.S.C. § 1539(a)(2)(B)(ii).  The Services

13   recognize that HCPs may involve interests other than the applicant.  But in order for the Services

14   to consider conservation measures by others "…the applicant must have specific authority over

15   the other parties affected by the HCP and be willing to exercise that authority, or must secure

16   commitments from them that the terms of the HCP will be upheld."  *See Habitat Conservation*

17   *Planning And Incidental Take Permit Processing Handbook* (hereinafter "HCP Handbook") at 7-

18   5 to 6.[1]  This is a "strict" requirement.  *Sierra Club v. Babbitt*, 15 F. Supp. 2d at 1282.

19       Second, for most HCPs the Services must prepare a biological opinion ("BiOp") and

20   insure that a proposed permit is not likely to jeopardize a listed species or adversely modify or

21   destroy any species' designated critical habitat.  16 U.S.C. § 1536(a)(2).  A valid "no jeopardy"

22

---

23   [1]      Portions of the HCP Handbook are attached as Exhibit A to the *Declaration of Wyatt Golding* (concurrently filed).  The HCP Handbook is available in full at

24   http://www.fws.gov/endangered/esa-library/.  *See also* 61 Fed. Reg. 63854 (Dec. 2, 1996); 65 Fed. Reg. 35242 (June 1, 2000).

1   finding in a biological opinion can also satisfy the ESA Section 10(a)(2)(B)(iv) finding.  *Nat'l*

2   *Wildlife Fed'n v. Babbitt,* 128 F. Supp. 2d 1274, 1285 (E.D. Cal. 2000).  While both the

3   minimize and mitigate finding and no jeopardy findings consider environmental impacts, they

4   are distinct in that the former focuses on conservation measures the applicant will carry out and

5   the latter gives broader consideration to environmental impacts as they are likely to occur in a

6   given context.  *See Nat'l Wildlife Fed'n v. Norton*, Civ. No. S-04-0579 DFL JF, 2005 WL

7   2175874 at *7-*19 (E.D. Cal. 2005).

8       A BiOp must meet certain requirements to "insure" a lack of jeopardy.  First, the agency

9   preparing the BiOp must analyze impacts to species on a temporal and spatial scale matching the

10  life-cycle of the species.  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries*

11  *Serv*., 265 F.3d 1028, 1037 (9th Cir. 2001); *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S.*

12  *Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. NMFS*, 524

13  F.3d 917, 934-35 (9th Cir. 2008).  Second, the Services may only rely on mitigation measures

14  that are reasonably certain to occur.  *Id.* at 934-35.  Reliance on uncertain, unenforceable, or

15  voluntary mitigation renders a BiOp arbitrary and capricious.  *Ctr. for Biological Diversity v.*

16  *Bureau of Land Mgt*, 698 F.3d 1101, 1117 (9th Cir. 2012); *Sierra Club v. Marsh*, 816 F.2d 1376,

17  1386 (9th Cir. 1987).  Third, the Service must use the "best scientific and commercial data

18  available."  16 U.S.C. § 1536(a)(2).

19      A uniting theme across the ESA is that the agency must give the benefit of the doubt to

20  the species because, under the ESA, risk "must be borne by the project, not by the endangered

21  species."  *Sierra Club v. Marsh*, 816 F.2d at 1386; *Ariz. Cattle Growers' Ass'n v. Salazar*, 606

22  F.3d 1160, 1166-67 (9th Cir. 2010) (referring to the ESA as maintaining a "policy of

23  institutionalized caution").  Accordingly, the Services may only rely on enforceable, reasonably

24  certain mitigation of environmental harms when making decisions regarding listed species.  *See*

1   *Nat'l Wildlife Fed. v. NMFS*, 524 F.3d at 935-936 (ESA Section 7); *Sw. Ctr. for Biological*

2   *Diversity*, 470 F. Supp. at 1146 (ESA Section 10); *Greater Yellowstone Coal., Inc. v. Servheen*,

3   665 F.3d 1015, 1029 (9th Cir. 2011) (ESA Section 4, regarding the decision to list or delist a

4   species).

5   B.      The National Environmental Policy Act.

6          In enacting the National Environmental Policy Act (NEPA) in 1969, Congress directed

7   all federal agencies to assess the environmental impact of proposed actions that significantly

8   affect the quality of the environment.  42 U.S.C. § 4332(2)(C).  NEPA is our Nation's basic

9   charter for the protection of the environment and was enacted to "help public officials make

10  decisions that are based on [an] understanding of environmental consequences, and to take

11  actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(c).  NEPA's

12  disclosure goals are two-fold: (1) to insure that the agency has fully contemplated the

13  environmental effects of its action; and (2) to insure that the public has sufficient information to

14  challenge the agency's action.  *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*,

15  462 U.S. 87, 97 (1983).

16         The Council on Environmental Quality promulgated uniform regulations to implement

17  NEPA that are binding on all federal agencies.  42 U.S.C. § 4342; 40 C.F.R. §§ 1500 *et seq.*

18  NEPA requires the preparation of an EIS for all "major federal actions significantly affecting the

19  quality of the human environment."  42 U.S.C. § 4332(2)(C).  "Major federal actions" include

20  issuance of an incidental take permit.  40 C.F.R. § 1508.18(b)(4).

21         An EIS is a "detailed written statement" that "provide[s] full and fair discussion of

22  significant environmental impacts and shall inform decision makers and the public of the

23  reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality

24  of the human environment."  40 C.F.R. §§ 1508.11, 1502.1.  An EIS must describe: (1) the

1   environmental impact of the proposed action; (2) any adverse environmental effects that cannot

2   be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the

3   relationship between short-term uses of the environment and the maintenance and enhancement

4   of long-term productivity; and (5) any irreversible or irretrievable commitment of resources that

5   would be involved in the proposed action.  42 U.S.C. § 4332.

6           NEPA's overarching requirement for an EIS is that the federal government take a "hard

7   look" at the impacts of the action and "ensure that environmental information is available to

8   public officials and citizens before decisions are made and before actions are taken."  40 C.F.R. §

9   1500.1(b).  Accurate scientific analysis, expert agency comments, and public scrutiny are

10  essential to implementing NEPA.  *Id.*  An EIS must therefore consider both direct and indirect

11  environmental impacts of a proposed action.  *See* 40 C.F.R. §§ 1508.8(a) & (b).

12          NEPA also requires the Services to assess the cumulative environmental effects of

13  proposed agency actions.  40 C.F.R. § 1508.7.  Cumulative effects are the impact of the proposed

14  action when added to other past, present, and reasonably foreseeable future actions.  *Id.*

15  Cumulative impacts result from individually minor but collectively significant actions taking

16  place over a period of time.  *Id.*  The "EIS must analyze the combined effects of the actions in

17  sufficient detail to be 'useful to the decisionmaker in deciding whether, or how, to alter the

18  program to lessen cumulative impacts.'"  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177

19  F.3d 800, 810 (9th Cir. 1999) (citation omitted).  "General statements about 'possible effects'

20  and 'some risk' do not constitute a 'hard look' absent a justification regarding why more

21  definitive information could not be provided."  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S.*

22  *Dept. of the Interior*, 608 F.3d 592, 603 (9th Cir. 2010) (citation omitted).

23  C.      Fruit Growers' Land and Logging Activities.

24          The incidental take permits challenged here apply to approximately 152,178 acres of

forest land owned by FGS in northern California.  AR 35942.[2]  FGS lands are in a "checkerboard" pattern:  many of its lands are adjacent to the Klamath National Forest, which is managed by the U.S. Forest Service, or to lands managed by the Bureau of Land Management.  AR 36000; AR 36002 (map showing ownership).  FGS lands feature a rugged and diverse landscape ranging from low river valleys to 7,000 foot mountain peaks.  AR 36012.  As a result, FGS lands feature unusually rich biological diversity and support northern spotted owls, SONCC coho salmon, and myriad other species dependent on older forest habitats.

FGS harvests timber and conducts related operations, such as road building and maintenance, on the lands covered by the incidental take permits (hereinafter "FGS lands").  AR 35957.  Fruit Growers manages its land in northern California in three management units: the Klamath River Management Unit in the Klamath River watershed; the Grass Lake Management Unit in the Shasta River watershed; and the Scott Valley Management Unit in the Scott River watershed.  AR 35945.  To facilitate logging FGS has built and maintained an extensive road network throughout its lands.  AR 36021.  FGS manages approximately 1,100 miles of roads, and shares an additional 250 miles of roads with other managers, for a total road density of approximately 4 to 7 miles of road per square mile of FGS forest.  AR 38447; AR 36021.

D.    Logging Can Harm Northern Spotted Owls.

Northern spotted owls are medium-sized, dark brown owls with white spots and dark eyes.  *Designation of Revised Critical Habitat for the Northern Spotted Owl*, 77 Fed. Reg. 71876, 71883 (Dec. 4, 2012).  They are endemic to the Pacific Northwest and can live up to 20 years in the wild.  AR 35983.  Northern spotted owls generally nest, roost, and forage in blocks

---

[2]    KS Wild references the FWS record as AR followed by the bates number and references the NMFS record as NMFS AR followed by the bates number.  The Court may access the documents by looking to the master index for each record and matching the bates number range in the column labeled "bates number" with the associated document in the record.

1   of mature and older forests containing large old trees.  AR 35987.

2          Throughout the range of the northern spotted owl logging has severely reduced the

3   species' habitat and caused significant population declines.  In 1990, the FWS listed northern

4   spotted owls as "threatened" under the ESA.  *See Determination of Threatened Status for the*

5   *Northern Spotted Owl*, 55 Fed. Reg. 26114 (June 26, 1990) (codified at 50 C.F.R. § 17.11(h)).  In

6   its final listing rule, the FWS noted that the northern spotted owl is threatened throughout its

7   range "by the loss and adverse modification of suitable habitat as the result of timber

8   harvesting."  *Id.*  Historical timber harvest and land-conversion were the primary causes of an

9   estimated 60 to 88 percent decline in northern spotted owl habitat from the 1800s to 1990.  AR

10  35986.  Logging can adversely impact northern spotted owls by removing habitat, creating noise

11  disturbance, increasing forest fragmentation, and altering landscape characteristics to create

12  habitat conditions that support barred owls, a competitor species.  AR 34224-25.

13         Northern spotted owls are particularly susceptible to harm from logging because they are

14  territorial—they live in specific forests and return to nest in the same forest stands over time—

15  and are usually monogamous.  AR 35984.  Each nesting pair has a "home range," which consists

16  of areas used for nesting, roosting, and foraging.  AR 35984.  Home ranges vary in size and

17  shape depending on region and topography, but are generally characterized as a circle drawn

18  around a recognized northern spotted owl activity center.  AR 35984.  For purposes of the HCP,

19  the home range (referred to herein as an "owl circle") covers approximately 3,398 acres, which is

20  equivalent to the area of a circle with a radius of 1.3 miles.  AR 35985.  The "core area" of the

21  home range covers 500 acres, which is equivalent to the area of a circle with a 0.5 mile radius,

22  and is the most important area for nesting and roosting.  AR 35985.

