1   JUSTIN AUGUSTINE, CA BAR #235561          THE HONORABLE NATHANAEL COUSINS
    Center for Biological Diversity
2   351 California Street, Suite 600
    San Francisco, CA 94104
3   PH: (415) 632-5315; FAX: (415) 436-9683
    jaugustine@biologicaldiversity.org

4

    *Attorney for Plaintiff Center for Biological Diversity*
5

6   SUSAN JANE BROWN, OSB #054607, **appearance** *pro hac vice*
    JOHN MELLGREN, OSB #114620, **appearance** *pro hac vice*
    Western Environmental Law Center
7   1216 Lincoln Street
    Eugene, OR 97401
8   PH: (541) 485-2471; FAX: (541) 485-2457
    brown@westernlaw.org
9   mellgren@westernlaw.org

10  PAUL KAMPMEIER, WSBA #31560, **appearance** *pro hac vice*
    WYATT GOLDING, WSBA #44412, **appearance** *pro hac vice*
11  Washington Forest Law Center
    615 Second Avenue, Suite 360
12  Seattle, WA 98104
    PH: (206) 223-4088; FAX: (206) 223-4280
13  pkampmeier@wflc.org
    wgolding@wflc.org
14
    *Attorneys for Plaintiffs Klamath-Siskiyou Wildlands Center,*
15  *Center for Biological Diversity and Klamath Forest Alliance*

16
                    UNITED STATES DISTRICT COURT
17                 NORTHERN DISTRICT OF CALIFORNIA
                      SAN FRANCISCO DIVISION
18

19  KLAMATH-SISKIYOU WILDLANDS          )   Case No. 3:13-cv-3717-NC
    CENTER, *ET AL.*,                   )
                                        )
20              Plaintiffs,             )   **PLAINTIFFS' REPLY BRIEF IN**
                                        )   **SUPPORT OF MOTION FOR**
21       v.                             )   **SUMMARY JUDGMENT**
                                        )
22  NOAA NMFS, *ET AL.*,                )
                                        )   Hearing Date: November 19, 2014 at 1:00
23              Defendants,             )   p.m. in Courtroom A, 15th Floor
           and                          )
24

FRUIT GROWERS SUPPLY COMPANY,          )
                                       )
                    Defendant-Intervenor.   )
                                       )

1

2

# TABLE OF CONTENTS

3

4

GLOSSARY OF ABBREVIATED and KEY TERMS ........................................................ v

I.      INTRODUCTION ................................................................................................. 1

II.     ARGUMENT ......................................................................................................... 2

        A. FWS' "Minimize and Mitigate" Finding Unlawfully Gave Fruit Growers'
           Credit for Owl Habitat on Neighboring Lands ................................................ 2

        B. FWS' "Minimize and Mitigate" Finding Is Unlawful Because FGS'
           Promise to Reduce Clearcutting Is Unenforceable ......................................... 7

        C. FWS' "No Jeopardy" Finding Is Arbitrary and Capricious Because FWS
           Relied On Unenforceable Mitigation ............................................................... 9

        D. FWS' "No Jeopardy"  Finding Is Arbitrary and Capricious Because It
           Rests on Inconsistent Assumptions Regarding Owl Habitat ......................... 11

        E. NMFS' "No Jeopardy" Findings are Arbitrary and Capricious Because
           NMFS Did Not Evaluate Short-Term Impacts to Fish ................................. 12

        F. NMFS' "Minimize and Mitigate" and "No Jeopardy" Findings Are
           Arbitrary and Capricious Because NMFS Relied on Voluntary and
           Unenforceable Measures ................................................................................ 15

        G. NMFS' "Minimize and Mitigate" Finding is Arbitrary and Capricious
           Because a Partial Reduction in Impacts Does Not Constitute the
           "Maximum Extent Practicable." .................................................................... 17

        H. The Services Violated NEPA by Failing to Disclose Environmental
           Information ..................................................................................................... 19

        I. The Services Failed to Adequately Analyze Cumulative Impacts................. 22

III.    RELIEF ............................................................................................................... 24

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

## TABLE OF AUTHORITIES

2

### <u>Cases</u>

3

*Alsea Valley Alliance v. Dep't of Commerce*,
    358 F.3d 1181 (9th Cir. 2004) ................................................................... 25

4

*Cal. Communities Against Toxics v. EPA*,
5
    688 F.3d 989 (9th Cir. 2014) ................................................................... 25

6

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ................................................................... 14

7

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
8
    698 F.3d 1101 (9th Cir. 2012) ............................................................. 2, 10

9

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
    255 F.3d 1073 (9th Cir. 2001) ................................................................... 17

10

*Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*,
11
    451 F.3d 1005 (9th Cir. 2006) ................................................................... 22

12

*Friends of the Wild Swan v. Jewell*,
    Civ. No. 13–61–M–DWM, 2014 WL 4182702 (D. Mont. Aug. 21, 2014).............. 18

13

*Gerber v. Norton*,
14
    294 F.3d 173 (D.C. Cir. 2002) ................................................................... 19

15

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004) ................................................................... 22

16

*League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*,
17
    549 F.3d 1211 (9th Cir. 2008) ........................................................... 22, 23

18

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989)................................................................................. 2, 5

19

*Motor Vehicles Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*,
20
    463 U.S. 29 (1983)........................................................................... 1, 11, 16

21

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) ................................................................... 24

22

*Nat'l Wildlife Fed'n v. Babbitt*,
23
    128 F. Supp. 2d 1274 (E.D. Cal. 2000)........................................... 7, 9, 18

24

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    524 F.3d 917 (9th Cir. 2008) ......................................................... 9, 10, 16

*Nat'l Wildlife Fed'n v. Norton*,
    Civ. No. S-04-0579, 2005 WL 2175874 (E.D. Cal. Sept. 7, 2005) ...................... 4, 18

*Natural Res. Def. Council v. Kempthorne*,
    506 F. Supp. 2d 322 (E.D. Cal. 2007)................................................. 15, 16

*Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*,
    668 F.3d 1067 (9th Cir. 2011) ........................................................ 3, 4, 5

*Or. Natural Res. Council v. Allen*,
    476 F.3d 1031 (9th Cir. 2007) .............................................................. 24

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries Serv.*,
    265 F.3d 1028 (9th Cir. 2001) ............................................................... 2

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
    426 F.3d 1082 (9th Cir. 2005) ......................................................... 12, 13

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008) .............................................................. 23

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
    747 F.3d 581 (9th Cir. 2014) ............................................................. 4, 5

*Seattle Audubon Soc. v. Lyons*,
    871 F. Supp. 1291 (W.D. Wash. 1994) *aff'd sub nom. Seattle Audubon Soc. v. Moseley*,
    80 F.3d 1401 (9th Cir. 1996) ............................................................... 19

*Sw. Ctr. for Biological Diversity v. Bartel*,
    470 F. Supp. 2d 1118 (S.D. Cal. 2006)................................................. 8, 16

*Wild Fish Conservancy v. Salazar*,
    628 F.3d 513 (9th Cir. 2010) ......................................................... 2, 11, 12