23         FWS determines whether "take" of northern spotted owls is likely to occur by evaluating

24  whether logging will reduce the amount of nesting, roosting, and foraging habitat within an owl

1    circle below certain minimum thresholds.  AR 36192.  Nesting habitat predominantly consists of

2    large, old trees with various deformities such as cavities, broken tops, and mistletoe platforms

3    that provide nesting opportunities.  Roosting habitat provides thermoregulation, shelter, and

4    cover to reduce predation risk while resting or foraging.  Foraging habitat consists of areas where

5    spotted owls hunt and may feature fragmented or younger forests.  *See* 77 Fed. Reg. at 71884-85.

6    Logging can also make spotted owl dispersal more dangerous.  For juveniles or displaced

7    adults to safely leave the home range spotted owls require dispersal habitat.  *Id.*  To provide the

8    required biological function, dispersal habitat must be connected to blocks of nesting and

9    roosting habitat and must consist of forest "stands with adequate tree size and canopy cover to

10   provide protection from avian predators and at least minimal foraging opportunities."  *Id.*

11   Logging can eliminate dispersal habitat and remove corridors between habitat blocks.  AR

12   34224-25.  Spotted owls that have to travel over large expanses of unsuitable habitat are at a

13   significant risk of predation and starvation.  77 Fed. Reg. at 71884.

14   E.    Logging Can Harm Southern Oregon/Northern California Coast Coho Salmon.

15   SONCC coho are anadromous fish.  AR 35966.  When adult SONCC coho reach sexual

16   maturity, at around 3 years old, they migrate from saltwater into freshwater streams to spawn

17   before dying.  AR 35966.  SONCC coho require relatively pristine freshwater to successfully

18   spawn and rear.  AR 35969.  Freshwater habitat must feature abundant, cool, well-oxygenated

19   water that flows year round and contains little suspended sediment.  AR 35969.  Gravel stream

20   bottoms must have minimal deposited fine sediment because the spaces between pieces of stone

21   allow oxygenated water to sustain eggs and fry.  AR 35977.

22   SONCC freshwater habitat has declined in quality and quantity over time, in part due to

23   the impacts of logging.  AR 36372-73.  In 1997 NMFS listed SONCC coho salmon as threatened

24   under the ESA.  *Threatened Status for Southern Oregon/Northern California Coast*

*Evolutionarily Significant Unit (ESU) of Coho Salmon*, 62 Fed. Reg. 24588 (May 6, 1997).

NMFS identified logging as one of the "major activities responsible for the decline of coho

salmon in Oregon and California."  62 Fed. Reg. at 24592.

Logging, timber hauling, and road maintenance and construction can adversely impact

SONCC coho salmon by altering stream features that support SONCC coho survival.  62 Fed.

Reg. at 24593.  Timber harvest activities, including hauling timber and road maintenance, often

deliver sediment to streams.  *Id.*; AR 37741.  Roads are a persistent source of sediment to

streams on and downstream of FGS lands.  AR 37741; AR 12890-91.  Sediment delivered to

streams can elevate levels of fine sediments in spawning gravels and suffocate salmon embryos.

62 Fed. Reg. at 24593.  Sediment can also fill the substrate interstices inhabited by invertebrates,

decreasing a primary food supply for juvenile salmon.  AR 37742.

F.     The Fruit Growers Supply Company Habitat Conservation Plan.

FGS has intensely logged its lands over the last century.  AR 38386; AR 35942.  In order

to gain access to the owl habitat on its lands that to date has been protected under the ESA and

California forestry regulations, FGS developed the habitat conservation plan at issue here and

applied for incidental take permits.  AR 35942.  Fruit Growers' implementation of the HCP will

adversely impact forest ecosystems and the species that live there, including northern spotted

owls, SONCC coho salmon, Yreka phlox, Upper Klamath and Trinity Rivers Chinook salmon,

Klamath Mountains Province steelhead, golden eagles, peregrine falcons, fishers, and the

Siskiyou mountains salamander.  AR 35965; AR 38507.

1.     **The HCP's Terrestrial Species Conservation Strategy.**

Chapter 5.3 of the HCP details Fruit Growers' "Terrestrial Species Conservation

Program" ("TCS"), which includes numerous provisions relating to northern spotted owls.  AR

36133.  The incidental take permits allow FGS to "take" 83 northern spotted owls at 43 site

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 3:13-cv-3717-NC – PAGE 12

1    centers.  AR 36192.  The basic strategy of the TCS is to allow FGS to log large tracts of spotted

2    owl habitat that support owls on its lands in return for (1) preserving relatively small fragments

3    of habitat on FGS land that support spotted owls on nearby federal land; (2) promoting the

4    development and maintenance of foraging and dispersal habitat across FGS ownership over time;

5    and (3) taking other steps to reduce logging-related impacts to owls.  AR 36101; AR 36193.

6                    a.   Conservation Support Areas

7            The primary mitigation measure in the TCS is FGS' commitment to preserve blocks of

8    habitat in 24 owl circles that FGS and FWS determined to have relatively high conservation

9    value.  The TCS conserves habitat blocks, known as "Conservation Support Areas" ("CSAs"), in

10   24 owl circles while allowing FGS to log extensively in another 58 owl circles.  AR 36200.

11   FWS chose the locations of the CSAs based in part on the "conservation value" it assigned to the

12   owl circles at issue.  AR 36193.  FWS derived the "conservation value" of the owl circles, which

13   it expressed by assigning points, using a formula that considered five variables:  (1) proximity of

14   the spotted owl activity center to designated northern spotted owl critical habitat; (2) the

15   reproductive status and history of the owl circle; (3) the proportion of private land in the core

16   area of the home range; (4) the proportion of private land in the outer ring of the home range;

17   and (5) the predicted probability of occupancy of the home range.  AR 36193.

18           FWS' conservation value formula did not include a variable that drove the conservation

19   value of the circles up or down based on the percentage of the land in the circles that is subject to

20   the HCP.  AR 36193.  Nor did the conservation value formula include a variable based on

21   expected future changes to habitat conditions on non-FGS lands in the owl circles.  AR 36193.

22   By failing to account for these variables, the conservation value formula assumed that habitat

23   conditions on non-FGS lands in owl circles would remain the same throughout the permit term

24   even though the HCP does not restrict timber harvest by non-FGS landowners.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - CASE NO. 3:13-cv-3717-NC – PAGE 13

1    Although the Forest Service and BLM are not parties to the HCP, AR 35942, FWS'

2    formula assigned relatively high conservation values to owl circles with a high percentage of

3    federal lands because:  (1) the formula gave conservation credit to lands near designated critical

4    habitat and all designated critical habitat in the area is on federal lands; and (2) the formula

5    assigned higher conservation value to circles that encompassed smaller percentages of private

6    land.  AR 1976-77; AR 17916 (FGS consultant stating "conservation value…almost entirely

7    driven by proximity to CHU [critical habitat units].").  For these same reasons, the formula

8    assigned lower conservation values to owl circles that encompassed higher percentages of private

9    lands.  AR 36194-96.

10    FGS and FWS picked the owl circles that would contain CSAs after ranking the owl

11    circles based on their conservation value as dictated by the formula.  AR 36198.  The nesting

12    areas for nearly all of the northern spotted owls that the FWS expects to be preserved by the

13    CSAs are on lands managed by the Forest Service in the Klamath National Forest.  AR 34182-

14    34190.  In many of the CSAs FGS lands comprise only a small fraction of the land within the

15    northern spotted owl home range.  AR 36137 (showing FGS habitat commitments); AR 36194

16    (showing current amounts of habitat in different ownerships for each owl circle).  The end result

17    is this:  FGS lands contain approximately 43,000 acres of suitable NSO habitat, AR 36202, but

18    "[o]ver the term of the Permits, nearly all of the currently available habitat for northern spotted

19    owl in the Plan Area could be harvested, with the exception of approximately 7,100 acres."  AR

20    36202.  FGS will log most of the owl habitat on its lands in the first decade under the HCP,

21    which will concentrate environmental impacts.  AR  36202.

22    The Services' conservation formula is unique to this HCP and did not receive any formal

23    peer review or approval.  Jeffrey Dunk, a biologist from Humboldt State University and co-

24    creator of the probability of occupancy model used in the conservation formula, reviewed the

1    conservation matrix formula.  AR 36193.  But Professor Dunk had significant critiques of the use

2    of his model to identify conservation sites, pointing out that there was no survey data reliably

3    establishing the reproductive status of the activity centers; that proximity to designated critical

4    habitat is not a strong indicator of conservation value because designated critical habitat often

5    does not correlate with high-quality habitat; and that accounting for percentage of owl habitat on

6    private lands measured impacts to private landowners rather than impacts to owls.  AR 1976-77.

7         Professor Dunk's concerns find support in the record.  FWS reviewed owl survey data

8    from FGS lands and the surrounding area to determine the reproductive status for each owl

9    circle, but due to a limited survey record FWS reviewed almost no *current* owl survey data.  AR

10   34179; AR 17916.  Additionally, the model FWS used to predict probability of spotted owl

11   occupancy showed little to no correlation between the selection of CSAs and the probability of

12   occupancy by spotted owls.  AR 34179; AR 17923-24 (graph showing no correlation between

13   mitigation sites and occupancy).[3]

14        The HCP does not place any area on FGS lands completely off-limits to logging.  The

15   HCP requires Fruit Growers to promote and maintain certain general conditions and habitat

16   features within each CSA.  AR 36134.  But the HCP allows logging in the CSAs when those

17   areas meet minimum habitat thresholds and allows salvage logging after fire or insect infestation.

18   AR 36138; AR 36226.  As a result, the HCP allows logging in CSAs that would actually result in

19   a significant decrease of nesting and roosting habitat in those areas over the permit term.  AR

20   34228 (showing that FGS is authorized to log over 1,000 acres of nesting and roosting habitat

21   within CSAs in the Klamath Province).  Logging within CSAs, even if it does not rise to the

22

23   ───────────────────
     [3]     FWS initially requested that FGS prepare this graph as "a visual representation showing
24   that we are capturing the owls sites with some of the best habitat as mitigation sites."  AR 17919.
     FGS' consultant prepared the graph; discovered there was little correlation; and recommended
     omitting the information from public review. AR 17921. FWS did not to publish the information.

level of "take," can still have adverse impacts on the northern spotted owls that reduce the benefits of the CSA.  AR 3886 (FWS staff comment: "degradation of habitat within CSAs directly reduces the primary mitigation for a large amount of take.").  Additionally, because the HCP does not require conservation of the CSAs beyond the 50-year permit term, the CSAs and any new habitat that develops could be logged in the future.  AR 38921 ("The Services acknowledge that the CSAs could be harvested after the permit expires.").

        b.  Dispersal habitat

The other asserted mitigation measure in the HCP is a supposed decrease in clearcutting on FGS lands (sometimes referred to as "even-aged harvest" or "regeneration harvest") and a corresponding increase in dispersal habitat.  AR 36139.  But the HCP does not require FGS to reduce clearcutting or to increase dispersal habitat.  AR 36225.  Additionally, while the HCP acknowledges that FWS has defined dispersal habitat as "stands with adequate tree size and canopy closure to provide protection from avian predators and at least minimal foraging opportunities," the HCP contains no criteria regarding what forest conditions constitute dispersal habitat on FGS lands.  AR 36139.  The HCP has no requirements for how many acres of dispersal habitat FGS will maintain; where FGS will preserve dispersal habitat; or when FGS will preserve dispersal habitat.  AR 36139.