## **Statutes**

5 U.S.C. § 706(2)(A)............................................................................. 22, 25

16 U.S.C. § 1536(a)(2)................................................................... 11, 14, 15, 24

16 U.S.C. § 1536(a)(4)................................................................................. 11

16 U.S.C. § 1539(a)(2)(A)(i) ........................................................ 15

16 U.S.C. § 1539(a)(2)(B)(ii) ........................................... 1, 5, 6, 8

16 U.S.C. § 1539(a)(2)(B)(iii) ........................................................ 9

16 U.S.C. § 1539(a)(2)(B)(iv) .................................................. 1, 24

42 U.S.C. § 4331 ........................................................................ 19

42 U.S.C. § 4332(2)(B) ............................................................... 19

42 U.S.C. § 4342 ........................................................................ 19

42 U.S.C. § 4344(4) .................................................................... 19

## **Regulations**

40 C.F.R. § 1501.2(b) ................................................................. 19

40 C.F.R. § 1508.7 ..................................................................... 24

40 C.F.R. § 1508.8 ..................................................................... 19

40 C.F.R. § 1508.14 ................................................................... 19

50 C.F.R. § 222.307(b)(4) ........................................................... 15

50 C.F.R. § 402.02 ..................................................................... 11

50 C.F.R. § 402.16 ..................................................................... 16

## **Other Authorities**

*Habitat Conservation Planning and Incidental Take Permit Processing Handbook*, U.S. Department of the Interior, Fish and Wildlife Service; U.S. Department of Commerce National Oceanic and Atmospheric Administration, National Marine Fisheries Service (November 4, 1996) ................................................................ 6

**GLOSSARY OF ABBREVIATED and KEY TERMS**

| Term | Description |
|---|---|
| Activity center | The term used in the HCP to describe what is otherwise referred to as an "owl circle" or "spotted owl circle." |
| ACS | Aquatic species conservation strategy.  Chapter 5 of the HCP sets forth the ACS. |
| BiOp | Biological opinion.  A federal agency prepares a biological opinion pursuant to 16 U.S.C. § 1536. |
| clearcutting | A method of logging whereby nearly every tree in a given stand is logged.  Sometimes referred to as "even-aged harvest" or "regeneration harvest." |
| CSA | Conservation Support Area |
| dispersal habitat | Forests used by northern spotted owls to travel from the owl's home range to other areas. |
| EIS | Environmental impact statement |
| FEIS | Final environmental impact statement |
| FGS | Fruit Growers Supply Company |
| HCP | Habitat conservation plan.  An HCP is an application for an incidental take permit.  *See* 16 U.S.C. § 1539(a). |
| ITP | Incidental take permit.  An ITP authorizes take of species protected by the Endangered Species Act.  *See* 16 U.S.C. § 1539(a). |
| Salmonid | Refers to trout or salmon and includes coho and Chinook salmon as well as steelhead. |
| SONCC coho | Southern Oregon/Northern California Coast coho salmon |
| spotted owl circle | The area that represents a northern spotted owl's home range.  In the region of the HCP, it consists of a 1.3 mile radius circle with a 0.5 mile radius inner core. |
| suitable owl habitat | Refers to forested areas that are suitable for use by northern spotted owls for nesting, roosting, foraging. |
| TCS | Terrestrial species conservation strategy.  Chapter 5 of the HCP sets forth the TCS. |

## I.       INTRODUCTION

Plaintiffs challenge the incidental take permits at issue here because they do not meet two essential protective requirements of the Endangered Species Act.  The first principle of Habitat Conservation Plans is that "the applicant" must keep the harm to listed species to the absolute minimum–it must minimize and mitigate impacts to the maximum extent practicable.  16 U.S.C. § 1539(a)(2)(B)(ii).  Here, the U.S. Fish and Wildlife Service ("FWS") erred when it found that the conservation value the Fruit Growers Supply Company ("Fruit Growers" or "FGS") will create by temporarily preserving 7,100 acres of owl habitat will *outweigh* the conservation value lost when FGS logs 36,626 acres of habitat.  Specifically, by giving FGS credit for conserving entire owl circles even though the vast majority of the land in those circles is managed by the U.S. Forest Service, which is not a party to the HCP, FWS improperly made its "minimize and mitigate" finding based on factors Congress did not intend it to consider—mitigation provided by someone other than "the applicant."  *Motor Vehicles Mfrs. Ass'n of the U.S. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  FWS also erred when it concluded "the applicant *will*" reduce clearcutting, change its timber practices in response to water quality monitoring results, and decommission logging roads because the HCP does not require any of those actions.  *See* 16 U.S.C. § 1539(a)(2)(B)(ii).

The second essential principal of HCPs is that, once "the applicant" has minimized harm, the Services must ensure that harm is not likely to jeopardize listed species.  16 U.S.C. § 1539(a)(2)(B)(iv).  Here, the Services' "no jeopardy" findings are unreliable because they did not analyze the actual impacts likely to occur under the HCP.  FWS' biological opinion is invalid because FWS assumed FGS would perform conservation measures that FGS is not obligated to perform and because, by assuming owl habitat on nearby lands would remain "static" during the permit term even though FWS expects ongoing habitat loss on those same lands, FWS failed to

PLAINTIFFS' REPLY BRIEF - CASE NO. 3:13-cv-3717-NC – Page 1

1    reconcile inconsistent information.  *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698

2    F.3d 1101, 1117 (9th Cir. 2012); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir.

3    2010).  NMFS' biological opinion is likewise invalid because NMFS failed to evaluate short-

4    term impacts to salmon.  *Pac. Coast Fed'n of Fishermen's Ass'ns v. Nat'l Marine Fisheries*

5    *Serv.*, 265 F.3d 1028, 1037 (9th Cir. 2001).

6            Plaintiffs challenge the Services' environmental impact statement ("EIS") for similar

7    reasons.  Although the National Environmental Policy Act requires disclosure of relevant

8    economic data, here the EIS did not include any financial information allowing citizens to

9    evaluate whether FGS could have done more to minimize and mitigate impacts.  And because the

10   EIS did not provide quantitative information or analyze cumulative effects, it did not provide

11   enough information to allow citizens to evaluate whether the HCP will jeopardize listed species.

12   Those failures not only violate NEPA, they also impeded thorough review of the HCP.

13           The Services and FGS fail to adequately defend the Services' decisions.  The Services'

14   claims that they did not violate the law are subject to "searching and careful" review, *Marsh v.*

15   *Or. Natural Res. Council*, 490 U.S. 360, 378 (1989), and that review demonstrates that the

16   Services' approval of the permits was arbitrary, capricious, and otherwise contrary to law.

17   Plaintiffs therefore respectfully request entry of summary judgment for Plaintiffs.

                                        **II.    ARGUMENT**

18

19   A.    FWS' "Minimize and Mitigate" Finding Unlawfully Gave Fruit Growers Credit for Owl
           Habitat on Neighboring Lands.
20

21           The parties appear to agree on almost all of the law and facts related to FWS' "minimize

22   and mitigate" finding.  FWS does not challenge, and therefore concedes, Plaintiffs' assertion that

23   it is unlawful for FWS to consider mitigation provided by landowners other than "the applicant"

24   when making its "minimize and mitigate" determination.  *See Federal Defendants' Cross-*

PLAINTIFFS' REPLY BRIEF - CASE NO. 3:13-cv-3717-NC – Page 2

1   *Motion for Summary Judgment* (Doc. #63) at 26-28 (hereinafter "Response"). FWS also agrees

2   it "...included federal lands in the calculation of each activity center's conservation value." *Id.* at

3   27. And FWS agrees it used those conservation values as the primary basis for its "minimize and

4   mitigate" finding. *Id.* at 13-14.

5           Notwithstanding those concessions, however, FWS contends it did not give FGS

6   mitigation credit for conservation occurring on surrounding lands in violation of ESA Section 10.