      **2.**    **The HCP's Aquatic Species Conservation Strategy.**

Because some of the rivers on and downstream of FGS lands provide spawning and rearing habitat for SONCC coho and other salmonids, Section 5.2 of the HCP includes an aquatic species conservation strategy ("ACS") intended to reduce logging-related impacts to SONCC coho, Upper Klamath and Trinity Rivers Chinook salmon, and Klamath Mountains Province steelhead.  AR 36102-36133.  The ACS has two basic components: 1) institution of a variety of forestry prescriptions to lessen the impacts of logging as they occur, AR 36105; and 2) a

1  requirement that FGS implement a road maintenance program after 10-15 years of HCP

2  implementation.  AR 36127.

3        The ACS divides Fruit Growers lands into Class A, Class B, and Class C lands.  AR

4  36103.  Borrowing heavily from California forestry regulations, the ACS prescribes different

5  limitations on logging activities for each land Class.  AR 36105.  The ACS prescriptions address

6  a wide variety of logging-related activities, including the maintenance of riparian buffers,

7  logging on steep slopes, timber harvest methods, building and maintenance of stream crossings,

8  and road construction and maintenance.  AR 36102-33.  The ACS includes monitoring programs

9  to measure some of the impacts of implementation of the prescriptions on salmon habitat.  AR

10  36213-14.  But the HCP does not include an adaptive management program that requires Fruit

11  Growers to alter management of its lands in response to data about the impacts of logging on

12  listed species.  AR 40039.  No matter the results of implementation of the HCP, the Services may

13  not require additional commitments of resources from FGS or impose additional restrictions on

14  FGS' activities without FGS' consent due to the No Surprises policy.  AR 36247.

15        The ACS also requires Fruit Growers to implement a Road Management Plan on Class A

16  lands, consisting of an initial inventory to document the roads and possible sources of sediment

17  delivery; the development of a plan to reduce potential sediment input to streams by fifty

18  percent; and later implementation of that plan.  AR 36127.  FGS must complete road inventories

19  within five to ten years of issuance of the incidental take permits and then take steps to reduce

20  the potential for sediment delivery to streams from those roads by fifty percent within ten to

21  fifteen years of issuance of the permits.  AR 36127.

22  G.    <u>The Services' Issuance of Incidental Take Permits to Fruit Growers.</u>

23        The Services invited public comment on the HCP before issuing the incidental take

24  permits.  *See Notice of Public Scoping and Intent to Prepare a Joint Environmental Impact*

1    *Statement* 73 Fed. Reg. 9776 (Feb. 22, 2008); *Multi-species Habitat Conservation Plan*, 74 Fed.

2    Reg. 58602 (Nov. 13, 2009); *Multi-Species Habitat Conservation Plan*, 77 Fed. Reg. 37656

3    (June 22, 2012).  In response to those invitations KS Wild submitted extensive comments

4    outlining serious concerns regarding the issuance of incidental take permits in an already

5    degraded environment.  AR 3696-3716 (scoping comments); AR 13262-13318 (comments on the

6    draft EIS and draft HCP); AR 39179-39198 (comments on the FEIS, BiOp, and final HCP).

7    State, federal, and tribal governments shared many of KS Wild's concerns and critiques.  *See* AR

8    14113 (comments of California's North Coast Regional Water Quality Control Board); AR

9    13538-36 (comments of EPA Region IX); AR 3763-3797 (comments of the Karuk Tribe); AR

10   3811 (comments of the Quartz Valley Tribe).

11       FWS made the findings required by ESA Section 10(a)(2)(B) in November 2012.  AR

12   40121-32.  FWS found that "the applicant will, to the maximum extent practicable, minimize and

13   mitigate the impacts of such taking," 16 U.S.C. § 1539(a)(2)(B)(ii), based on its determinations

14   that:  (1) "[t]he conservation value of the areas conserved under the HCP outweighs the

15   conservation value of the areas subject to harvest." (AR 40126); (2) "[m]any of the activity

16   centers where take would be authorized under the ITP are likely not occupied and contribute

17   little to the survival and recovery of the northern spotted owl." (AR 40127); (3) "[t]he proposed

18   [CSAs] will provide for the protection and expansion of higher quality habitat on FGS ownership

19   that would likely not occur under existing regulatory mechanisms governing timber harvest on

20   FGS ownership." (AR 40127); (4) "[t]he changes in timber management practices identified in

21   the proposed HCP are expected to result in an increase in northern spotted owl foraging and

22   dispersal habitat across FGS ownership over the permit term due to a decrease in clearcutting

23   and other even-aged management practices." (AR 40128); and (5) "[t]he higher costs to the

24   applicant of conserving additional activity centers on the FGS ownership is not necessary to

1    minimize and mitigate the impacts of take and would provide little additional conservation value

2    for the northern spotted owl." (AR 40128).

3          FWS also found that the HCP would not cause jeopardy to northern spotted owls, *see* 16

4    U.S.C. § 1539(a)(1)(B)(iv), by incorporating by reference its BiOp.  AR 40131; AR 34258.

5    FWS relied heavily on its belief that FGS would decrease clearcutting and increase dispersal

6    habitat across its ownership.  AR 34252; AR 34260-61.  FWS also relied heavily on the

7    conservation value formula and, in so doing, relied on preservation of forests outside FGS lands

8    over time.  AR 34260.  FWS explicitly assumed that habitat conditions on lands surrounding

9    FGS lands would persist until 2062 (the end of the permit term), "to avoid speculating on the

10   types of changes that may occur on these lands over time."  AR 34181.  Elsewhere in its BiOp

11   FWS described probable habitat declines on those same lands.  AR 34194-95.

## III.    JURISDICTION

13         This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Plaintiffs have standing to

14   bring their claims.  An organization "has standing to bring suit on behalf of its members when its

15   members would otherwise have standing to sue in their own right; the interests at stake are

16   germane to the organization's purpose; and neither the claim asserted nor the relief requested

17   requires the participation of individual members in the lawsuit.  *Friends of the Earth v. Laidlaw*,

18   528 U.S. 167, 181 (2000).  For individual members to establish standing the individual must

19   show: (1) an "injury in fact" (2) that is fairly traceable to the challenged conduct of the

20   Defendants and (3) capable of being redressed by a favorable decision from the court.  *Natural*

21   *Res. Def. Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (citing *Laidlaw*, 528 U.S. at 181).

22   Additionally, the interests sought to be protected must arguably be within "the zone of interests"

23   protected by the statute in question.  *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397

24   U.S. 150, 153-54 (1970).  Plaintiffs have standing for all claims because Defendants' issuance of

the incidental take permits, and the supporting documents those permits rely on, cause Plaintiffs'

members concrete injuries in fact that this Court can redress by invalidating the permits or the

agencies' supporting decision documents. *See* the Declarations of Luke Ruediger, George

Sexton, Jordan Beckett, Kyle Haines, John Livingston, Rich Nawa, and Monica Bond

(concurrently filed). The wildlife and habitat interests at stake are germane to Plaintiffs'

purposes and neither the claim asserted nor the relief requested requires the participation of

individual members. Finally, because Plaintiffs' claims seek to protect threatened species and

their habitat they are clearly within the zone of interests of the ESA and NEPA. *Envtl. Prot.*

*Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1079 (9th Cir. 2001) (ESA); *W. Watersheds*

*Project v. Kraayenbrink*, 632 F.3d 472, 485-86 (9th Cir. 2011) (NEPA).

## IV.   ARGUMENT

A.   Standard of Review.

Summary judgment is appropriate if "there is no genuine issue as to any material fact

and…the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Section 706 of the Administrative Procedure Act sets the standard of review for the NEPA and

the ESA claims in this case. 5 U.S.C. § 706; *Ecology Ctr., Inc. v. Austin,* 430 F.3d 1057, 1062

(9th Cir. 2005) (NEPA); *Pac. Coast Fed'n v. BOR*, 426 F.3d at 1090 (procedural ESA claims);

*W. Watersheds Project*, 632 F.3d at 496 (substantive ESA claims). Under the APA, "[t]he

reviewing court shall...hold unlawful and set aside agency action, findings, and conclusions

found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A). Review under this standard is "searching and careful," but

"narrow." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). A reviewing court

may uphold an agency's decision only on the basis of the reasoning found in that decision.

*Anaheim Mem'l Hosp. v. Shalala*, 130 F.3d 845, 849 (9th Cir. 1997).

In evaluating whether an agency action is arbitrary and capricious, the court "is first required to decide whether the [agency] acted within the scope of [its] authority.  This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion."  *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402, 415-416 (1971) (citations omitted).  The U.S. Supreme Court has explained that an agency action is arbitrary and capricious

> …if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 42-44.  An agency relies on "factors which Congress has not intended it to consider" when it departs from statutory criteria in making decisions. *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1004-05 (9th Cir. 1998); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1222-1223 (9th Cir. 2004).

B.    Statement of Issues.

    1.    Whether FWS' issuance of the incidental take permit is arbitrary and capricious because FWS relied on conservation value provided by entities other than "the applicant," unenforceable mitigation provisions, an outdated critical habitat designation, and an invalid BiOp.

    2.    Whether FWS' BiOp is arbitrary and capricious because FWS relied on unenforceable mitigation and lacked basis in the record for its findings.

    3.    Whether NMFS' issuance of the incidental take permit is arbitrary and capricious because NMFS relied on unenforceable mitigation, failed to explain whether the HCP minimizes and mitigates to the maximum extent practicable, and relied upon an invalid BiOp.

4.     Whether NMFS' BiOp is arbitrary and capricious because NMFS failed to analyze short-term impacts to salmonids and relied on unenforceable mitigation.

5.     Whether the Services' failure to disclose environmental information and consequences of the proposed action pertaining to the economics of Fruit Growers' implementation of the HCP, and the Services' failure to conduct a quantitative analysis of the direct, indirect, and cumulative effects of the proposed action, violates NEPA.

6.     Whether the Services' failure to disclose and analyze the cumulative effects of timber harvest on nearby public and private lands, the use of herbicides and other chemicals in the project area, and water withdrawals from the project area, violates NEPA.

C.     The FWS' "Minimize and Mitigate" Finding is Arbitrary and Capricious Because FWS Relied on Conservation Value Provided by an Entity Other Than "The Applicant."

The FWS' finding that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of [the] taking," *see* 16 U.S.C. § 1539(a)(2)(B)(ii) *and* AR 40126-129, is arbitrary and capricious because FWS "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  Specifically, by giving high conservation values to owl circles that encompass an abundance of federal land, and by then crediting FGS with the entire conservation value of those owl circles because FGS committed to maintaining a CSA that comprises a small fraction of the land in the circle, FWS credited FGS for conservation value that someone other than "the applicant" will provide.  FWS' "minimize and mitigate" finding is arbitrary and capricious because FWS considered factors Congress did not intend it to consider when it credited FGS for conservation value provided by neighboring landowners.