7   *Id.* at 27. FWS' argument is incorrect. FWS used the conservation value of *entire* owl circles, or

8   "each activity center's conservation value," as the primary means of measuring mitigation in its

9   "minimize and mitigate" finding. *See* AR 40126-27, 40129 (relying on conservation values to

10  measure FGS mitigation); AR 36194 (showing conservation values of "Each Activity Center").

11  In doing so, FWS attributed the entire conservation value of owl circles containing Conservation

12  Support Areas ("CSAs") to FGS even though the CSAs only comprise small fractions of those

13  owl circles. *See* AR 40126-27, 40129 (Section 10 Findings relying on conservation values of

14  owl circles as mitigation "retained and conserved under the HCP."); AR 36137 (limited habitat

15  commitments of CSAs); AR 36402-25 (maps showing CSAs). That approach necessarily gave

16  Fruit Growers credit for owl habitat occurring on federal lands within those owl circles. And

17  that approach is clearly unlawful because it contravenes the unambiguous language in ESA

18  section 10(a)(2)(B)(ii), which only allows the Services to consider what "the applicant will" do

19  when evaluating whether an HCP minimizes and mitigates impacts to the maximum extent

20  practicable.

21          In addition to violating the ESA, FWS' "minimize and mitigate" finding is arbitrary and

22  capricious on its face because temporarily preserving 7,100 acres cannot possibly fully offset the

23  loss of 36,626 acres of a threatened species' habitat. *See Northern Plains Res. Council, Inc. v.*

24  *Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (agency action is arbitrary and

PLAINTIFFS' REPLY BRIEF - CASE NO. 3:13-cv-3717-NC – Page 3

1   capricious "when the record plainly demonstrates that [the agency] made a clear error in

2   judgment.") (citation omitted); *Nat'l Wildlife Fed'n v. Norton*, No. Civ-S-04-0579, 2005 WL

3   2175874 (E.D. Cal. Sept. 7, 2005) (stating that mitigation does not offset harm in an HCP if there

4   is a net habitat loss or the HCP allows destruction of high quality habitat).  FWS justified its

5   finding by giving Fruit Growers the most mitigation credit for those owl circles in which Fruit

6   Growers committed to protecting the least habitat.  *Compare* AR 36137 (habitat commitments in

7   each CSA, specifically SK 238, SK 378, SK 291) and AR 36194 (attributed conservation

8   values).  Under FWS' approach, the preservation of 66 acres of owl habitat in one CSA

9   outweighs the adverse impacts of logging over 18,000 acres of habitat in twenty-three other owl

10  circles and taking approximately forty spotted owls.  *See Plaintiffs' Motion for Summary*

11  *Judgment* (Doc. #53) at 27 (hereinafter "Opening Br.").  FWS even gave FGS *mitigation credit*

12  for logging all its lands in certain owl circles where that logging is not expected to cause "take."

13  AR 40127 (finding that FGS' unrestricted logging in 15 owl circles will deliver "27 percent of

14  the total conservation value of all activity centers").  There is no rational basis for the conclusion

15  that less conservation, and more logging, somehow delivers more mitigation.  FWS'

16  determination that temporarily protecting fractions of owl circles fully offsets logging tens of

17  thousands of acres of owl habitat constitutes a "clear error of judgment" and is therefore arbitrary

18  and capricious.  *Northern Plains Res. Council*, 668 F.3d at 1075.

19         The Services incorrectly argue that the conservation value determination deserves

20  deference because it is based on a "scientific formula and computations."  Response at 26-28

21  (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 610 (9th Cir. 2014)).

22  The Services are wrong because KS Wild does not challenge the scientific validity or accuracy

23  of the conservation value formula itself, but rather FWS' misuse of the results of that formula to

24  measure the mitigation provided by FGS.  FWS can use formulas to determine that one owl

circle has more conservation value than some other owl circle, but it cannot, consistent with 16 U.S.C. § 1539(a)(2)(B)(ii) or the APA, credit FGS with the entire conservation value of a circle when FGS is only temporarily preserving a small fraction of the land therein.

KS Wild asserts a legal error that is not subject to deference. As the Supreme Court recognized in *Marsh*, courts defer to the reasoned judgment of agency experts on scientific matters, but not in making legal determinations. 490 U.S. at 378. "A contrary approach would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'" *Id.*; *see also Northern Plains Res. Council*, 668 F.3d at 1075 (distinguishing between the deference afforded to an agency's reliance on scientific studies and the agency's determination that a project complies with NEPA). The 80-page, detailed analysis in *San Luis & Delta-Mendota Water Auth.* demonstrates that review under the APA is "searching and careful." *Marsh*, 490 U.S. at 378. It does not demonstrate that the Services are entitled to deference here.[1]

FWS and FGS both argue that reliance on neighboring lands is reasonable because federal lands are designated critical habitat and the linchpin of the northern spotted owl recovery plan. Response at 27; *see also FGS' Cross-Motion for Summary Judgment* (Doc. #65) at 2-7 (hereinafter "FGS"). But compliance with a recovery plan is not an HCP approval criterion, nor does compliance with a recovery plan diminish the applicant's obligation to minimize and mitigate impacts to the maximum extent practicable. *See Second Declaration of Wyatt Golding* (concurrently filed) Exhibit A at Appendix 6 (explaining that HCP requirements and federal

---

[1] KS Wild does challenge the conservation value formula's use of an outdated critical habitat designation as its most heavily weighted variable. Opening Br. at 28-29. But determining whether FWS erred when it ignored the 2012 critical habitat designation does not require this Court to choose between conflicting scientific opinions. Accordingly there is no basis to defer to that decision.

PLAINTIFFS' REPLY BRIEF - CASE NO. 3:13-cv-3717-NC – Page 5

1    recovery efforts are "independent, but complimentary") (hereinafter "HCP Handbook"); *see also*

2    HCP Handbook at 3-19 to 3-20.

3    The actions of surrounding landowners can never fulfill the mitigation requirement that

4    ESA Section 10 imposes on the applicant because the statutory text does not allow it.  16 U.S.C.

5    § 1539(a)(2)(B)(ii).  The only instance in which conservation measures on surrounding lands

6    count as mitigation in an applicant's favor is if the applicant specifically funds and controls those

7    measures, which is not the case here.  *See* HCP Handbook at 1-16, 3-2 to 3-3, 7-5.  Even if the

8    neighboring federal lands were permanently secured as wildlife sanctuaries, giving Fruit

9    Growers credit for those protections would still violate ESA Section 10.  As explained in the

10   HCP Handbook:

11   > …the Federal activity of establishing a NWR [National Wildlife Refuge] should
12   > never be considered a substitute for the habitat mitigation requirements for the
     > incidental take permittee that are established by the HCP. Under section 10 of the
13   > Act, an incidental take permittee is required to "minimize and mitigate" the
     > effects of its taking of listed species and the permittee has specific conservation
14   > responsibilities within any HCP program. It must be stressed that the incidental
     > take permittee **must** mitigate regardless of what is required of or carried out by
15   > other entities in terms of habitat management and protection, to the extent deemed
     > appropriate, as defined in an approved HCP.

16   Appendix 6 of the HCP Handbook, at 5 (emphasis in original).  No matter their condition,

17   federal lands adjacent to lands covered by an HCP cannot fulfill the independent requirement

18   that the "*applicant* will, to the maximum extent practicable, minimize and mitigate the impacts

19   of such taking."  16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added).

20   In any event, contrary to the Services' and FGS' claims that the HCP is consistent with

21   the recovery plan, the Services' authorization of large amounts of habitat destruction in the short-

22   term clearly contradicts the recommendations of the spotted owl recovery plan.  The Recovery

23   Plan recognizes an exigent threat to the species from "barred owls, past habitat loss, and current

24   habitat loss," and as a result recommends "conserving occupied spotted owl sites throughout the

1   range," particularly "in the short-term, until spotted owl population trends improve."  AR 77251.