In making the Section 10(a)(2)(B)(ii) finding, FWS may only consider minimization and mitigation measures "the applicant will" take under the HCP.  The ESA is unambiguous on this point.  In setting forth the contents of an application for an incidental take permit, Section

10(a)(2)(A)(ii) requires the applicant to explain "what steps *the applicant will take* to minimize and mitigate" the impacts of the taking.  16 U.S.C. § 1539(a)(2)(A)(ii) (emphasis added). Section 10(a)(2)(B)(ii) then requires FWS to find that "*the applicant will*, to the maximum extent practicable, minimize and mitigate the impacts of such taking."  16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added).  The applicant is the entity seeking permit coverage, and the word "will" means "the mandatory sense of 'shall' or 'must.'"  *Burns v. Alcala*, 420 U.S. 575, 580–581 (1975); Black's Law Dictionary 1433 (5th Ed. 1979).  Accordingly, FWS can only evaluate what "the applicant" "must" do under the HCP and determine whether those actions—and only those actions—will minimize and mitigate the impacts of the proposed taking.

The Services' own guidance confirms that the Services may only consider habitat conservation measures that are provided by the applicant and enforceable under the HCP. According to the Services, one of the "few ironclad rules" of mitigation programs is that "that they are manageable and enforceable."  HCP Handbook at 1-16.  Where an HCP covers activities implicating multiple owners, the permit-holder must "have the authority to regulate or control all or applicable parts of the HCP program" and "the conditions of the HCP [must be] enforceable." *Id.* at 3-2 to 3-3.  The Services recognize that HCPs may implicate multiple landowners:

> Some HCPs may involve interests other than the applicant or permittee.  In these cases, the applicant must have specific authority over the other parties affected by the HCP and be willing to exercise that authority, or must secure commitments from them that the terms of the HCP will be upheld. In the latter case, agreements between the FWS or NMFS and the other groups, or legally binding contracts between the applicant and such individuals or interests, may be necessary to bind all parties to the terms of the HCP.

*Id.* at 7-5 to 7-6.

Case law also confirms that FWS can only consider actions that "the applicant will" take. In *Sierra Club v. Babbitt*, the court rejected approval of an HCP where the FWS relied on mitigation provided by non-applicants, holding that "the FWS cannot comply with the strict ESA

1   mandate that the HCP 'minimize and mitigate' the effects of the projects to the 'maximum extent

2   practicable' simply by relying on speculative future actions of others."  15 F. Supp. 2d at 1282.

3   By contrast, courts have upheld HCPs where multiple applicants have applied for joint incidental

4   take permits with mutually binding and enforceable mitigation measures.  *See Friends of*

5   *Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 984 (9th Cir. 1985); *WildEarth Guardians v.*

6   *U.S. Fish and Wildlife Service*, 622 F.Supp.2d 1155, 1159-60 (D. Utah 2009).  These cases all

7   confirm what is clear from the statute:  FWS must make its Section 10(a)(2)(B)(ii) finding based

8   only on what "the applicant will" do, not based on what some other entity that is not bound by

9   the permit may or may not do.

10      Section 10's requirement that the Services may only consider mitigation measures "the

11   applicant" will carry out harmonizes with the broader statutory context.  Section 10 functions as

12   a step-by-step framework for the formation of a contract between the applicant and the Services.

13   *See* 16 U.S.C. § 1539(a)(2)(A) (offer); (B) (acceptance); (C) (formation); *see also Plum Creek*

14   *Timber Co., Inc. v. Trout Unlimited*, 255 F. Supp. 2d 1159, 1168 (D. Idaho 2003) (analyzing

15   HCP as a contract in deciding Declaratory Judgment Act claim).  Viewed in the contract context,

16   it is appropriate that the Services may only rely on enforceable terms, for only enforceable terms

17   guarantee the Services the benefit of the bargain.  Reliance on enforceable mitigation also

18   accords with the statutory mandate to minimize risk to threatened and endangered species, *Sierra*

19   *Club v. Marsh*, 816 F.2d at 1386, and the stated purpose of the ESA that all federal agencies

20   "shall seek to conserve endangered species and threatened species and shall utilize their

21   authorities in furtherance" of that purpose.  16 U.S.C. § 1531(c)(1).

22      FWS' finding that FGS will minimize and mitigate the impacts of taking 83 northern

23   spotted owls is unlawful because the Service credited FGS for conservation value provided by

24   neighboring landowners even though those neighboring landowners are not "applicants" for the

incidental take permits.  FGS is the only applicant for the incidental take permits, AR 35942; the only party besides the Services bound by the implementation agreement, AR 40047; and the only party subject to the terms of the incidental take permit, AR 40109.  Because FGS is the only "applicant," FWS may only consider mitigation provided by FGS in determining whether the HCP's conservation measures adequately compensate for the take of 83 spotted owls.  16 U.S.C. 1539(a)(2)(B)(ii).  *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (citations omitted) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'")

But that is clearly not what the Service did.  Instead, FWS gave FGS mitigation credit for all spotted owl habitat in the owl circles where FGS committed to maintaining a CSA even though the vast majority of that habitat is on land that FGS does not own and that is not subject to the HCP.  AR 40127.  To support its "minimize and mitigate" finding, FWS relied on the "conservation value matrix" that FWS and FGS developed in Chapter 6 of the HCP.  AR 40127; s*ee* AR 36193-361200.  While the matrix is complicated, examining how it operates reveals that FWS gave FGS mitigation credit for conserving entire owl circles even where FGS will at best preserve only tiny fractions of those circles, based on its assumption that surrounding landowners will preserve the habitat in those areas for the entire length of the permit term.

To make its "minimize and mitigate" finding FWS compared the conservation value of the owl circles containing CSAs to the conservation value of the owl circles in which FGS can log.  AR 36193-96.  FGS and FWS first added up the conservation value of all of the owl circles to produce a regional conservation value total.  AR 36198.  To determine the conservation value of the 24 owl circles supported by the CSAs, FWS then divided the total regional conservation value by the value of the circles supported by the CSAs.  AR 36198.  Using that approach, FWS

1  determined that: 1) the conservation value of the owl circles supported by CSAs comprises 55

2  percent of the total conservation value in the area; 2) the conservation value of the owl circles in

3  which FGS can freely log but will not cause take comprises 27 percent of the total; and 3) the

4  conservation value of the owl circles in which FGS' logging will cause take comprises 18

5  percent of the total.  AR 36200.  FWS then adopted this analysis as the basis for its Section

6  10(a)(2)(B)(ii) finding.  AR 40127 (finding that the HCP minimizes and mitigates take to the

7  maximum extent practicable because "the activity centers protected by the CSAs contribute

8  approximately 55 percent of the total conservation value in the area of impact").

9         FWS departed from the statutory criteria that required it to find that "the applicant will"

10  minimize and mitigate the impacts because it attributed the entire conservation value of

11  numerous owl circles to FGS even though FGS will preserve only small amounts of habitat in

12  those circles.  FGS received conservation credit for the entire circle when in fact, if any benefit is

13  provided at all, the vast majority of it will be provided by the other landowners in the circles,

14  primarily the Forest Service.

15         Drilling down on one owl circle reveals the irrationality of FWS' analysis.  In the owl

16  circle labeled SK238, the HCP requires FGS to temporarily preserve zero acres of habitat in the

17  core nesting and roosting area and 66 acres of habitat in the outer ring, comprising less than 2

18  percent of the total owl circle.  AR 36137; AR 36412 (map showing FGS land as sliver on far-

19  right side of circle).  Despite FGS' marginal contribution, and despite the fact that the Forest

20  Service controls over 2,400 acres of habitat in that owl circle, AR 34184, FWS credited FGS

21  with 111 "conservation value" points (the total conservation value of the circle) when

22  determining whether FGS mitigated the impacts of take to the maximum extent practicable.  AR

23  36194.  According to FWS, the conservation value of FGS preserving 66 acres in SK238 (111

24  points) outweighs the conservation value lost by logging in 23 other owl circles (102 points in

1    total), *even though FGS' logging in those 23 owl circles will eliminate 18,875 acres of suitable*

2    *owl habitat and take approximately 40 northern spotted owls.*[4]

3         SK238 is just one example among many.  For 13 of the 24 CSA's, the CSAs comprise

4    less than 10 percent of the total area of the owl circle.  AR 36137.  For 17 of the 24 CSA's, the

5    CSA comprise less than 15 percent of the total area of the owl circle.  AR 36137.  Based on those

6    percentages, under the HCP's own criteria, AR 36191-92, the decision to log or protect those 17

7    CSAs will neither cause nor prevent take.  Yet in each instance FWS gave FGS credit for

8    preserving the entire owl circle.  AR 36195-95.

9         The flaws in the accounting system drew internal criticism at FWS.  Brian Woodbridge,

10   regional Northern Spotted Owl Recovery Chair for FWS, specifically reviewed FGS' mitigation

11   in a different owl circle, SK099.  AR 7728.  FGS commits to protecting 1 acre of suitable habitat

12   in the core area and 305 acres overall, yet FWS gave FGS 100 points of mitigation credit.  *See*

13   AR 36137; AR 34183.  Mr. Woodbridge called FGS' commitments "ludicrous" and "illusory,"

14   asking "why bother calling it conservation." AR 7728.

15        After wading through the complex formulas, pie charts, and tables, FWS' "minimize and

16   mitigate" finding boils down to these key facts:  the HCP requires FGS to preserve very little

17   habitat on its lands and allows FGS to log more than 80 percent of the suitable owl habitat on its

18   property, AR  36202, based on the premise that temporarily preserving small amounts of habitat

19   will have a huge conservation benefit because those lands are near habitat on Forest Service

20   lands.  Giving FGS credit for conservation value provided by the Forest Service renders FWS'

---

21

22   [4]      The sum of the conservation value for the 23 least "valuable" owl circles where take will
     occur is 102.  AR 36195-96.  The 23 take sites are SK333, 369, 467, 358, 364, 360, 368, 361,
23   475, 363, 534, 046, 450, 365, 391, 309, 205, 454, 474, 389, 388, 533, and 473.  *Id.*  Table 7 in
     the FWS Biological Opinion shows how many acres of habitat are currently on FGS lands in
24   each owl circle.  AR 34182-91.  There are 18,875 acres of owl habitat total in the 23 owl circles
     where take will occur under the HCP.  *Id.*

minimize and mitigate finding unlawful because it takes into account actions taken by a party

other than "the applicant," which is a factor "Congress has not intended it to consider."  *Motor*

*Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Additionally, the FWS' "minimize and mitigate" finding is arbitrary and capricious

because there is no "rational connection between the facts found and the conclusions made."  *Or.*

*Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997).  The 7,100 acres of CSAs are

temporary conservation efforts:  logging can occur in CSAs during the permit term and FGS can

log them in their entirety after the HCP expires.  AR 34228; AR 38921.  FWS' finding that the

conservation value of the 7,100 acres in CSAs "outweighs the conservation value" of the 36,626

acres of spotted owl habitat subject to harvest, AR 40126, is arbitrary and capricious because

there is no credible explanation for how temporarily preserving 7,100 acres outweighs the

impacts of permanently destroying 36,626 acres of a threatened species' habitat.  AR 5860 (FWS

staff comment on draft HCP: "It is far from clear how managing 10,000 acres mitigates for

adversely affecting (in the initial years of the permit) almost 3x's that acreage over the permit

term. So may have an MEP [maximum extent practicable] issue."); *c.f. Nat'l Wildlife Fed'n v.*

*Norton*, 2005 WL 2175874 at *14 (upholding HCP with mitigation ratio of .5 to 1, where

mitigation land held in permanent reserves).