2   The Recovery Plan specifically states:  "we recommend conserving occupied sites and

3   unoccupied, high-value spotted owl habitat on State and private lands wherever possible."  AR

4   77260.  In contrast, the HCP allows Fruit Growers to log over 36,000 acres of northern spotted

5   owl suitable habitat and to take 83 northern spotted owls, with the expectation that this harm will

6   be concentrated "in the first 10 years of the HCP." AR 36202.[2]

7   B.   FWS' "Minimize and Mitigate" Finding Is Unlawful Because FGS' Promise to Reduce
        Clearcutting Is Unenforceable.

8

9        In its Section 10 Findings, FWS relied on an expected "increase in northern spotted owl

10  foraging and dispersal habitat across FGS ownership over the permit term due to a decrease in

11  clearcutting and other even-aged management practices."  AR 40128-29.  That reliance is

12  unlawful because nothing in the HCP requires FGS to increase foraging or dispersal habitat, to

13  reduce clearcutting, or to change its even-aged management practices.  *See* Opening Br. at 29.

14       The Services again do not challenge KS Wild's description of the legal requirements,

15  thereby conceding that they are not allowed to rely on unenforceable mitigation when making the

16  Section 10 findings.  Instead the Services incorrectly argue that a reduction in clearcutting does

17  not have to be enforceable because it is "not required mitigation under the Plan, but rather is a

18  predicted outcome of implementing the plan."  Response at 18.  But the facts are plain:  FWS

19  expressly relied on FGS to "decrease clearcutting" to deliver conservation benefit to owls.  AR

20  40128.  And clearcutting will only decrease if FGS makes an affirmative decision to change its

21  [2] The Services reference FWS' alternative "minimize and mitigate" finding, which is based on a
    cost-benefit analysis.  Response at 13-14.  Because that finding relies on the attribution of the

22  conservation value of entire owl circles to FGS, it is infected with the same violations of the ESA
    and APA as the finding that implementation of the HCP will completely offset its impacts.

23  FWS' alternative analysis also improperly fails to explain why creating additional or alternative
    CSAs in several owl circles with large purported "benefit to cost" ratios is impracticable.  *Nat'l*

24  *Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1292-93 (E.D. Cal. 2000).

1    logging practices, something the HCP, implementation agreement, and biological opinions

2    ("BiOps") do not require.  Indeed, FWS concedes that "a reduction in clearcutting is not an

3    explicit mitigation requirement of the Plan."  Response at 17.  FWS further concedes that

4    implementation of the HCP will, at most, give FGS "additional operation flexibility" under

5    which FGS may choose to decrease clearcutting.  *Id.* at 18.  FWS' reliance on Fruit Growers'

6    voluntary decision to change its forest management practices clearly violates the ESA.  16

7    U.S.C. § 1539(a)(2)(B)(ii) ("the applicant *will*…") (emphasis added); *see also Sw. Ctr. for*

8    *Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1141-42 (S.D. Cal. 2006).

9          The Services also argue the HCP is enforceable because it requires Fruit Growers to

10   "promote forest management practices that develop and maintain dispersal habitat across its

11   ownership to provide connectivity between the CSAs and federal lands."  Response at 19 (citing

12   AR 36139).  The Services are wrong because the operative question is not whether the HCP

13   states that an action is required, but rather whether the HCP provides objective criteria that allow

14   enforcement.  In *Sw. Center for Biological Diversity*, the HCP, biological opinion, and even a

15   city ordinance required developers to "avoid" vernal pools to the maximum extent practicable.

16   470 F. Supp. at 1141.  Notwithstanding that, the court held that FWS violated the law by relying

17   on those assurances as mitigation because the avoidance standards allowed developers to

18   "unilaterally determine" whether and to what extent it would be necessary to avoid habitat.  *Id.* at

19   1140.  Here, the supposed requirement to "promote" certain forest practices similarly lacks any

20   concrete, objective criteria by which to determine what "promotion" means, when it will occur,

21   or what the result will be.  It was therefore arbitrary and capricious for FWS to rely on that

22   measure in making its "minimize and mitigate" finding.

23         FWS next argues that the HCP's statement that FGS will "promote forest management

24   practices" is enforceable because if Fruit Growers does not comply, FWS will reinitiate

consultation under ESA Section 7 or revoke the incidental take permit.  Response at 21.

However, the agency's ability to reinitiate consultation or revoke a permit is irrelevant to, and

cannot support a finding that, "the applicant" will minimize and mitigate impacts.  *See Nat'l*

*Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d at 1274 (holding that FWS' ability to revoke an

incidental take permit cannot form the basis of the finding that "the applicant" will ensure

adequate funding to implement the HCP) (citing 16 U.S.C. § 1539(a)(2)(B)(iii)).  Moreover, as a

practical matter, FWS will not be able to reinitiate consultation or revoke the permit because

there are no objective criteria by which to measure compliance and because FGS will be able to

claim they are in compliance with the HCP.  *See* AR 36225 ("[b]ecause FGS will maintain a

forested landscape on its ownership, the biological objective for dispersal habitat will be met.").

C.     FWS' "No Jeopardy" Finding Is Arbitrary and Capricious Because FWS Relied On
       Unenforceable Mitigation.

       FWS' "no jeopardy" findings also unlawfully relied on assurances that FGS will reduce

clearcutting and increase foraging and dispersal habitat even though the HCP lacks any "specific

and binding plans" or "solid guarantees" that such mitigation will occur.  *See* Opening Br. at 31-

34; *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935-36 (9th Cir. 2008).

FWS argues in response that the CSAs will ensure an increase in foraging and dispersal habitat

across Fruit Growers' lands because they will allow FGS to log more in other owl circles, which

in turn will allow Fruit Growers to log less elsewhere on its lands, which Fruit Growers is likely

to do because of California law.  Response at 18-19.

       FWS' argument is wrong because *Nat'l Wildlife Fed'n* requires "specific and binding

plans," not speculation about a causal chain of events, for an agency to consider "future

improvements" in its jeopardy evaluation.  524 F.3d at 935-36.  Here, FWS repeatedly relied on

Fruit Growers representations that it intends to improve its future forestry practices to increase

foraging and dispersal habitat across the landscape in order to reduce the impacts of

1    implementation of the HCP.  AR 34260 ("The significance of this habitat loss over longer time

2    periods (>25 years) is further reduced by the increase in foraging habitat expected to occur

3    across FGS's ownership, as modeled by the company's MSP analysis").  However, neither the

4    referenced "MSP analysis" nor anything else actually creates a "specific and binding plan"

5    requiring such mitigation to ever actually occur.

6        FWS also argues that KS Wild has failed to demonstrate a likelihood that the supposed

7    mitigation will not occur.  *See* Response at 19-20.  But FWS misstates the legal standard: KS

8    Wild does not bear the burden of establishing it is unlikely the "future improvements" will occur,

9    but rather need only demonstrate that there are no "specific and binding plans."  *Nat'l Wildlife*

10   *Fed'n*, 524 F.3d at 935-36.  Unenforceable mitigation measures are inherently "not reasonably

11   certain to occur" and therefore may not be considered in the jeopardy analysis.  *Ctr. for*

12   *Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1117 (9th Cir. 2012).  Here,

13   the governing document is the HCP and the HCP contains no specific and binding terms

14   requiring Fruit Growers to decrease clearcutting or to increase foraging and dispersal habitat.