Moreover, while the CSA selection and conservation value analysis was driven almost

entirely by proximity to critical habitat, AR 17916, FWS adopted a revised critical habitat

designation prior to permit approval and failed to provide any analysis of the impact of that

revision on the Section 10 findings.  *See* 77 Fed. Reg. 71876 (Dec. 4, 2012) (stating that FWS

submitted revised critical habitat prior to court-ordered deadline of Nov. 21, 2012); AR 40121

(permit issuance on Nov. 27, 2012).  Finally, FWS' finding that"[t]he higher costs to the

applicant of conserving additional activity centers on the FGS ownership is not necessary to

minimize and mitigate the impacts of take…," AR 40128, is arbitrary and capricious because, by crediting FGS for conservation value it was not providing, FWS greatly overstated the benefits of FGS' conservation efforts and greatly understated the impacts of FGS logging on spotted owls. Clearly FGS could have done more to minimize and mitigate its impacts on spotted owls. *See Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d at 1292.

D.   <u>The FWS' Minimize and Mitigate Finding Is Arbitrary and Capricious Because FGS' Promise to Reduce Clearcutting is Illusory and Unenforceable.</u>

FWS' Section 10(a)(2)(B)(ii) finding is also arbitrary and capricious because it relies on an illusory FGS promise "to promote" an increase in dispersal habitat across its lands by reducing clearcutting. But the HCP does not require FGS to reduce clearcutting or to increase dispersal habitat, nor does the HCP provide any means to measure whether FGS is actually accomplishing those goals. The ESA does not allow FWS to make the Section 10(a)(2)(B)(ii) finding based on just good intentions. It requires FWS to find that "the applicant *will*" take the steps required to minimize and mitigate the impacts of the taking to the maximum extent practicable. 16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added). FWS' reliance on expected decreases in clearcutting is unlawful because the HCP does not require FGS to reduce clearcutting or to increase dispersal habitat across its lands.

In *Sw. Ctr. for Biological Diversity*, 470 F. Supp. at 1140, the court rejected FWS' issuance of an incidental take permit based on the applicant's commitments to "avoid" vernal pool habitat "to [the] maximum extent practicable." The court reasoned that reliance on avoidance measures as mitigation was unlawful because open-ended commitments to "avoid" areas are unmeasurable and unenforceable. *Id.* As a result, the court found that "the duty to 'avoid' vernal pools is toothless" and that "passing, undefined references to 'avoidance' do not satisfy the ESA." *Id.* at 1141 (citing *TVA v. Hill*, 437 U.S. at 174).

1        In making the "minimize and mitigate" finding at issue here, FWS relied on its finding

2  that "changes in timber management practices in the proposed HCP are expected to result in an

3  increase in northern spotted owl foraging and dispersal habitat across FGS ownership over the

4  permit term due to a decrease in clearcutting and other even-aged management practices."  AR

5  40140; AR 40128.  That finding is undermined by FGS' plan to log over 36,000 acres of spotted

6  owl habitat during the permit term.  Indeed, the only assurance in the HCP regarding reduction of

7  clearcutting is the statement that "FGS will *promote* forest management practices that develop

8  and maintain dispersal habitat across its ownership to provide connectivity between the CSAs

9  and nearby federal lands."  AR 36139 (emphasis added).

10        The promise to "promote" certain forest practices, like the promise to "avoid" vernal

11  pools, is unenforceable.  *See Sw. Ctr. for Biological Diversity,* 470 F. Supp. 2d at 1140.  The

12  HCP does not impose an obligation to reduce clearcutting or to increase dispersal habitat, much

13  less require FGS to replace the tens of thousands of acres of foraging habitat it will log during

14  the permit term.  AR 34260 ("Implementation of the FGS HCP is anticipated to result in a … 31

15  percent reduction in foraging habitat from current levels…").  Similarly, the HCP has no criteria

16  by which to measure what constitutes dispersal habitat; the conservation value of dispersal

17  habitat to the owl; whether forests provide the intended dispersal function; how many acres of

18  dispersal habitat will be provided; where those acres will be located; or when they will exist.  *See*

19  AR 5762 (FWS staff conceding that "[n]ot having an accounting system for dispersal habitat is a

20  vulnerability").  The HCP simply has no mechanism for FWS or the public to enforce or monitor

21  promises to increase dispersal habitat.  Indeed, the HCP expressly states:

> 22  Because FGS will maintain a forested landscape on its ownership, the biological
> objective for dispersal habitat will be met. No compliance monitoring or
> 23  additional reporting is required to document compliance with this measure.

24

1    AR 36225.  But the conclusion that any "forested landscape" constitutes dispersal habitat is flat

2    wrong.  *See* AR 38942 ("The Services agree…that…stating 'almost any forested landscape can

3    provide dispersal opportunities' for northern spotted owl is an oversimplified, if not incorrect,

4    characterization of dispersal habitat.").  The lack of actual requirements or compliance

5    monitoring renders any assurances that FGS will increase dispersal habitat unenforceable.  As in

6    *Sw. Ctr. for Biological Diversity*, the commitment to "promote" different forest management is

7    "toothless."  470 F. Supp. 2d at 1140.  Reliance upon that supposed commitment renders FWS'

8    Section 10(a)(2)(B)(ii) finding invalid because the HCP does not ensure that "the applicant *will*"

9    reduce clearcutting and increase dispersal habitat across its lands.

10    E.    The FWS' Reliance on FGS' Unenforceable Promise to Reduce Clearcutting Renders the
          "No Jeopardy" Findings FWS Made in its Biological Opinion and Under Section

11        10(a)(2)(B)(iv) Arbitrary and Capricious.

12        FWS' reliance on FGS' unenforceable promise to promote reductions in clearcutting also

13    renders its "no jeopardy" findings arbitrary and capricious.  FWS' reliance on voluntary and

14    unenforceable mitigation measures plainly violates the ESA's requirement that agencies rely

15    only on mitigation measures that are enforceable under the ESA.

16        In *Nat. Wildlife Fed'n v. NMFS*, 524 F.3d at 935-936, the U.S. Court of Appeals for the

17    Ninth Circuit reviewed a BiOp in which NMFS relied on an action agency's intention to mitigate

18    impacts from building a dam by installing fish passage structures "where feasible."  The court

19    invalidated the BiOp because it was "not persuaded that even a sincere general commitment to

20    future improvements may be included in the proposed action in order to offset its certain

21    immediate negative effects, absent specific and binding plans."  *Id.*; *see also Ctr. for Biological*

22    *Diversity v. Bureau of Land Mgt*, 698 F.3d at 1117 ("a conservation agreement entered into by

23    the action agency to mitigate the impact of a contemplated action on a listed species must be

24

1    enforceable under the ESA to factor into the FWS' biological opinion as to whether an

2    action…is likely to jeopardize the continued existence of a listed species…").

3            In its BiOp, FWS expressly and repeatedly relies on expected increases in foraging and

4    dispersal habitat to make its finding that implementation of the HCP will not jeopardize the

5    species or adversely modify critical habitat.  *See, e.g.*, AR 34241 (concluding in BiOp that "[a]n

6    important aspect of the HCP is the ownership-wide increase in foraging and dispersal habitat that

7    is predicted to occur due to changes in FGS's management practices."); AR 34249 (concluding

8    that loss of owl habitat will be mitigated by increase in foraging habitat); AR 34252 (same); AR

9    34260-61 (same).  FWS justifies its reliance by referencing two potential sources of a

10   requirement to increase dispersal habitat:  (1) California Forest Practices Rules requiring timber

11   companies to adopt maximum sustained production plans and (2) "page 2-18 of the Final EIS."[5]

12   AR 34215-16; AR 34241.  But the FEIS and relevant California Forest Practices Rules do not

13   require FGS to increase dispersal habitat on its lands and, moreover, they are unenforceable

14   under the ESA.

15           FEIS page 2-17 states:

16           Issuance of the ITPs would allow the applicant to harvest more of the currently
             suitable northern spotted owl habitat on its ownership. The applicant has indicated
17           that this would reduce the amount of even-aged regeneration harvest
             (clearcutting) necessary to meet financial targets… Under the Proposed Action, it
18           is anticipated that there would be about a 10 percent decrease in acres harvested
             each decade, including as much as a 25 percent decrease in even-age regeneration
19           harvest (clear cuts) compared to the No Action Alternative.

20   AR 38400.  This statement does not create a requirement because it is based entirely on what the

21   applicant "has indicated" and because environmental impact statements are not enforceable

22   elements of the HCP.  AR 36133 (HCP stating that Chapter 5.3 of the HCP "reflect[s] all the

23   _____

24   [5]      This appears to be a typographical error, as page 2-18 of the FEIS concerns road
     management practices.  *See* AR 38401.  It appears that FWS was referencing page 2-17, which
     discusses timber management and Maximum Sustained Production ("MSP").  *See* AR 38400.

1    binding, enforceable commitments FGS will make to satisfy the requirements of Section 10(a) of

2    the Endangered Species Act.").  Moreover, the EIS plainly states that reducing clearcutting is

3    based on whether FGS can do so and still meet "financial targets."  But those targets are not

4    disclosed anywhere in the record and there are no compliance measures in place to determine

5    whether or when FGS will have met its "financial targets" such that it must begin reducing

6    clearcutting.  FWS' reliance on the FEIS is fatally flawed because the FEIS does not demonstrate

7    that FGS will in fact reduce clearcutting, nor does it impose any such requirement on FGS.[6]

8           FWS also erroneously relies on the FGS "MSP analysis." AR 38701.  MSP is the

9    abbreviation for "Maximum Sustained Production," a calculation the California Forest Practices

10   Rules require timber companies to develop.  *See* 14 C.C.R. § 913.11.  Under California law, the

11   timber producer must put forth a plan "balancing growth and harvest over time."  14 C.C.R. §

12   913.11(a)(2).  However, the "the yield of timber products" is "specified by the landowner," and

13   may be revised at any time.  14 C.C.R. § 913.11(a)(1); *see also* AR 499 (FGS stating that the

14   MSP "did not include any specific modeling relating to the HCP's Proposed Action.").  Here

15   again, FWS reliance on FGS' MSP analysis is erroneous because that analysis does not require

16   FGS to reduce clearcutting or increase dispersal habitat during the life of the HCP.  In fact, the

17   MSP analysis in the record shows that the opposite will occur—FGS plans to increase

18   clearcutting over the next decade.  AR 2120.