15   *See generally* AR 36133-41 (TCS lacking any specific requirements to increase foraging and

16   dispersal habitat); AR 34260 (FWS relying on "the company's MSP analysis," an unenforceable

17   document outside the HCP, to provide increased foraging habitat).  While that alone is a

18   sufficient basis to overturn FWS' "no jeopardy" finding, there is also ample evidence in the

19   record demonstrating that Fruit Growers is unlikely to actually increase foraging and dispersal

20   habitat.  *See, e.g.*, AR 34260 ("Implementation of the FGS HCP is anticipated to result in a … 31

21   percent reduction in foraging habitat from current levels…"); Opening Br. at 30.

22       Finally, the Services contend that FWS did not have a duty to analyze impacts to the

23   revised critical habitat because Fruit Growers' logging occurs only on private lands and therefore

24   will have no direct effects on critical habitat on federal lands.  Response at 33; *see* 16 U.S.C. §§

1536(a)(2), (a)(4); Opening Br. at 34.  The Services' argument fails because it is both inaccurate

and a *post hoc* rationalization to which this court owes no deference.  *Motor Vehicle Manuf.*

*Ass'n*, 463 U.S. at 50 (citations omitted).  As FWS recognized in the BiOp, logging adjacent to

critical habitat can adversely modify critical habitat by fragmenting that habitat and creating

edge effects.  AR 34261 (acknowledging that FGS' logging on borders of critical habitat will

adversely impact the quality of that habitat); *see also* 50 C.F.R. § 402.02 ("adverse modification

means a direct or indirect alteration that appreciably diminishes the value of critical habitat").

Indeed, the entire premise of the HCP is that there is a biological relationship between logging

on FGS lands and the surrounding federal lands.  *See* AR 36101.  Given that, FWS cannot simply

ignore impacts to designated critical habitat on the theory that logging on adjacent private lands

will not impact it.

D.    FWS' "No Jeopardy" Finding Is Arbitrary and Capricious Because It Rests on
      Inconsistent Assumptions Regarding Owl Habitat.

      FWS' biological opinion is arbitrary and capricious because it rests on inconsistent

assumptions regarding owl habitat on nearby, non-FGS lands.  *See* Opening Br. at 34-37 (citing

*Wild Fish Conservancy*, 628 F.3d at 527.  In evaluating the effects of the HCP and making its

"no jeopardy" finding, FWS assumed that habitat conditions on nearby lands would persist

unchanged for the entire 50-year permit term even though the BiOp documents past habitat

declines on nearby federal lands (due to logging, fire, disease, and competition from barred owls)

*and* recognizes habitat loss as an ongoing threat to spotted owls.[3]  By assuming habitat on

adjacent lands will remain unchanged during the permit term, FWS *assumed* that owl centers

---

[3] *See* AR 34260 (relying on the conservation value of the CSAs to make the "no jeopardy" finding); Opening Br. at 13 (lines 18-24) and AR 36193 (listing factors considered in the conservation formula, none of which account for future habitat loss on adjacent lands); AR 34181 ("Habitat on Federal and private non-FGS land over the term of the ITP is represented by the owl habitat layer to avoid speculating on the types of changes that may occur on these lands over time."); AR 34127, 34132 (ongoing habitat loss threatens spotted owls).

supported by CSAs will support owls into the future even though the BiOp documents significant uncertainty about that given ongoing habitat loss.  FWS' BiOp is arbitrary and capricious because FWS' reliance on internally inconsistent habitat assumptions underestimated the impacts of the HCP and rendered its "no jeopardy" finding unreliable.  *Wild Fish Conservancy*, 628 F.3d at 527.

The Services incorrectly contend in response that Plaintiffs selectively cited the record, that FWS considered ongoing loss of habitat on nearby lands, and that it was reasonable for FWS to rely on the Northwest Forest Plan and the consultation requirements of ESA Section 7 to protect habitat because those programs provide "certainty for owl habitat."  Response at 29-30. But KS Wild did not selectively cite the record.  In fact KS Wild cited extensive record evidence showing that habitat is likely to decline on adjacent lands because that evidence supports its argument that FWS needed to consider ongoing habitat loss in evaluating the effects of the HCP. Opening Br. at 13, 19, 35-37.  Moreover, that evidence plainly demonstrates that FWS expects owl habitat to decline over time even under the Northwest Forest Plan and even with ESA Section 7 consultations on future proposed federal actions.  AR 34132, 34144-45, 34194-96. The Services' contentions fail because they do not reconcile the inconsistent assumptions in the BiOp or demonstrate that FWS *actually* factored future habitat loss into its evaluation.

E.      NMFS' "No Jeopardy" Findings are Arbitrary and Capricious Because NMFS Did Not Evaluate Short-Term Impacts to Fish.

NMFS' BiOp fails to assess impacts in a manner that accurately reflects the life-cycle of Southern Oregon/Northern California Coast coho salmon ("SONCC coho") because it only includes a generalized assessment of impacts over the fifty-year permit term.  Opening Br. at 37-39 (citing *Pac. Coast Fed'n v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1094 (9th Cir. 2005)).  The Services contend that: 1) NMFS did analyze short-term impacts to the extent

1    possible; 2) NMFS "has not limited its analysis to any particular timeframe"; and 3) further

2    analysis of short-term and site-specific impacts is impossible and legally unnecessary because

3    NMFS does not know when or where FGS will carry out logging operations.  Response at 30-32.

4           The Services' claim that the agency analyzed short-term impacts fails because the

5    agency's limited acknowledgement of the existence of some short-term impacts does not

6    constitute analysis of whether those impacts will cause jeopardy to salmonids.  For example, the

7    NMFS BiOp acknowledges the likelihood of short-term impacts to SONCC coho habitat, but

8    then summarily concludes that "overall we expect habitat quality, and thus the conservation

9    value of that habitat, to improve throughout the duration of the permit."  AR 37777.  This

10   methodology fails to actually consider how implementation of the HCP will impact salmon in the

11   3-5 year life cycle of the impacted species and it ignores the fact that long-term habitat

12   improvements may be irrelevant if the species cannot survive in the interim.  *See Pac. Coast*

13   *Fed'n v. BOR*, 426 F.3d at 1095 ("It is not enough to provide water for the coho to survive in five

14   years, if in the meantime, the population has been weakened or destroyed by inadequate water

15   flows."); *see also Pac. Coast Fed'n v. NMFS*, 265 F.3d at 1037-38.

16          In an apparent contradiction, NMFS also argues that it "has not limited its analysis to any

17   particular timeframe, but rather, has analyzed short- and long-term impacts from the undertaking

18   of activities, whenever those activities may occur in the permit term."  Response at 31.  As an

19   initial matter, that is not true:  NMFS did make some attempt at analyzing impacts in some

20   watersheds at a 10-year scale, AR 37749, but that is the same timescale rejected in *Pacific Coast*

21   *Fed'n of Fishermen's Ass'ns*, 265 F.3d at 1037.  In any event, to the extent that NMFS "has not

22   limited its analysis to any particular timeframe," NMFS violated the express requirement to

23   consider impacts in an applied, time-specific manner that reflects the life cycle of the species.

24   *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d at 934 (citing *Pac. Coast Fed'n v. BOR*, at 1094).