19          Nothing in the HCP or BiOp requires FGS to increase dispersal habitat over the permit

20   term.  No other document or regulation requires FGS to increase dispersal habitat over the permit

21   term, and even if it did, reliance on mitigation that is not enforceable under the ESA renders a

---

[6]     To the extent that FWS relied on financial targets, the 2007 MSP analysis, or an updated MSP analysis as part of the FGS application for an incidental take permit, FWS violated ESA Section 10(c), which requires the Secretary to publish notice of the application in the Federal Register and make all of the application available for public notice and comment.  16 U.S.C. 1539(c); *Gerber v. Norton*, 294 F.3d 173, 179 (D.C. Cir. 2002).

BiOp invalid. *Ctr. for Biological Diversity v. Bureau of Land Mgt*, 698 F.3d at 1117. FWS'

reliance on voluntary and unenforceable mitigation renders its "no jeopardy" determinations

under ESA Section 10(a)(2)(B)(iv) and Section 7(a)(2) arbitrary and capricious. *Nat'l Wildlife*

*Fed'n v. NMFS*, 524 F.3d at 935-936.

FWS' reliance on increases in foraging and dispersal habitat is also fatal to FWS' finding

that implementation of the HCP will not destroy or adversely modify critical habitat. 16 U.S.C.

§ 1536(a)(2); AR 34261. Many of the owl circles in which FGS is authorized to log border on

critical habitat and FGS anticipates carrying out most of that logging in the first decade of

implementation. AR 39-40 (maps showing owl circles before and after implementation of the

HCP); AR 34249 (stating expectation that FGS will log over 17,000 acres of habitat in first

decade). FWS acknowledged that logging under the HCP will degrade critical habitat "by

creating fragmentation and 'edge effects' along the boundaries of FGS lands and adjacent critical

habitat," but ultimately concluded there will be no adverse modification of critical habitat

because "implementation of the FGS HCP will reduce this contrast during the 50-year permit

term as stands develop as forecasted in the MSP modeling." AR 34261. FWS' analysis is

arbitrary and capricious because: 1) MSP modeling is not enforceable, *see supra*; 2) impacts to

critical habitat are site-specific, yet nothing in the HCP governs the location of any foraging or

dispersal habitat that FGS may develop as mitigation; 3) FWS' analysis was based on a critical

habitat designation that became outdated before permit issuance; and 4) FWS' long-term analysis

ignores short-term impacts to the species, *see Pac. Coast Fed'n v. NMFS*, 265 F.3d at 1037-38.

F.    The FWS' "No Jeopardy" Findings Are Arbitrary and Capricious Because FWS Relied
      on the Incorrect Assumption that Forests Surrounding FGS Lands Will Remain
      Unchanged During the 50-year Permit Term.

FWS' "no jeopardy" findings are also arbitrary and capricious because to make them

FWS assumed that northern spotted owl habitat outside of FGS lands would persist unchanged

for the entire 50-year permit term even though FWS' own BiOp predicts significant declines in

spotted owl habitat on surrounding Forest Service lands due to logging, fire, disease, and

competition from barred owls.  A BiOp is arbitrary and capricious if it rests on internally

inconsistent assumptions.  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010).

FWS' biological opinion analyzed the landscape surrounding FGS lands using habitat data from

2005, AR 36191, and assumed those habitat conditions would persist until 2062 (the end of the

permit term), "to avoid speculating on the types of changes that may occur on these lands over

time."  AR 34181.  FWS then measured the impacts of implementation of the HCP over the

permit term and found that the impact of FGS' logging on local and regional owl populations

would be small.  AR 34245; AR 34246.  Based in part on the assumption that habitat conditions

will remain unchanged from 2005 conditions on nearby lands, FWS also concluded that the 24

owl circles that contain CSAs will continue to have sufficient habitat on non-FGS lands to

support spotted owls over the 50 year permit term.  AR 34247.

   In fact, spotted owl habitat in the Action Area is declining and will continue to decline

significantly, as FWS concedes elsewhere in its BiOp.  The BiOp notes:  "[t]hreats to the

northern spotted owl in this region include habitat loss due to fires, Federal and private

management activities, displacement by barred owls, forest health (insect outbreaks and disease),

and potential for avian disease."  AR 34194.  The BiOp then documents that fire alone

eliminated more than 71,600 acres of suitable habitat in the Klamath province over a recent 13-

year period.  AR 34195.  The BiOp also documents that from 1994-2007 logging and natural

disturbance eliminated 5.2 percent of the nesting and roosting habitat on federal lands in the

California Klamath Province.  AR 34194-95.  It also recognizes that logging occurs on the

approximately 25,000 acres of suitable NSO habitat on private lands in the Area of Impact and

concedes that "it can be expected that commercial timber harvest will continue in the future." AR 34257.

The Forest Service lands on which FWS relies so heavily are simply not protected habitat reserves. The Forest Service manages its lands according to a statutory multiple use mandate that requires timber extraction, 16 U.S.C. § 1604(e), and it routinely logs northern spotted owl critical habitat. *See, e.g.*, *Conservation Cong. v. U.S. Forest Serv.*, 720 F.3d 1048 (9th Cir. 2013) (denying preliminary injunction on 13,830 acre timber sale, including 544 acres of spotted owl critical habitat); *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122 (9th Cir. 2010) (documenting loss of 3,736 acres of suitable owl habitat in fire event and upholding timber sale of additional 618 acres); *Or. Nat'l Res. Council v. U.S. Bureau of Land Mgmt.*, 470 F.3d 818 (9th Cir. 2006) (overturning environmental assessment after completion of timber sale in spotted owl critical habitat).

Spotted owl habitat in the Action Area is declining and it is doing so at an accelerating rate. Barred owls, which render habitat inhospitable to spotted owls and which FWS has recognized as a "significant additional threat to spotted owl conservation," 77 Fed. Reg. 14063, "are predicted to become established in the Action Area within 5 years." AR 34196; AR 34201. Due to the impacts of climate change, plantation forestry, and fire suppression regimes, fires are burning with increasing intensity and size. AR 34225; AR 34195. Increasing winter temperatures have already resulted in increasing range of invasive insect pests that harm forest health. AR 14253-54. Regardless of the cause, it is certain that habitat amounts and conditions on lands near FGS lands will *not* remain static for the next fifty years.

FWS' inconsistent analysis is similar to the analysis the Ninth Circuit rejected in *Wild Fish Conservancy*, 628 F.3d at 527-28. In *Wild Fish Conservancy*, FWS found that operation of a dam had caused declines in the local bull trout population for nearly 70 years. *Id.* Yet

1    elsewhere in the BiOp, FWS found that continued operation of the dam was "not likely to change

2    the current distribution of the bull trout in the action area." *Id.* The court invalidated the BiOp

3    due to FWS' reliance on conflicting findings to reach its conclusion, holding that FWS failed to

4    articulate a rational connection between the facts found and the conclusions made. *Id.* at 527.

5         FWS's contradictions here likewise compel invalidation of the BiOp. The BiOp

6    documents a steady decline of owl habitat on public and private lands in the Klamath region. AR

7    34194-95. Yet in analyzing local and regional impacts of FGS' logging and arriving at a "no

8    jeopardy" conclusion, FWS assumed that spotted owl habitat conditions on tens of thousands of

9    acres in the Klamath National Forest will remain unchanged during the 50-year permit term. AR

10   34181. By assuming that the amount and quality of habitat on Forest Service lands will remain

11   unchanged when in fact FWS knows it will decline over time, the agency over-estimated the

12   conservation value of FGS conservation efforts *and* under-estimated the impacts FGS logging

13   will have on regional spotted owl populations. Both errors undermine the validity of FWS' "no

14   jeopardy" findings. Because the agency relied on conflicting findings the BiOp is arbitrary and

15   capricious. *Wild Fish Conservancy*, 628 F.3d at 527.

16   G.   NMFS' "No Jeopardy" Findings are Arbitrary and Capricious Because NMFS Did Not
         Evaluate Short-Term Impacts to Fish at a Sufficiently Specific Spatial Scale.

17        NMFS' BiOp is invalid because NMFS failed to evaluate impacts to SONCC coho on a

18   timeline that reflects their life cycle and migration patterns, and made generalized assessments of

19   habitat impacts rather than providing stream or site-specific analysis. Biological opinions must

20   evaluate impacts to fish as they actually occur: using a time-scale that reflects the life cycles of

21   the fish being evaluated and at a spatial scale that reflects site-specific conditions. *Pac. Coast

22   Fed'n v. NMFS*, 265 F.3d at 1037-38 (BiOp analyzing impacts to salmon on a 10-year scale at

23   the watershed level is invalid because "[t]his generous time frame ignores the life cycle and

24

1    migration cycle of anadromous fish" and because "assuming away site-specific degradations that

2    could lead to a jeopardy finding contradicts the purpose of ESA and is arbitrary.")

3        SONCC have a three-year life cycle, AR 37658, but NFMS conducted no analysis of

4    impacts on the three to five year scale and no stream- or site-specific analysis.  NMFS instead

5    based its "no jeopardy" finding on its conclusion that logging under the HCP would generally be

6    better than logging under California's forest practices rules across the FGS landscape.  NMFS

7    relied on a general conclusion that "over the duration of the 50-year permit, improvements to

8    habitat will occur" relative to California forest practices regulations.  NMFS AR 150905-06; AR

9    37783; *see also* AR 37745 ("Impacts to salmonids or designated critical habitat could occur

10   during the period between permit issuance and treatment if road sites fail and deliver

11   sediment…However, we believe sediment delivery will occur at lower rates and quantities

12   within the first 15 years.").  For three watersheds, NMFS conducted cursory analysis of impacts

13   occurring over the first ten years of implementation on a broad watershed scale.  AR 37749.  But

14   even there, NMFS failed to analyze impacts at a sub-watershed scale and declined to analyze

15   short-term impacts because "[t]he timeframe for harvesting cannot adequately be predicted as the

16   lumber economy plays a significant factor in the statewide timber harvest rates."  *Id.*

17       NMFS' failure to analyze short-term impacts at a sufficiently specific scale is closely

18   analogous to the analysis overturned in *Pac. Coast Fed'n v. NMFS*.  There, as here, NMFS

19   concluded that long-term mitigation would outweigh short-term impacts of logging to SONCC

20   coho.  *Pac. Coast Fed'n v. NMFS*, 265 F.3d at 1037-38. The Ninth Circuit rejected such analysis:

21       The NMFS predicts that more trees will grow within the watershed during the
         ensuing decade than are cut in the proposed project and, therefore, concludes that

22       the "short-term" and "localized" effects of the logging will be naturally mitigated
         by regrowth. This optimism may be justified for the purpose of counting trees, but

23       for the purpose of counting anadromous fish, it is wholly unrealistic.