PLAINTIFFS' REPLY BRIEF - CASE NO. 3:13-cv-3717-NC – Page 13

Finally, NMFS' claim that the ESA does not require analysis of short-term and site-specific impacts if NMFS lacks sufficient information is wrong because the ESA places an affirmative burden on the agency to "*insure* that any action …is not likely to jeopardize the continued existence of any endangered species or threatened species…." 16 U.S.C. § 1536(a)(2) (emphasis added). As the Ninth Circuit has aptly stated, "incomplete information about [future] activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (citing 16 U.S.C. § 1536(a)(2)). In *Conner*, the Ninth Circuit considered a challenge to a BiOp analyzing the sale of oil and gas leases on approximately 1.3 million acres of federal land. 848 F.2d at 1453. FWS argued there was insufficient information on post-leasing activities to prepare comprehensive biological opinions. *Id.* The court soundly rejected FWS' argument, reasoning that "[a]lthough we recognize that the precise location and extent of future oil and gas activities were unknown at the time, extensive information about the behavior and habitat of the species in the areas covered by the leases was available." *Id.*

Here, just as in *Conner*, NMFS knows what type of activities FGS will carry out over the permit term and where on the landscape it has authorized FGS to cause harm to covered species. *See* AR 35957-64 (detailing forest practices that will cause take); AR 37721-22 (listing FGS ownership in watersheds). NMFS also had the requisite "extensive information about the behavior and habitat of the species in the areas covered," *Conner*, 848 F.2d at 1453, because NMFS had previously prepared listing determinations for each of the covered species, as well as critical habitat designations and a five-year review for SONCC coho, and had received extensive input from local tribes and stakeholders regarding specific areas of biological concern. AR 37799-800 (listing NMFS references); AR 3813-16 (Quartz Valley Tribe comments); AR 3765-3785 (Karuk Tribe comments); AR 12892-93 (fisheries biologist detailing risk of extirpation

1    from site-specific impacts); NMFS AR 4973-4988 (NMFS staff discussing intense impacts in

2    specific reaches of Moffett Creek, with photographs).  NMFS had all of the tools it needed to

3    analyze short-term impacts, the agency simply chose to forego such analysis, and in so doing

4    violated its obligation to "insure a lack of jeopardy" to the covered species.  16 U.S.C. §

5    1536(a)(2).[4]

6    F.    NMFS' "Minimize and Mitigate" and "No Jeopardy" Findings Are Arbitrary and
          Capricious Because NMFS Relied on Voluntary and Unenforceable Measures.

7           NMFS "minimize and mitigate" and "no jeopardy" findings are arbitrary and capricious

8    because in making those findings NMFS relied on its belief that FGS would decommission

9    logging roads and take action in response to water quality monitoring results when in fact the

10   HCP does not require those actions.  *See* Opening Br. at 39-42; *see also* AR 36128 (allowing

11   road decommissioning "or road upgrading").  The Services' arguments in response lack merit.

12          The Services generally contend the ACS includes a detailed plan that is not aspirational

13   and so is very different from the plan at issue in *Natural Res. Def. Council v. Kempthorne*, 506 F.

14   Supp. 2d 322 (E.D. Cal. 2007).  Response at 22-23.  But the Services' generalized claims about

15   the ACS do not respond to or rebut Plaintiffs' specific contentions.  Indeed, the Services do not

16   cite *any* part of the aquatic conservation strategy—*not one page*—demonstrating that the HCP

17   requires FGS to take action in response to water quality monitoring results, that it requires FGS

18   to decommission logging roads, or that it prohibits FGS from building new roads.

19          The Services next claim "[t]here is nothing 'unilateral' about [the HCP's] road treatment

20   provision."  Response at 23.  But the plain text of the HCP belies that claim: the operative

21

22   _____
     [4] NMFS' argument also fails because the ESA requires NMFS to demand a full accounting of
23   impacts to covered species prior to approving an incidental take permit.  16 U.S.C. §
     1539(a)(2)(A)(i); 50 C.F.R. § 222.307(b)(4) (each permit application must include a "detailed
     description of the proposed activity, including the anticipated dates, duration, and specific
24   location.").  If NMFS truly lacked sufficient information to determine whether the HCP will
     cause jeopardy, the HCP was *per se* incomplete and permit approval unlawful.

provision in the HCP states, "FGS will develop reasonable and feasible erosion prevention and control prescriptions for each source of treatable erosion that is identified in the field."  AR 36128.  That provision gives FGS unfettered discretion regarding which sediment sources are "treatable" and what treatments will be considered "reasonable" and "feasible."  It is therefore unenforceable and arbitrary and capricious for NMFS to rely on it.  *Nat'l Wildlife Fed.*, 524 F.3d at 936 n.17; *Kempthorne*, 506 F. Supp. 2d at 350-351; *Sw. Center for Biological Diversity*, 470 F. Supp. 2d at 1141.

Finally, the Services contend the HCP's monitoring program requires actual action in response to monitoring results, and is therefore enforceable under the ESA, because the Services' incidental take statements impose numerical limits on the amount of habitat degradation allowed under the permits.  Response at 23-24.  The Services fail to explain how numerical limits in the incidental take statements mean the HCP requires action in response to monitoring results.  *Id.* Presumably the Services are suggesting that if FGS exceeds those limits the Services could reinitiate consultation and then seek changes to the HCP at that time.  *See* 50 C.F.R. § 402.16.

But that argument fails for at least two reasons.  First, it is an impermissible *post hoc* rationalization.  Courts may uphold agency action only on the basis articulated by the agency; courts may not accept *post hoc* rationalizations for agency action.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50 (citations omitted).  Here, NMFS made its "minimize and mitigate" and "no jeopardy" findings based on its belief that FGS would change the conservation measures in the HCP in response to monitoring results.[5]  Nothing in NMFS' findings remotely suggests that

---

[5] *See* NMFS AR 150902-903 ("The monitoring programs are designed to measure the effectiveness of the ACS and, if necessary, make changes to the strategy in order to meet the biological goals and objectives of the HCP.  NMFS has confidence that all these programs will be implemented given FGS' commitment of monitoring resources to date and the required FGS financial assurances provided for in the IA."); NMFS AR 150906 ("The monitoring programs

NMFS thought reinitiation of consultation would cause FGS to change its practices in response to monitoring results.  NMFS AR 150899-907; AR 37769-83.  This Court therefore cannot affirm NMFS' findings based on counsel's new rationale.

Second, even if NMFS had made its "no jeopardy" finding on that basis, that finding would be arbitrary and capricious.  Assuming the Services even could reinitiate consultation, which is at least questionable—*see Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) (FWS not required to reinitiate consultation on a logging HCP in California)— reinitiation would at most *suspend* the HCP pending a new "jeopardy" finding; it would not by itself require FGS to *change* the HCP.  Furthermore, the No Surprises assurances in the HCP would almost certainly prevent NMFS from using a new consultation process to require FGS to make additional conservation commitments in response to monitoring results.  AR 36247, 40050. There is no basis to find that a new consultation will force FGS to change its management practices in response to monitoring results.

G.   NMFS' "Minimize and Mitigate" Finding is Arbitrary and Capricious Because a Partial Reduction in Impacts Does Not Constitute the "Maximum Extent Practicable."

NMFS' "minimize and mitigate" finding violates the ESA and is arbitrary and capricious because it lacks any basis in the record.  The Services concede that NMFS does not know how much harm to fish FGS' logging causes, or how much harm to fish implementation of the HCP is expected to cause.  *See* Response at 24.  Notwithstanding NMFS' lack of information, the Services argue that *any* long-term reduction of harm is an improvement from what otherwise would occur and therefore necessarily constitutes sufficient mitigation.  *Id.* at 15-16, 24-25;

---

described in the HCP will assist in determining if and when it is necessary to change the plan's conservation measures to achieve the plan's biological objectives."); AR 37738 ("Temperature effectiveness…" through "…stream temperatures."); AR 37739 ("The greater…" through "…collaboratively."); AR 37748 ("FGS will implement…" through "…management strategy."); AR 37771 ("The 15-year mass-wasting study….").