24

*Id.* Here, once again, NMFS has disregarded the court of appeal's "clear instruction that NMFS 'must consider near term habitat loss to populations with short life cycles.'" *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d at 934 (citing *Pac. Coast Fed'n v. BOR*, 426 F.3d at 1094). NMFS' "no jeopardy" findings are fatally flawed because NMFS failed to adequately analyze impacts on the timescale that matters most: the life-cycle of the affected fish. SONCC have a three-year life cycle, and considering the impact to salmon over a ten year or longer period "entirely fail[s] to consider an important aspect of the problem." *Pac. Coast Fed'n v. BOR*, 426 F.3d at 1094 (*citing Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43); *Pac. Coast Fed'n v. NMFS*, 265 F.3d at 1037; *Nat'l Wildlife Fed. v. NMFS*, 524 F.3d at 934-35. An agency does not avoid the likelihood of jeopardy to a listed species when it disregards the life cycle of the species in crafting the measures designed to protect it. *Pac. Coast Fed'n v. BOR*, 426 F.3d at 1094.

H.   <u>NMFS "Minimize and Mitigate" and "No Jeopardy" Findings Are Arbitrary and Capricious Because NMFS Relied on Voluntary and Unenforceable Mitigation.</u>

Like FWS, NMFS violated the ESA by relying on voluntary and unenforceable mitigation in its no jeopardy findings. The "proper course" is for the Services to "exclude [unenforceable measures] from the analysis and consider only those actions that are in fact under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d at 936 n. 17; *see also CBD v. BLM*, 698 F.3d at 1117; *Sw Ctr. for Biological Diversity*, 470 F. Supp. at 1141; *Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 350-51 (E.D. Cal. 2007); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1151–53 (D. Ariz. 2002). Here, however, NMFS relied on numerous voluntary and unenforceable provisions, rendering its "no jeopardy" findings arbitrary and capricious.

First, NMFS erroneously relied on the notion that FGS will increase protections for fish in response to monitoring results.  In *Natural Res. Def. Council v. Kempthorne*, the court considered an "adaptive management" plan that required the agency to go through a process to determine whether further environmental protections were necessary to protect listed species. Reliance on the adaptive management plan violated the ESA because "[a]lthough the *process* must be implemented by holding meetings and making recommendations, nothing requires that any *actions* ever be taken."  506 F. Supp. 2d at 350-51 (emphasis in original).

Here, NMFS explicitly found that FGS met the "minimize and mitigate" requirement because the "monitoring programs described in the HCP will assist in determining if and when it is necessary to change the plan's conservation measures to achieve the plan's biological objectives."  NMFS AR 150906.  NMFS likewise repeatedly relied on the monitoring program in the BiOp to make its no jeopardy determination.  AR 37738-39 (reliance on response to temperature monitoring); AR 37748 (reliance on response to sediment monitoring).

But the monitoring program requires no actual action in response to any monitoring results.  If stream temperatures rise in conjunction with FGS logging, the monitoring program requires only "further assessment."  AR 36215.  Sediment increases will be documented in reports, assessments, and trend analysis, but the monitoring program sets no thresholds and requires no action.  AR 36219-22.  Nor can NMFS impose more protective conservation measures on FGS in response to monitoring results.  NMFS granted FGS "no surprises" assurances, so if additional conservation and mitigation measures are deemed necessary to respond to changed circumstances, NMFS lacks authority to require any conservation and mitigation measures beyond those provided for in the plan without the consent of the permittee. 50 C.F.R. § 222.307(g)(2)-(3); *see also* AR 36247 (HCP stating that the Services may not require any additional mitigation from FGS).

1        Just as in *Kempthorne*, the HCP requires a process, but no action, in response to

2    effectiveness monitoring.  As a result, any changes in response to the monitoring program are

3    unenforceable under the ESA and reliance on the monitoring program in the Section 10 findings

4    and BiOp renders those decisions arbitrary and capricious.  506 F. Supp. 2d at 356; *see also CBD*

5    *v. BLM*, 698 F.3d at 1117.

6        Second, NMFS relied on many aspirational and unenforceable assurances from FGS that

7    are virtually identical to the promises to "avoid" vernal pool habitat that were rejected in *Sw. Ctr.*

8    *for Biological Diversity*, 470 F. Supp. 2d at 1141.  In making its "no jeopardy" finding, NMFS

9    notes the impacts of roads on FGS lands and repeatedly relies on the fact that FGS "anticipates"

10   decommissioning old roads and not building many new ones.  AR 37739; AR 37750; AR 37744.

11   Similarly, the BiOp relies on the expectation that "the HCP road management plan will result in

12   the gradual reduction of active road mileage across the plan area."  AR 37744.  But the HCP

13   does not require FGS to decommission any roads or impose concrete limits on new road

14   construction.  Rather, the HCP only states that "FGS will use existing roads *whenever feasible*,

15   *strive* to minimize total mileage, *minimize* disturbance to natural features, *avoid* wet areas and

16   unstable areas, and *minimize* the number of watercourse crossings." AR 36173 (emphasis added).

17   Indeed, the road management plan is a collection of existing California forest practices

18   regulations, most of which only apply where "feasible."  *See, e.g.*, AR 36334 ("FGS will utilize

19   existing roads whenever feasible…"); AR 36338 ("To the extent feasible, new roads will be

20   constructed so the road network will not drain directly into watercourses…crossings shall be

21   kept to a feasible minimum).

22       The HCP's directives to "avoid," "strive," "minimize," or to take action only when

23   "feasible" may provide conservation benefits or they may not.  But if not, NMFS lacks any

24   power to enforce such assurances because they are entirely left to the unilateral interpretation and

discretion of FGS.  NMFS' reliance on assurances that a permittee will carry out environmental

protections "if feasible" is arbitrary and capricious and renders its biological opinion arbitrary

and capricious.  *Nat'l Wildlife Fed. v. NMFS*, 524 F.3d at 936 (invalidating BiOp that relied on

mitigation the agency would implement if "feasible").

I.      NMFS' Minimize and Mitigate Finding is Arbitrary and Capricious Because Reducing
        Impacts Does Not Mean that FGS Will Minimize and Mitigate Impacts to the Maximum
        Extent Practicable.

        NMFS' finding that the HCP minimizes and mitigates the impacts "to the maximum

extent practicable," 16 U.S.C. § 1539(a)(2)(B)(ii), is arbitrary and capricious because there is no

rational connection between NMFS' finding that implementation of the HCP will cause

decreasing levels of take over time and NMFS' conclusion that implementation of the HCP will

minimize and mitigate take to "the maximum extent practicable."  Neither the ESA nor the

Services' implementing regulations define "maximum extent practicable."  However, the HCP

Handbook states that the finding "typically requires consideration of two factors: adequacy of the

minimization and mitigation program, and whether it is the maximum that can be practically

implemented by the applicant."  HCP Handbook at 7-3; *Nat'l Wildlife Fed'n v. Norton*, 306 F.

Supp. 2d 920, 927 n. 11 (E.D. Cal. 2004).

        Here, NMFS's primary basis for concluding that the HCP minimizes and mitigates to the

maximum extent practicable is NMFS' finding that FGS' logging will cause decreasing levels of

take over the 50-year permit term, resulting in gradual habitat improvements relative to the

severely degraded status quo.  NMFS AR 150906.  But although conservation groups, the Karuk

Tribe, AR 3763-3797, the U.S. EPA, AR 13530, and California's North Coast Regional Water

Quality Control Board, AR 14113, all called upon NMFS to require faster and more effective

action to address impacts to SONCC coho, NMFS provides no analysis explaining why the

aquatic conservation strategy in the HCP minimizes and mitigates the impacts of the taking to

the maximum extent practicable.  Simply making a bad circumstance better does not mean that more could not be done.  *See Gerber v. Norton*, 294 F.3d 173, 184-85 (D.C. Cir. 2002) ("Merely referencing the Section 10 requirement is not the same as complying with that requirement.").

NMFS' reliance on the road sediment reduction program provides a clear example of NMFS unlawful conflation of habitat improvement with minimizing and mitigating to the maximum extent practicable.  AR 150905 (findings relying on sediment reduction); AR 36127 (sediment reduction program).  The HCP requires FGS, *after* permit approval, to conduct road surveys to determine how much sediment the roads might deliver to streams.  AR 36127.  FGS is then supposed to reduce that amount by 50 percent.  *Id.*  But when it issued the permit NMFS had *no idea* how much sediment FGS roads were delivering to streams or how that sediment was impacting SONCC coho.  NMFS made its "minimize and mitigate" finding entirely on the basis of the expectation that harm to SONCC coho would be reduced relative to impacts that are entirely unknown.  But what is 50 percent of a question mark?  NMFS certainly does not know and its determination that an unknown quantity of mitigation is the "maximum extent practicable" is therefore inherently arbitrary and capricious.  *See Sw. Ctr. for Biological Diversity*, 470 F. Supp. 2d at 1153 ("Another significant problem with the use of the percentage measurement is that the base is undefined.").

There simply is no rational connection between NMFS' finding that the HCP will result in reduced take over time and the conclusion that the HCP will minimize and mitigate take to the maximum extent practicable.  HCP Handbook at 7-3.  NMFS' Section 10(a)(2)(B)(ii) finding lacks a rational connection between facts found and conclusions made and is therefore arbitrary and capricious.  *See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 42 (citation omitted).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

J.      The Services Violated NEPA by Failing to Disclose Environmental Information and Consequences.

The Services also violated NEPA by failing to disclose environmental information and consequences.  NEPA requires federal agencies to take a "hard look" at "all foreseeable direct and indirect impacts" of a proposed action.  *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012); *see also* 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1502.16.  In analyzing the environmental impacts of a proposed action, NEPA requires a *quantitative* analysis of environmental consequences.  *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 869 (2004); *League of Wilderness Defenders-Blue Mts. Biodiversity Project v. Allen*, 615 F.3d 1122, 1144-45 (9th Cir. 2010) ("'*greater*' is a relative term that requires comparison. Without quantifying actual risk a comparison is not possible") (Paez, J, dissenting).  The FEIS at issue here fails to comply with NEPA in two important respects.

First, it fails to disclose relevant economic data.  NEPA requires economic information and analysis to be disclosed to the public, and, "where economic analysis forms the basis of choosing among alternatives, that the analysis not be misleading, biased, or incomplete." *Seattle Audubon Soc. v. Lyons*, 871 F. Supp. 1291, 1324 (W.D. Wash. 1994) *aff'd sub nom. Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401 (9th Cir. 1996).  Accurate economic information about the proposed action is critical to implementing NEPA because "inaccurate economic information may defeat the purpose of an EIS by impairing the agency's consideration of the adverse environmental effects and by skewing the public's evaluation of the proposed agency action." *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811-12 (9th Cir. 2005) (internal quotations omitted).