NMFS AR at 150905-06.  Based on this premise, and the finding that implementation of the HCP will reduce impacts to fish over the long term, the Services contend that NMFS was not required to determine whether the mitigation provided is the "maximum extent practicable."  *Id.*

But the Services again apply the wrong legal standard.  It is only where the mitigation of an HCP *completely offsets* the expected impacts of implementation that the "maximum extent practicable" requirement is fulfilled without further inquiry.  *Nat'l Wildlife Fed'n v. Norton*, No. Civ-S-04-0579, 2005 WL 2175874 (E.D. Cal. Sept. 7, 2005), at * 13-14.  A partial reduction in impacts, by definition, does not completely offset the impacts of implementation of the HCP.  *See Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d at 1274.  Contrary to the Services' contention, it is the "rare case" where an HCP fully compensates for permitted harm.  *Nat'l Wildlife Fed'n v. Norton*, 2005 WL 2175874 at *16; *and see* Response at 13 (misciting *Nat'l Wildlife Fed'n v. Norton*).

Under the correct legal standard, NMFS was required to find either:  1) that mitigation provided under the HCP will fully offset the impacts of the authorized take; or 2) that greater mitigation would be impracticable.  *Friends of the Wild Swan v. Jewell*, Civ. No. 13–61–M–DWM, 2014 WL 4182702, at *4 (D. Mont. Aug. 21, 2014); *Nat'l Wildlife Fed'n. v. Babbitt*, 128 F. Supp. 2d at 1292–93.  Here, NMFS provides no evidence that implementation of the HCP will completely offset all the take expected to occur.  Rather, by NMFS' own admission, implementation of the HCP is expected to cause short-term increases in harm to covered species, followed by an eventual partial reduction in the impacts of authorized take.  NMFS AR at 150905-06.  Furthermore, NMFS provides no evidence supporting a conclusion that greater mitigation would be impracticable.  *Id.*  For example, the HCP requires a 50 percent reduction in potential sediment from certain FGS logging roads after 10-15 years.  AR 36127.  But the record contains zero information explaining why the 50 percent target or the required timeframe

1    provides mitigation to the maximum extent practicable.  NMFS AR 150905-06.  That analysis is

2    insufficient.  *See Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) ("Merely [r]eferencing a

3    requirement is not the same as complying with that requirement.") (citation omitted).

4    H.      The Services Violated NEPA by Failing to Disclose Environmental Information.

5           In their responsive brief, the Services argue that NEPA does not require the disclosure of

6    economic information and that the FEIS adequately discloses the environmental effects of the

7    proposed action.  The Services are mistaken.  First, NEPA clearly requires the disclosure and

8    consideration of economic information, particularly where—as here—it is the underlying

9    motivation for the applicant (FGS) seeking federal approval for its action.  AR 38354.  The

10   "Congressional declaration of national environmental policy" in NEPA expressly requires

11   federal agencies to consider the effects of federal action on the quality of the human

12   environment, so that "man and nature can exist in productive harmony, and fulfill the social,

13   *economic*, and other requirements of present and future generations of Americans."  42 U.S.C. §

14   4331.  The statute also requires federal agencies to develop methods of analysis that "will insure

15   that presently unquantified environmental amenities and values may be given appropriate

16   consideration in decision-making *along with economic and technical considerations*," indicating

17   that quantified economic amenities and values should already be reflected in the decision-making

18   process.  *Id.* § 4332(2)(B) (emphasis added); *see also*, 42 U.S.C. §§ 4342, 4344(4); 40 C.F.R. §§

19   1501.2(b), 1508.8, 1508.14.  Economics is an "environmental concern" for purposes of NEPA

20   analysis, and indeed, both the statute and applicable regulations required the Services to address

21   economic considerations in the FEIS.

22          Despite this authority, the Services argue that disclosure of economic information is only

23   required when it forms the basis of the development of alternatives, arguing that KS Wild

24   misunderstands the court's opinion in *Seattle Audubon Soc. v. Lyons*, 871 F. Supp. 1291, 1324

1    (W.D. Wash. 1994) *aff'd sub nom. Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401 (9th Cir.

2    1996).  In that case, Judge Dwyer held that because economic considerations were at issue in the

3    litigation economic information must not be "misleading, biased, or incomplete."  *Id*.  In the

4    present case, because the entire motivation behind the HCP is to permit FGS to "increase

5    efficiencies" and "to continue to operate its *commercial* timberlands on a long-term basis while

6    complying with the ESA," AR 38354 (emphasis added), the economic and financial (*i.e.*,

7    "commercial") information regarding how the HCP will accomplish this goal is highly relevant

8    to an adequate consideration of the environmental consequences of the proposed action.

9            Second, the Services argue that disclosure of financial or economic data relevant to the

10    HCP would be speculative.  Response at 36.  However, prior to seeking an HCP, FGS routinely

11    provided this type of information to the State of California, and in fact prepared a 50-year

12    harvest plan that disclosed the details of its operations and fiscal assumptions that supported its

13    sustained-yield calculations.  AR 14499-14633 (harvest plan with redacted financial

14    information).  Providing this information to the public as part of the EIS process clearly is not

15    "speculative," because FGS has disclosed it in the past.

16            Third, the Services argue that because the data may be exempt from disclosure under the

17    Freedom of Information Act ("FOIA"), the agencies were not required to disclose it in the NEPA

18    process.  Whether this economic information would be exempt from disclosure under FOIA is

19    not an issue before this court, and has no bearing as to whether it must be disclosed under NEPA.

20    The Services cite no case law to the contrary and their rebuttal on this point fails.

21            The Services also failed to provide *quantified* data regarding the environmental

22    consequences of the HCP.  *See* Opening Br. at 46-47.  The Services contend in response that they

23    were not required to prepare this information and that NEPA only requires *either* "some

24    quantified" *or* "some detailed" information, and that regardless, the agencies included this

1    information with respect to effects to northern spotted owls.  Response at 38-39.  The Services

2    first attempt to distinguish the cases cited by KS Wild by merely restating their holdings.

3    Response at 37-38.  Nothing in the holdings of these cases suggests that the Services do not need

4    to provide the type of information—objective and not relative—KS Wild seeks.

5         The Services also appear to claim that the entire FEIS complies with NEPA because they

6    provided "some" detailed information regarding canopy closure and effects to northern spotted

7    owls.  Response at 38.  This retort misses the mark.  The section in the EIS addressing canopy

8    closure discusses the change in canopy closure in relative terms, but never discusses what the

9    effects of the alteration of habitat conditions are expected to be, what effects on wildlife a 20

10   percent decrease in canopy closure over the first 30 years of HCP implementation are expected

11   to be, or any other actual effects of the proposed action.  The mere preparation of a table showing

12   canopy change over time does not *explain* the effects of these changes, which is what NEPA

13   requires.