In this case the public was given *no* economic information regarding the applicant FGS, its harvest plans, business models, and other information that is necessary to determine whether

1    the minimal beneficial aspects of the HCP will be funded and implemented.  Indeed, as the

2    Services acknowledge, the "Services have not asked the applicant to disclose its discrete, private,

3    and protected economic business models and plans."  AR 38926.  This retort indicates that the

4    Services have abrogated their independent NEPA obligation to disclose information relevant to

5    an informed choice among alternatives about the environmental consequences of the proposed

6    action.  Because the entire motivation for FGS to seek an HCP is to permit the company to

7    "increase efficiencies" and "to continue to operate its *commercial* timberlands on a long-term

8    basis while complying with the ESA," AR 38353 (emphasis added), the economic and financial

9    (i.e., "commercial") information regarding how the HCP will accomplish this goal for FGS is

10   highly relevant to an adequate consideration of the environmental consequences of the proposed

11   action.  *See*, *Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*, 449 F.2d

12   1109, 1113 (D.C. Cir. 1971) (requiring a discussion of the economic, as well as environmental,

13   consequences of proposed action).  Indeed, the EPA even criticized the Services for failing to

14   provide economic information about FGS' timber harvest operations.  AR 39007-08.  Despite the

15   clear connection between the economic and environmental impacts of the proposed action, the

16   FEIS expressly does not disclose financial information about FGS, its harvest plans, business

17   models, and other substantive information that is necessary to determine whether the minimal

18   beneficial aspects of the HCP will be funded and implemented.

19       The FEIS simply states that "[u]nder the Proposed Action, issuance of the ITPs would

20   allow the applicant to harvest more of the currently suitable northern spotted owl habitat in the

21   Plan Area, reducing the amount of even-aged regeneration harvest (clearcutting) necessary to

22   meet its financial targets." AR 38548; *see also* AR 36263-36264.  However, there is nothing in

23   the record that discusses, for example, what these "financial targets" are or what factors may

24   affect them, what specific "economic expenditures" are "too costly," what "too costly" and

1    "economically and operationally infeasible" mean, and what amount of "income" the applicant

2    "has to produce," among other considerations.  The rationale for how the Services will comply

3    with their ESA obligation to ensure that an HCP is adequately funded is undermined when the

4    underlying environmental review lacks any supporting economic or financial analysis.

5         Second, the Services violated NEPA in failing to disclose and discuss the quantitative

6    direct, indirect, and cumulative environmental consequences of the proposed action.  In

7    analyzing the environmental impacts of a proposed action, NEPA requires a *quantitative* analysis

8    of environmental consequences.  *League of Wilderness Defenders*, 615 F.3d at 1144-45; *Ocean*

9    *Advocates*, 402 F.3d at 869; *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387

10   F.3d 989, 994-95 (9th Cir. 2004); *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d

11   1372, 1380 (9th Cir. 1998); *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 2014 WL 199093,

12   *16 (D. Or. Jan. 16, 2014) (requiring disclosure of environmental effects and holding that

13   "simply because a proposed action is expected to decrease the negative impacts in comparison to

14   a much worse historical practice does not mean that the action will not have a significant

15   negative impact itself, only that it will have a less harmful impact than prior actions").

16        In this case, the FEIS only contains a *relative* comparison of the alternatives and fails to

17   provide specific, quantifiable differences among alternatives including the No Action alternative.

18   For example, regarding anadromous salmonids, the FEIS states:

19            …the conservation measures under the Proposed Action would *minimize* the
              potential impacts that could otherwise result from altered hydrology in the Plan
20            Area. They would *reduce* the impacts of forest management on surface runoff and
              peak flows, *reduce* soil compaction and disturbance, *increase* slope stability, and
21            *maintain* or *enhance* in-channel LWD. Any adverse impacts to anadromous
              salmonids due to altered hydrology and water quality would be *minimized* and
22            *mitigated* by the improved riparian conditions resulting from riparian
              management and *decreased* sediment production and delivery.

23

24

1   AR 38573 (emphasis added); *see also*, 38541-38544 (geology), 38547-38549 (hydrology),

2   38555- 38559 (biological resources), 38562-38565 (spotted owl), 38569-38574 (salmonids),

3   38585-38588 (fisher).  This "analysis" merely states that the design criteria of the proposed

4   action would "minimize," "reduce," "decrease," or "mitigate" environmental impacts compared

5   to the status quo, which would be "beneficial" to natural resources.  But these statements tell the

6   public and decision makers nothing about *what* those actual environmental impacts are, because

7   the Services have failed to provide numeric or other objective data.  NEPA requires a more

8   rigorous analysis.  *Neighbors of Cuddy Mountain*, 137 F.3d at 1380.

9   K.      The Services Violated NEPA by Failing to Analyze Cumulative Impacts.

10          The Ninth Circuit has noted that there are "two critical features of a cumulative effects

11   analysis": "first, it must not only describe related projects but also enumerate the environmental

12   effects of those projects…Second, it must consider the interaction of multiple activities and

13   cannot focus exclusively on the environmental impacts of an individual project."  *Or. Natural*

14   *Res. Council Fund v. Brong*, 492 F.3d 1120, 1133 (9th Cir. 2007).  The cumulative effects

15   analysis in the FEIS lacks both critical features with regards to the effects of timber harvest on

16   adjacent and nearby federal and nonfederal lands on northern spotted owls, the effects of the

17   application of herbicides and other forest chemicals, and withdrawal of water on FGS land and

18   proximate federal and nonfederal lands on salmonids.

19          First, as KS Wild noted in its comments on the DEIS, the Services' cumulative impacts

20   analysis is completely devoid of any disclosure or quantification, let alone any analysis, on the

21   cumulative impacts of the timber harvest proposed by the FGS HCP and timber harvest on

22   proximate federal and nonfederal lands.  AR 13467-71.  For example, in the discussion of the

23   cumulative effects of the proposed action on the northern spotted owl, the only mention of timber

24   operations on adjacent and nearby federal and nonfederal lands is a portion of a single sentence:

1    "For these reasons, the agencies anticipate that the measures associated with the Proposed

2    Action, in conjunction with ongoing activities on other private and public lands, would result in

3    substantial benefits to the northern spotted owl, compared to the No Action Alternative."  AR

4    38633.  Noticeably absent is any discussion of what timber (and other) activities have occurred

5    in the past, are currently being implemented, or are reasonably foreseeable on adjacent and

6    nearby federal and nonfederal lands, and the effects of those actions, despite internal and external

7    criticisms of this omission.  *See* AR 120, 3245, 3694, 22208, 3940, 16505, 3599, 12870, 4879-

8    4886, 8407, 8621; NMFS AR 3810. NEPA requires this analysis.[7]  *Muckleshoot*, 177 F.3d at

9    811; *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

10            Second, the FGS FEIS fails to discuss and analyze the cumulative effects on salmonids of

11   the application of herbicides and other forest chemicals and the withdrawal of water from FGS

12   land and proximate federal and nonfederal lands.  KS Wild specifically asked the Services to

13   supply this information, AR 38867, but the agencies failed to provide it in the FEIS, AR 38382,

14   even though the Services acknowledged that the use of herbicides could indeed impact salmonids

15   and that the information should be disclosed and analyzed.  AR 3079, 7582, 39401 ("we could

16   use more info about FGS's anticipated use of herbicides").  The Services state that the "[d]raft

17   EIS does not address the impacts associated with herbicide, pesticide, and fertilizer use … [and

18   that] NMFS conclude[d] that there is some potential for forest chemicals to enter salmonid

---

7        The Services' failure to assess cumulative effects of logging on private lands similarly
renders the FWS BiOp arbitrary and capricious.  50 CFR § 402.1(c)(4) (requiring cumulative
effects analysis); 50 C.F.R. § 402.02 (limiting cumulative effects in ESA context to state and
private actions).  FWS acknowledged that such logging is likely to continue, AR 34258, but
failed to analyze how decreases in habitat on private lands will impact FGS lands, specifically in
the 24 owl circles that FWS relies upon as mitigation.  *Id.*

1    habitats resulting in exposure to the chemicals used by FGS over the 50-year permit term."[8]  AR

2    38923.

3            Similarly, the Services failed to discuss the cumulative effects of water withdrawals on

4    FGS lands, as well as adjacent and nearby federal and nonfederal lands, on salmonids.  AR

5    38504 ("amount and timing" of water drafting is "unquantified").  The proposed locations of

6    these withdrawals for water drafting on FGS lands subject to the HCP are shown on a series of

7    three maps in the FEIS, AR 38449, 38451, 38453; but no information is given as to the proposed

8    use of the withdrawals, amount of withdrawal, season of withdrawal, or any other characteristics

9    of these activities.  Further, the FEIS is silent as to the cumulative effects of water withdrawals

10   from FGS lands on salmonids when considered with those from adjacent and nearby federal and

11   nonfederal lands.  AR 38626.

12           In the administrative process, the Services acknowledged that the cumulative effects

13   analysis in the FEIS lacked any real detail or analysis, NMFS AR 8723 (Attachment FGS

14   DEIS_010_ S Mendez Comments.doc at 2), and attempted to justify these deficiencies by

15   questioning the usefulness of such an exercise, AR 38809, 38923, 38934, or deferring the

16   discussion to the non-NEPA state-based Timber Harvesting Plan process, AR 38809.  But NEPA

17   does not allow an agency to defer its environmental analysis to a non-federal agency at some

18   undetermined point in time in the future.  *Muckleshoot*, 177 F.3d at 810.  Moreover, the sought

19   after information is relevant to an accurate assessment of the environmental consequences of the

20   action because both the use of herbicides and water drafting can have a significant negative

21   environmental impact. AR 38923 (herbicide "use ha[s] a greater potential to adversely affect

22

23   _____

     [8]     In an early draft of the EIS, Service staff commented on the statement that the application
24   of forest chemicals would not be addressed in the EIS, "why not?"  AR 3184.  There is no follow
     up on this comment in the record, but other Service staff similarly remarked "Why not? This
     may develop into the problem with the BO here as we did for Green Diamond [HCP]," AR 6272.

aquatic species … salmonids could experience sub-lethal effects from this exposure (e.g.,

reduced growth)"); AR 34208 (water drafting "has the potential to result in adverse effects to the

northern spotted owl"); AR 62671 (water withdrawals are one of the "major activities

responsible for the decline of coho salmon in Oregon and California").  Absent this information,

both the public and the decision-maker have no idea about the extent and magnitude of these

activities, and therefore the potential environmental impacts of these activities.

The Services should have conducted a thorough and probing discussion and analysis of

the cumulative effects of past, present, and reasonably foreseeable timber harvest and other

operations, herbicide use, and water withdrawal on FGS lands and proximate federal and

nonfederal lands.  The failure to do so is arbitrary, capricious, and not in accord with NEPA,

which demands more than what the Services have done here.  *Muckleshoot*, 177 F.3d at 811.

## V.    CONCLUSION.

For all of the reasons stated herein, KS Wild respectfully request that this Court grant KS

Wild' motion for summary judgment, invalidate the incidental take permits, remand the

biological opinions and environmental impact statements to FWS and NMFS, and award costs,

attorneys' fees, and other expenses to KS Wild.

Respectfully submitted this 1st day of August, 2014.


By: _____            By: _____

WYATT GOLDING, WSBA #44412            SUSAN JANE BROWN, OSB #054607
PAUL KAMPMEIER, WSBA #31560            JOHN MELLGREN, OSB #114620

*Attorneys for Plaintiffs*