14        With respect to the effects on the northern spotted owl, the FEIS similarly restates what

15   the HCP will do, but beyond restating the expected level of incidental take, does not actually

16   quantify the effects of the HCP on spotted owls.  Rather, the FEIS concludes that

17   "implementation of the Proposed Action would result in impacts to the regional spotted owl

18   population in the California Klamath province..." without discussing what precisely those

19   impacts will be.  Finally, the Services argue that some types of information can only be disclosed

20   and discussed in a relative manner and that it fully disclosed the assumptions behind its

21   "analysis."  Response at 39.  But the case law has held that the information must be discussed in

22   a more concrete and quantitative manner.  Indeed, many of the cases cited by KS Wild involve

23   the same environmental effects of timber harvest that are at issue in this case, which indicates

24   that federal agencies are clearly capable of providing this information, although they failed to do

1    so here.  The passages quoted by the Services in their response brief regarding the water

2    resources analysis and salmonids prove KS Wild's point: nothing in these quoted passages tells

3    the reader about *whether in fact* the proposed "management activities" will "affect hydrologic

4    processes," "alter snowpack," "enhance runoff," "affect physical habitat conditions," or have any

5    of the other "possible" environmental effects, and if so, how.  Response at 39.  The failure to

6    provide this information is arbitrary, capricious, and not in accordance with NEPA.  5 U.S.C. §

7    706(2)(A).

8    I.      The Services Failed to Adequately Analyze Cumulative Impacts.

9            Instead of meaningfully addressing KS Wild's cumulative effects arguments, the Services

10   cite to portions of the administrative record that only highlight the deficiencies in the Services'

11   cumulative effects analysis.  *See* Opening Br. at 47-50.  To support its assertion that it considered

12   the cumulative impacts of the HCP in conjunction with timber harvest on adjacent and nearby

13   lands, the Services cite to a section of the cumulative effects chapter of the FEIS titled "Timber

14   Operations."  Response at 40-41.  But this section of the FEIS does not provide the data and

15   information that NEPA requires, and instead simply describes "the timber harvest regulatory

16   regimes that apply to any timber projects on adjacent public and private land…."  *Id.*  A brief

17   summary of the various federal and state regulatory regimes that govern timber harvest does not

18   inform the decision maker or the public about what types or amount of timber harvest on nearby

19   lands has occurred in the past and is currently occurring, as required by NEPA.

20           The Ninth Circuit has explicitly stated that "[timber harvest] [p]rojects that are

21   reasonably foreseeable should be included in the cumulative effects analysis."  *Envtl. Prot. Info.*

22   *Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006); *see also Klamath-Siskiyou*

23   *Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994-95 (9th Cir. 2004) (calculation of

24   acres to be harvested is "a necessary component of a cumulative effects analysis"); *League of*

1   *Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211,

2   1218 (9th Cir. 2008) ("NEPA requires adequate cataloguing of relevant past projects in the

3   area.").  Here, the Services have not disclosed a *single* timber harvest project on any adjacent or

4   nearby lands that occurred in the past or that is currently being implemented, nor have they

5   disclosed and analyzed "the actual environmental effects that can be expected" from that timber

6   harvest.  This information is crucial to determine the cumulative effects of timber harvest

7   occurring on adjacent and nearby lands in combination with the timber harvest contemplated by

8   the HCP. Its omission deprived both the public and the decision-maker of a comprehensive and

9   forthright evaluation of the environmental effects of the HCP.  This takes on increased

10  importance here, where the Services rely upon adjacent lands through the HCP's mitigation

11  program to preserve 24 Conservation Support Areas in owl circles.  *See* AR 36135.  Because the

12  CSAs comprise owl circles that encompass significant amounts of non-FGS lands, the disclosure

13  and analysis of the cumulative effects of timber harvest on those lands is vitally important.

14  Indeed, had the Services evaluated this information, it may have "influence[d] the agency's

15  ultimate decision of whether to take or refrain from taking a certain action."  *Salmon Spawning*

16  *& Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226-27 (9th Cir. 2008).

17      As to the cumulative effects on salmonids of herbicide use on adjacent lands, the Services

18  simply assert that because the permits do not cover herbicide use they have no obligation to

19  consider the cumulative effects of their use.  Response at 41.  But whether the permits cover

20  herbicide use has no bearing on NEPA's requirement to consider those cumulative effects in the

21  EIS.  Indeed, because FGS will use herbicides during implementation of the HCP, the Services

22  have an obligation under NEPA to consider the cumulative effects of all "past, present, and

23  reasonably foreseeable future actions regardless of what agency…undertakes such other

24

PLAINTIFFS' REPLY BRIEF - CASE NO. 3:13-cv-3717-NC – Page 23

1  actions," 40 C.F.R. § 1508.7, including those impacts to salmonids from herbicide use on

2  adjacent and nearby lands in conjunction with their use on lands subject to the HCP.

3        Finally, as to the cumulative impacts from water withdrawals on salmonids, the Services

4  assert that "[s]uch information need not be analyzed under NEPA because it is speculative."

5  Response at 42.  The Services are wrong: the FEIS contains three maps showing the proposed

6  locations of these withdrawals on FGS lands.  AR 38449, 38451, 38453.  However, no

7  information is given as to the cumulative impacts of these withdrawals, such as the proposed use,

8  season of use, and amounts of these proposed withdrawals, including the synergistic effects of

9  the withdrawals when considered in conjunction with those from adjacent and nearby lands.

10  While the Cumulative Effects section of the FEIS does discuss some of the effects of the

11  implementation of the HCP on water resources, *see* AR 38624-30, it fails to actually disclose and

12  discuss the cumulative impacts on salmonids of water withdrawals on lands subject to the HCP

13  in conjunction with similar water withdrawals on adjacent and nearby lands.  NEPA requires

14  more.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 811 (9th Cir. 1999).

### III.    RELIEF

16        While KS Wild did not make specific arguments against the incidental take statements,

17  KS Wild has demonstrated that each of the BiOps is arbitrary and capricious, and an invalid

18  BiOp necessarily invalidates the accompanying incidental take statement.  *Or. Natural Res.*

19  *Council v. Allen*, 476 F.3d 1031, 1037 (9th Cir. 2007).  Similarly, invalidation of either BiOp

20  invalidates both incidental take permits because those permits may not be issued absent both

21  Services issuing a valid and comprehensive biological opinion.  16 U.S.C. § 1536(a)(2); 16

22  U.S.C. § 1539(a)(2)(B)(iv).

23

24

The Services argue that KS Wild has failed to demonstrate that vacatur is an appropriate remedy.  Response at 43.  However, where a plaintiff proves a violation of the APA the *defendant* bears the burden of demonstrating that vacatur would be inequitable.  5 U.S.C. § 706(a)(2) (reviewing court shall "hold unlawful and set aside" arbitrary and capricious agency action); *Alsea Valley Alliance v. Dep't of Commerce*, 358 F.3d 1181, 1185-86 (9th Cir. 2004) ("Although not without exception, vacatur of an unlawful agency rule normally accompanies a remand.") (citations omitted); *Cal. Communities Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2014) (remand without vacatur occurs "in limited circumstances.")

Vacatur is appropriate and required here because KS Wild has established violations of law that go to the heart of the ESA and NEPA.  Specifically, KS Wild has shown that the Services failed to ensure that the applicant "minimized and mitigated" impacts to the maximum extent practicable and that they failed to insure a lack of jeopardy to the threatened species.  KS Wild has also demonstrated fundamental deficiencies in the EIS that undermined the public's strong interest in contributing to the decision making process.  Because KS Wild has established standing, and because implementation of the HCP would allow unlawful harm to threatened species, vacatur is the appropriate and lawful remedy.  If this Court has any questions regarding the appropriate remedy, then KS Wild respectfully requests additional briefing on this point.

Respectfully submitted this 8th day of October, 2014.

By: _____

WYATT GOLDING, WSBA #44412
PAUL KAMPMEIER, WSBA #31560

By: _____

SUSAN JANE BROWN, OSB #054607
JOHN MELLGREN, OSB #114620

*Attorneys for Plaintiffs*