1
2
3
4
5
6
7                     UNITED STATES DISTRICT COURT
8                    NORTHERN DISTRICT OF CALIFORNIA
9

| 10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | KLAMATH-SISKIYOU WILDLANDS<br>CENTER, CENTER FOR BIOLOGICAL<br>DIVERSITY, and KLAMATH FOREST<br>ALLIANCE,<br><br>              Plaintiffs,<br><br>        v.<br><br>NATIONAL OCEANIC AND<br>ATMOSPHERIC ADMINISTRATION,<br>NATIONAL MARINE FISHERIES<br>SERVICE, and UNITED STATES FISH<br>AND WILDLIFE SERVICE,<br><br>              Defendants,<br>        and<br><br>FRUIT GROWERS SUPPLY<br>COMPANY,<br><br>              Defendant-Intervenor. | Case No. 13-cv-03717-NC<br><br>**ORDER ON CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 53, 63, 66 |

23        The Endangered Species Act makes it unlawful for any person to "take" members
24   of an endangered or threatened species.  There is an exception: a person may obtain a
25   permit to take a species, if such taking is incidental to the proposed activity and the
26   applicant presents plans to minimize and mitigate its impact.  Here, the primary issue is
27   whether or not a permit applicant should be allowed to piggyback off of the conservation
28   work of a non-applicant neighbor.

Case No.: 13-cv-03717-NC

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs Klamath-Siskiyou Wildlands Center, Center for Biological Diversity, and

2  Klamath Forest Alliance (collectively "KS Wild") allege that defendants U.S. Fish and

3  Wildlife Service and National Marine Fisheries Service (collectively "the Services")

4  improperly issued 50-year incidental take permits to defendant-intervenor Fruit Growers

5  Supply Company to take two "threatened" species: the northern spotted owl and the

6  Southern Oregon/Northern California Coast coho salmon.  KS Wild alleges multiple

7  violations of the Endangered Species Act and the National Environmental Policy Act.

8    KS Wild's key allegation is that Fruit Growers wrongfully obtained an incidental

9  take permit by piggybacking off of the U.S. Forest Service's conservation efforts on

10  neighboring lands.

11    In discussing the ESA issues, the Court first tackles KS Wild's claims associated

12  with the northern spotted owl.  Those claims involve the issue of whether or not the U.S.

13  Fish and Wildlife Service arbitrarily and capriciously issued an incidental take permit to

14  Fruit Growers.  The Court also discusses whether FWS erred in issuing a biological

15  opinion that found Fruit Growers' plan to harvest timber would not likely jeopardize the

16  northern spotted owl's continued existence or result in the destruction or adverse

17  modification of critical habitat.

18    Next, the Court looks at the ESA claims concerning the Southern Oregon/Northern

19  California Coast coho salmon ("coho salmon").[1]  KS Wild argues that the National Marine

20  Fisheries Service made an arbitrary and capricious finding in its biological opinion that

21  Fruit Growers' proposed timber-harvesting activities would not jeopardize the continued

22  existence of coho salmon.  In particular, KS Wild argues that the Services failed to account

23  for the coho salmon's short three-year lifespan in its "no jeopardy" analysis.  KS Wild also

24  argues that NMFS's finding that Fruit Growers satisfied the "minimize and mitigate"

25

26  [1] NMFS determined that the Southern Oregon/Northern California Coast Evolutionarily
Significant Unit (ESU) of coho salmon (*Oncorhynchus kisutch*) is a "species" under the

27  ESA.  62 Fed. Reg. 24588 (May 6, 1997).  An ESU is a "distinct population segment."  62
Fed. Reg. at 24588.  There are many distinct population segments of coho salmon.  But for

28  the purposes of this Order, the term "coho salmon" will refer only to the Southern
Oregon/Northern California Coast ESU of coho salmon.

1 requirement under § 10 was arbitrary and capricious.

2   Finally, the Court examines KS Wild's claims that the Services violated the

3 National Environmental Policy Act.  Under NEPA, the reviewing agency must issue an

4 "environmental impact statement" that measures the cumulative effects of the

5 environmental action.  The Court examines the question of whether the Services' joint

6 Final Environmental Impact Statement conducted a sufficient cumulative effects analysis

7 of Fruit Growers' proposed actions—its timber harvest projects, its plan to use herbicides,

8 and its plan to perform water withdrawal projects.  The Court then looks at KS Wild's

9 contention that Fruit Growers violated NEPA by failing to release certain economic data

10 about Fruit Growers, and by failing to quantify its findings as to the environmental

11 consequences of Fruit Growers' proposed action.

12   For the reasons explained below, the Court GRANTS KS Wild's summary

13 judgment motion and finds the incidental take permits issued by the Services, the

14 biological opinion issued by NMFS, and the Final Environmental Impact Statement

15 invalid.  But the Court DENIES KS Wild's summary judgment motion to invalidate the

16 FWS biological opinion.  Accordingly, the Services' cross-motion for summary judgment

17 is DENIED as to all issues except the claim involving the FWS biological opinion's

18 validity.  As to that claim, the Services' cross-motion is GRANTED.

19 //

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

<strong>TABLE OF CONTENTS</strong>

I.    BACKGROUND
      A.    Statutory Framework
            1.    Endangered Species Act
            2.    National Environmental Policy Act
      B.    The Threatened Species
            1.    Northern Spotted Owl
            2.    Southern Oregon/Northern California Coast Coho Salmon
      C.    The Incidental Take Permits and the Supporting Documents
            1.    Habitat Conservation Plan
            2.    Environmental Impact Statement
            3.    Biological Opinion
      D.    The Dispute
II.   JURISDICTION
III.  STANDARD OF REVIEW
IV.   DISCUSSION
      A.    Endangered Species Act
            1.    Northern Spotted Owl
                  a.    Incidental Take Permit
                        i.    FWS's "Minimize and Mitigate" Finding for "the Applicant"
                        ii.   Fruit Growers' Unenforceable Commitments
                  b.    Biological Opinion
                        i.    FWS's "No Jeopardy" Findings
                        ii.   FWS's Inconsistent Assumptions
            2.    Coho Salmon
                  a.    Incidental Take Permit and Biological Opinion
                        i.    NMFS's Failure to Evaluate Short-Term Impacts
                        ii.   NMFS's "Minimize and Mitigate" Finding
      B.    National Environmental Policy Act
            1.    Cumulative Effects Analysis in Environmental Impact Statement
                  a.    Timber Harvests
                  b.    Herbicides
                  c.    Water Withdrawal
            2.    Other NEPA Issues
                  a.    Economic Data
                  b.    Quantification of Environmental Consequences
V.    CONCLUSION
      A.    Summary of Findings
            1.    Endangered Species Act Claims: Northern Spotted Owl
            2.    Endangered Species Act Claims: Coho Salmon
            3.    National Environmental Policy Act Claims
      B.    Additional Briefing
            1.    Remedy
            2.    Claim Three
            3.    Briefing and Hearing Schedule
Attachments
      •   Exhibit 1: Owl Circle "SK378" from Habitat Conservation Plan (AR 36417)
      •   Exhibit 2: Owl Circle "SK238" from Habitat Conservation Plan (AR 36412)

# I.     BACKGROUND

## A.     Statutory Framework

### 1.     Endangered Species Act

Congress enacted the Endangered Species Act of 1973, 16 U.S.C. §§ 1531-1544, "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978).  In accordance with this policy, the ESA directs the Secretary of the Interior or the Secretary of Commerce to list endangered and threatened species.  ESA § 4(a), 16 U.S.C. § 1533(a).  Section 9 of the ESA makes it unlawful for any person to "take" a species that has been listed.  ESA §§ 9(a)(1)(B) and (G), 16 U.S.C. §§ 1538(a)(1)(B) and (G).

Defined broadly, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  ESA § 3(19), 16 U.S.C. § 1532(19); *see Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995) ("Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions.").  The regulations further define the term "harass" as an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3.  The regulations define "harm" as "an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Id.*

There is an exception to the ESA's § 9 prohibition on taking.  Section 10 of the ESA gives wildlife Services the discretion to issue a permit that allows a private individual to take a species, "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  ESA § 10(a)(1)(B), 16 U.S.C. § 1539(a)(1)(B).

Before the Services can issue this "incidental take permit," the permit applicant must submit a "Habitat Conservation Plan."  This Plan must show that "the applicant will,

to the maximum extent practicable, minimize and mitigate the impacts of the taking," and that "the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild."  ESA § 10(a)(2), 16 U.S.C. § 1539(a)(2).  The Secretary[2] cannot approve an incidental take permit unless he or she determines that the applicant has satisfied these statutory conditions.

In addition, § 7 of the ESA requires federal agencies to consult with either FWS or NMFS to ensure that any action authorized or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of critical habitat of the species.  ESA § 7, 16 U.S.C. § 1536.  This process requires the Services to prepare a biological opinion that includes a finding as to whether the proposed action is likely to jeopardize the continued existence of an endangered or threatened species or its habitat.  50 C.F.R. § 402.14.  Only after the Service makes this "no jeopardy" finding can it issue an incidental take permit to the applicant.

### 2.    National Environmental Policy Act

Congress passed NEPA to protect the environment by requiring that federal agencies scrupulously weigh environmental considerations, and consider potential alternatives to proposed actions before the government launches a major federal action.  *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

Instead of substantive outcomes, NEPA imposes procedural requirements on actions by federal agencies.  *Id.* (citation omitted).  For proposed major federal actions—where there is no dispute that the proposed action qualifies as such—NEPA requires the agency to prepare an environmental impact statement.  42 U.S.C. § 4332.  "NEPA requires that a federal agency consider every significant aspect of the environmental impact of a proposed

---

[2] This term refers to either the Secretary of the Interior or the Secretary of Commerce.  "The Fish and Wildlife Service (FWS) administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior, while the National Marine Fisheries Service (NMFS) administers the ESA with respect to species under the jurisdiction of the Secretary of Commerce."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 651 (2007) (citing 50 CFR §§ 17.11, 222.101(a), 223.102, 402.01(b)).

United States District Court
Northern District of California

1    action . . . [and] inform the public that it has indeed considered environmental concerns in

2    its decisionmaking process." *Earth Island Inst. v. U.S. Forest Serv.,* 351 F.3d 1291, 1300

3    (9th Cir. 2003) (internal quotation marks omitted).  "In order to accomplish this, NEPA

4    imposes procedural requirements designed to force agencies to take a 'hard look' at

5    environmental consequences."  *Id.*

6    **B.    The Threatened Species**

7        **1.    Northern Spotted Owl**

8        The northern spotted owl inhabits "structurally complex forests" from southwestern

9    British Columbia through Washington and Oregon to northern California. 77 Fed. Reg.

10    71876, 71877-78 (Dec. 4, 2012); AR 35983.  Dark brown with white spots, dark brown

11    eyes, and a barred tail, northern spotted owls are territorial and usually monogamous.  77

12    Fed. Reg. at 71883, AR 35984.  They rely on older forested habitats that contain the

13    structures and characteristics required for nesting, roosting, foraging, and dispersal.  77

14    Fed. Reg. at 71884.

15        FWS listed the northern spotted owl as a "threatened" species in 1990 "because of

16    widespread loss of habitat across its range and the inadequacy of existing regulatory

17    mechanisms to conserve it."  *Id.* (citations omitted).  In 2004 and 2011, FWS again

18    concluded that the northern spotted owl should remain listed as a threatened species.  77

19    Fed. Reg. at 71887-88.  Notably, historical timber harvest and land-conversion have been

20    identified as the primary causes of an estimated 60 to 88 percent decline in northern

21    spotted owl habitat from the 1800s to 1990.  AR 35986.  Additionally, the northern spotted

22    owl faces a significant threat from the barred owl, which competes with the northern

23    spotted owl for habitat, food, and shelter.  77 Fed. Reg. at 71878.  This competitive

24    pressure has "intensified the need to conserve and restore large areas of contiguous, high-

25    quality habitat" across the northern spotted owl's range.  77 Fed. Reg. at 71879.

26        FWS first designated federal lands in Washington, Oregon, and California as

27    "critical habitat" for the northern spotted owl in 1992.  57 Fed. Reg. 1796 (Jan. 15, 1992).

28    This designation "identifies specific areas essential to the conservation of a species," and

United States District Court
Northern District of California

1   provides additional protection requirements under the ESA as to activities funded,

2   authorized, or carried out by a federal agency.  57 Fed. Reg. at 1797; ESA § 3(5)(A), 16

3   U.S.C. § 1532(5)(A).  FWS revised these designations in 2008 and 2012.  That latter

4   revision represented an increase in the total land area identified from previous designations

5   due to the northern spotted owl's "unanticipated steep decline."  77 Fed. Reg. at 71895.

6   ## 2.    Southern Oregon/Northern California Coast Coho Salmon

7       The SONCC coho salmon are anadromous fish, which means they migrate from the

8   sea to fresh water to spawn.  Coho salmon have a three-year life cycle—they reach sexual

9   maturity at three years old, and then spawn before dying.  AR 35966, 37658.  They

10  naturally reproduce and spawn in streams between Punta Gorda, California, and Cape

11  Blanco, Oregon.  62 Fed. Reg. 24588 (May 6, 1997).

12      As a coldwater species, coho salmon require cool suitable water temperatures for

13  spawning and egg incubation.  AR 35969.  High water temperatures can reduce growth,

14  lead to egg loss, promote disease, and block upstream or downstream migration.  AR

15  35969.  Cool water temperatures are also necessary for juvenile coho salmon while rearing

16  in freshwater environments.  AR 35969.

17      NMFS listed the SONCC coho salmon as "threatened" in May 1997.  AR 35966

18  (citing 62 Fed. Reg. 24588).  NMFS designated critical habit for the coho salmon in May

19  1999.  64 Fed. Reg. 24049 (May 5, 1999).  This includes portions of areas affected by Fruit

20  Growers' Habitat Conservation Plan.  AR 35966.  NMFS identified logging, road building,

21  and water withdrawals as some of the major activities responsible for the coho salmon's

22  decline.  62 Fed. Reg. at 24592.

23      Indeed, such timber-harvest activities can alter stream features that support coho

24  survival.  62 Fed. Reg. at 24593.  For instance, roads serve as a source of sediment to

25  streams.  AR 37740-41.  Sediment delivered to streams, in turn, can lead to reduced

26  reproductive success as well as reduced growth rates for coho salmon.  AR 37743.  NMFS

27  expressed "particular concern" over the "increased sediment input into spawning and

28  rearing areas that results from loss of properly functioning riparian areas, land

1   management activities that occur on unstable slopes, and certain agricultural practices." 62

2   Fed. Reg. at 24592.

3      **C.   The Incidental Take Permits and the Supporting Documents**

4      In 2009, Fruit Growers submitted an application to FWS for authorization under

5   ESA § 10 to take northern spotted owls on the company's lands in connection with timber

6   harvest operations.  AR 40133.  Fruit Growers also submitted an incidental take permit

7   application to NMFS for authorization to take coho salmon, which could be affected by

8   logging activities.  NMFS AR 150899.  FWS and NMFS eventually issued incidental take

9   permits to Fruit Growers, allowing the company to take northern spotted owls and coho

10  salmon during the course of its logging activities.  AR 40108-40110; NMFS AR 150875.

11  The permits last for 50 years.

12     The incidental take permits apply to 152,163 acres of Fruit Growers ownership.  AR

13  35942.  Fruit Growers manages its lands in northern California in three management units:

14  the Klamath River Management Unit, the Scott Valley Management Unit, and the Grass

15  Lake Management Unit.  NMFS AR 150900.  The Klamath River and Scott Valley

16  Management Units are located west of the Interstate 5 in Siskiyou County, California, and

17  the Grass Lake Management Unit is located east of the Interstate 5, north of Mt. Shasta,

18  and also in Siskiyou County.  NMFS AR 150900.

19     Before granting the permits, however, the Services required Fruit Growers to

20  submit a Habitat Conservation Plan that specified several factors, including how Fruit

21  Growers planned to minimize and mitigate the take.  In addition to reviewing the Plan, the

22  Services also issued an environmental impact statement under NEPA as well as a

23  biological opinion under the ESA.  AR 38346 (Final Environmental Impact Statement);

24  AR 34071 (FWS biological opinion); AR 37604 (NMFS biological opinion).

25         **1.   Habitat Conservation Plan**

26     Because Fruit Growers intended to take the northern spotted owl and the coho

27  salmon, the Habitat Conservation Plan presented separate strategies on how to conserve

28  each species.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    First, the conservation plan's centerpiece to preserve the northern spotted owl,

2    known as the "Terrestrial Species Conservation Program," involved the creation of

3    Conservation Support Areas on Fruit Growers land.  Fruit Growers lands are in a

4    "checkerboard" pattern: they consist of square blocks of land adjacent to federal lands

5    managed by the U.S. Forest Service or the Bureau of Land Management.  AR 36000,

6    36002.  These Conservation Support Areas consist of Fruit Growers' land located within

7    1.3 miles of an owl's "activity center"—that is, the center of the owl's "home range."  AR

8    36133-41; AR 35942 (defining "activity center").

9    To support northern spotted owl reproduction, an owl's home range requires

10   appropriate amounts of nesting, roosting, and foraging habitat arrayed so that nesting pairs

11   can survive, obtain resources, and breed successfully.  77 Fed. Reg. at 71884; AR 35984.

12   While a home range can vary in size and shape, Fruit Growers' Plan characterizes the

13   home range as a circle drawn around a recognized northern spotted owl activity center

14   (roosting or nesting site).  AR 35984.  Thus, the parties also refer to home ranges as "owl

15   circles."

16   Each owl circle covers approximately 3,400 acres, which is equivalent to the area of

17   a circle with a radius of 1.3 miles.  AR 35985.  Northern spotted owls exhibit "central-

18   place foraging behavior," and, during breeding season, concentrate their activity mostly

19   within a "core area" surrounding the nest tree.  77 Fed. Reg. at 71887; AR 35985.  This

20   "core area" of the owl circle covers 500 acres, which is equivalent to the area of a circle

21   with a 0.5 mile radius.  AR 35985.  Another way to think of the 3400-acre home range is

22   of a circle with an inner ring (0.5 mile radius) and an outer ring (1.3 mile radius).

23   Under the Fruit Growers Plan, the Conservation Support Areas, located within the

24   3400-acre owl circle, would provide "demographic support" to the conservation efforts of

25   surrounding landowners, namely the U.S. Forest Service.  AR 36133-41.  Indeed, the U.S.

26   Forest Service must manage these surrounding lands for the northern spotted owl as part of

27   the Northwest Forest Plan.  AR 36265; *see also League of Wilderness Defenders Blue*

28   *Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1125 (9th Cir. 2010) ("[T]he

Case No.: 13-cv-03717-NC          10

1    Forest Service developed the Northwest Forest Plan (NWFP) to protect and enhance old-

2    growth forest ecosystems in the Pacific Northwest and Northern California that serve as

3    habitats for numerous species.").

4            Within the Conservation Support Areas, Fruit Growers would "promote and

5    maintain" general conditions and beneficial habitat features such as "[a]reas composed of

6    tree species associated with use by northern spotted owls (i.e., Douglas-fir with mistletoe

7    infections to provide nesting platforms, [and] hardwoods to provide food and shelter for

8    prey)" and "variable tree densities."  AR 36134.  Timber harvest on the Conservation

9    Support Areas would be "restricted" and "any harvest . . . [would] require evaluation for

10   compliance with the [Habitat Conservation Plan] provisions, and written approval by

11   [FWS]."  AR 36134.

12           The Plan identifies 24 owl circles where Fruit Growers would establish, maintain,

13   and manage Conservation Support Areas during the Plan's 50-year term.  By preserving

14   Conservation Support Areas in these 24 owl circles, the Plan would permit Fruit Growers

15   to harvest timber in another 58 owl circles.  AR 36200.  Even though there are fewer

16   circles with Conservation Support Areas than circles where logging would be permitted,

17   the Plan emphasized that the 24 owl circles have a higher conservation value and "high[er]

18   likelihood of owl use" than the other 58.  AR 36138, 36200.

19           This conservation value was calculated using a number of factors, including the

20   activity center's proximity to areas that FWS designated as northern spotted owl critical

21   habitat.  AR 36193.  According to the Plan, the 24 activity centers protected by the

22   Conservation Support Areas contribute 55 percent of the total conservation value of

23   activity centers in the area affected by the Plan.  AR 36255-56.  In contrast, the lower

24   quality activity centers, where take is allowed, represent only 18 percent of the total

25   conservation value.  AR 36255-56.  The Plan stressed that most northern spotted owls that

26   could be taken would come from activity centers with low conservation value: "the loss of

27   conservation value at these activity centers is mitigated at a 3:1 ratio (in conservation

28   value) by establishment of the [Conservation Support Areas]."  AR 36256.

United States District Court
Northern District of California

The second key part of the Plan is known as the "Aquatic Species Conservation Program," which contains measures designed to protect and conserve species of fish, including coho salmon.  AR 36102.  For example, the strategy imposes "limitations on equipment use in and around waters and wetlands to minimize erosion and sedimentation and maintain hydrologic processes" along the miles of streams on Fruit Growers land that contain coho salmon.  NMFS AR 150901; *see also* AR 36099.  It also includes a road management plan, under which Fruit Growers must take steps to reduce sediment delivery to streams from those roads by 50 percent within 10 to 15 years of issuance of the permits.  AR 36127.

### 2.    Environmental Impact Statement

To further evaluate the Plan and the application, Fruit Growers and the Services prepared a Draft Environmental Impact Statement as required by NEPA.  42 U.S.C. § 4321 *et seq*.  The Services published a Notice of Availability of Fruit Growers' Plan and Draft Environmental Impact Statement in the Federal Register on November 13, 2009.  AR 12680.  In December 2009, the Services held public hearings on the proposed Plan and Draft Environmental Impact Statement, and received public comments until February 2010.  *Id.*; *see also* AR 38349.  The Services published the Final Environmental Impact Statement in June 2012.  AR 37656.

### 3.    Biological Opinion

During this time, both FWS and NMFS assessed whether issuing an incidental take permit to Fruit Growers would likely jeopardize the continued existence of an endangered or threatened species, or destroy or adversely modify designated critical habitat.  *See* ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).  In making this determination, FWS and NMFS issued biological opinions.  Both concluded that the proposed permit would not jeopardize the species or adversely modify critical habitat.  AR 38177-38180; NMFS AR 150828.

Because of the numerous issues raised by the parties, the voluminous administrative record consisting of tens of thousands of pages, and in the interest of judicial efficiency, the Court will describe additional facts germane to the threatened species, the statutes, the

Plan, the biological opinion, and the Final Environmental Impact Statement, as necessary as it goes through the parties' various claims.

### D.   The Dispute

On August 12, 2013, nine months after the Services issued incidental take permits to Fruit Growers, KS Wild filed a complaint for declaratory and injunctive relief against the Services.  Dkt. No. 1.  KS Wild alleged that the Services violated the Administrative Procedure Act, the Endangered Species Act, and the National Environmental Policy Act. Dkt. No. 1 at 2.

On August 1, 2014, KS Wild filed a motion for summary judgment seeking to invalidate the incidental take permits, the associated biological opinions, and the Final Environmental Impact Statement.  Dkt. No. 53 at 13.  In response, the Services filed a cross-motion for summary judgment seeking to uphold the permits, the biological opinions, and the Final Environmental Impact Statement.  Dkt. No. 63 at 9.  Fruit Growers, who intervened in the case, joined the Services' opposition and cross-motion briefing and filed a supporting brief.  Dkt. No. 65.

On November 19, 2014, the Court held a hearing on the summary judgment cross-motions.  Dkt. No. 76.

## II.   JURISDICTION

As a threshold issue, this Court must determine whether the plaintiff organizations Klamath-Siskiyou Wildlands Center, Center for Biological Diversity, and Klamath Forest Alliance have standing to sue.

An organization "has standing to bring suit on behalf of its members when its members would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).

For individual members to establish standing the individual must show: (1) an "injury in fact" (2) that is fairly traceable to the challenged conduct of the defendants and

1   (3) the injury is likely to be redressed by a favorable court decision.  *Natural Res. Def.*

2   *Council v. Jewell*, 749 F.3d 776, 782 (9th Cir. 2014) (citing *Friends of the Earth*, 528 U.S.

3   at 181).  Additionally, the interests sought to be protected must arguably be within "the

4   zone of interests" protected by the statute in question.  *Ass'n of Data Processing Serv.*

5   *Orgs., Inc. v. Camp*, 397 U.S. 150, 153-54 (1970).

6        Here, the Court finds that each plaintiff organization has established standing.

7   Plaintiffs have submitted declarations based on the personal knowledge of members from

8   plaintiffs Klamath-Siskiyou Wildlands Center, Center for Biological Diversity, and

9   Klamath Forest Alliance.[3]  The members of these associations would otherwise have

10  standing to sue in their own right.  "Approval and implementation of the incidental take

11  permits harms and will continue to harm" members of these associations "by reducing [the

12  members'] enjoyment of forests and forest ecosystems in the areas surrounding [Fruit

13  Growers] lands covered by [the Plan]."  Dkt. No. 57 at 4 (Sexton Decl.); *see also, e.g.*,

14  Dkt. No. 58 at 4 (Beckett Decl.) (stating that the Plan and the incidental take permit

15  "greatly reduces my likelihood of viewing Northern Spotted Owls and Pacific fishers in

16  their native habitat").

17       Such interests are germane to the organizations' purpose of advocating "for the

18  forests, wildlife and waters of southern Oregon and northern California."  Dkt. No. 55 at 3

19  (Ruediger Decl.).  Members of the organizations include avid hikers, campers,

20  photographers, and ecologists, who spend a significant time in parts of the Klamath-

21  Siskiyou region affected by the Plan.  *See, e.g.,* Dkt. Nos. 58 at 3 (Beckett Decl.), 55 at 5-6

22  (Ruediger Decl.).

23       The Court can redress the members' injuries in fact by invalidating the permits.

24  *See, e.g.*, Dkt. No. 61 at 10 (Haines Decl.) ("Invalidating the [Plan] and incidental take

25

26  _____

27  [3] The Court considered plaintiffs' declarations for the sole purpose of determining standing.  Defendant-intervenor objects to the declarations' use to the extent that the testimony offered goes beyond the record.  Dkt. No. 63 (motion to strike portions of two

28  declarations).  The objection is overruled because the Court considered the declarations only for the issue of standing.  Defendant-intervenor's motion to strike is denied.

Case No.: <u>13-cv-03717-NC</u>          14

United States District Court
Northern District of California

1   permits would help to redress my injuries by reinstating protections that benefit northern

2   spotted owls, their habitat, and the forest ecosystems in spotted owl habitat.").  Plaintiffs'

3   lawsuit does not require the participation of all of these individual members.

4   Finally, because plaintiffs' claims seek to protect threatened species and their

5   habitat, plaintiffs' interests fall clearly within the ESA's and NEPA's zone of interests.

6   *See Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1079 (9th Cir. 2001)

7   ("the interests [plaintiff] seeks to protect in this litigation clearly fall within the zone of

8   interests contemplated by section 7(a)(2) of the ESA"); *W. Watersheds Project v.*

9   *Kraayenbrink*, 632 F.3d 472, 485-86 (9th Cir. 2011) (finding plaintiffs' NEPA claims fall

10   within the statute's zone of interest).

11   For these reasons, and, in particular, because "the case law is abundantly clear that a

12   minimal showing of detriment is all that is required to establish an injury in fact," the

13   Court finds that the plaintiffs have established standing.  *See Sierra Club v. U.S. Army*

14   *Corps of Eng'rs*, 935 F. Supp. 1556, 1570 (S.D. Ala. 1996); *see also Japan Whaling Ass'n*

15   *v. Am. Cetacean Soc'y*, 478 U.S. 221, 231 n.4 (1986) (holding that plaintiff whale watchers

16   alleged sufficient injury in fact by asserting that their ability to engage in whale watching

17   activities would be adversely affected by continued whale harvesting activities of the

18   defendant).

19   This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Plaintiffs, defendants,

20   and defendant-intervenors consented to the jurisdiction of a magistrate judge under 28

21   U.S.C. § 636(c).  Dkt. Nos. 10, 18, 28.

22   **III.  STANDARD OF REVIEW**

23   Summary judgment may be granted only when, drawing all inferences and

24   resolving all doubts in favor of the nonmoving party, there are no genuine issues of

25   material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

26   P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when,

27   under governing substantive law, it could affect the outcome of the case.  *Anderson v.*

28   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine

United States District Court
Northern District of California

1  if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

2  party." *Id.*

3     A court reviews final agency actions under the "arbitrary and capricious" standard

4  of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  *Friends of Endangered*

5  *Species v. Jantzen*, 760 F.2d 976, 980-81 (9th Cir. 1985).  Under the APA, the court

6  "shall" set aside any agency decision that it finds "arbitrary, capricious, an abuse of

7  discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

8     An agency action is arbitrary and capricious if "the agency has relied on factors

9  which Congress has not intended it to consider, entirely failed to consider an important

10  aspect of the problem, offered an explanation for its decision that runs counter to the

11  evidence before the agency, or is so implausible that it could not be ascribed to a

12  difference in view or the product of agency expertise."  *Motor Vehicles Mfrs. Ass'n v. State*

13  *Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

14     Review under this "arbitrary and capricious" standard is narrow, and the reviewing

15  court may not substitute its judgment for that of the agency.  *League of Wilderness*

16  *Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir. 2008).  Despite this narrow

17  scope of review, the court's inquiry must be "searching and careful."  *Marsh v. Or.*

18  *Natural Res. Council*, 490 U.S. 360, 378 (1989).  Ultimately, " the agency must articulate a

19  rational connection between the facts found and the conclusions made."  *Or. Natural Res.*

20  *Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (citing *U.S. v. Louisiana-Pac. Corp.*,

21  967 F.2d 1372, 1376 (9th Cir. 1992)).

22  **IV.  DISCUSSION**

23     **A.     Endangered Species Act**

24        **1.     Northern Spotted Owl**

25     KS Wild asserts that the incidental take permit issued by the Fish and Wildlife

26  Service should be invalidated because the Secretary's finding that Fruit Growers satisfied

27  the minimization and mitigation requirement was arbitrary and capricious.  Likewise, KS

28  Wild argues that the biological opinion issued by FWS should be invalidated because its

United States District Court
Northern District of California

no-jeopardy conclusion was based on false assumptions.

### a.   Incidental Take Permit

Congress provided an incidental take permit exception to ESA § 9 for takings that are incidental to, and not the purpose of, the execution of an otherwise lawful activity.  ESA § 10(a)(1)(B), 16 U.S.C. § 1539(a)(1)(B).  As a prerequisite to receiving an incidental take permit, the applicant must submit a habitat conservation plan that specifies:

> (i)    the impact which will likely result from such taking;
> (ii)   what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;
> (iii)  what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and
> (iv)   such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

ESA § 10(a)(2)(A)(i)-(iv), 16 U.S.C. § 1539(a)(2)(A)(i)-(iv).  After opportunity for public comment, if the Secretary finds that the permit application and habitat conservation plan satisfies the following, the Secretary "shall" issue the permit:

> (i)    the taking will be incidental;
> (ii)   the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking;
> (iii)   the applicant will ensure that adequate funding for the plan will be provided;
> (iv)   the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and
> (v)    the measures, if any, required under subparagraph (A)(iv) will be met;

ESA § 10(a)(2)(B)(i)-(v), 16 U.S.C § 1539(a)(2)(B)(i)-(v).

### i.   FWS's "Minimize and Mitigate" Finding for "the Applicant"

ESA § 10(a)(2)(B)(ii) requires the Secretary to find that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of [the proposed] taking" before issuing an incidental take permit to the applicant.  ESA § 10(a)(2)(B)(ii), 16 U.S.C. § 1539(a)(2)(B)(ii).  Determining whether an applicant meets this standard for minimizing and mitigating the take "typically requires consideration of two factors: adequacy of the

1    minimization and mitigation program, and whether it is the maximum that can be

2    practically implemented by the applicant." *Habitat Conservation Planning and Incidental*

3    *Take Permit Processing Handbook* at 7-3 ("HCP Handbook").[4]

4        Because the ESA is silent on the definition of "applicant," the Court turns to the

5    regulations issued jointly by NMFS and FWS found at 50 C.F.R. § 402.  There, the

6    Services define an "applicant" as "any person, as defined in section 3(13) of the [ESA],

7    who requires formal approval or authorization from a Federal agency as a prerequisite to

8    conducting the action."  50 C.F.R. § 402.02; *see also, e.g.*, *Haw. Longline Ass'n v. NMFS*,

9    2002 U.S. Dist. LEXIS 7263, at *14-15 (D.D.C. Apr. 25, 2002) (looking to 50 C.F.R. §

10   402 to define "applicant" in ESA claim).  Section 3(13) of the ESA, in turn, defines the

11   term "person" as "an individual, corporation, partnership, trust, association, or any other

12   private entity; or any officer, employee, agent, department, or instrumentality of [any

13   federal, state, or municipal government] . . . subject to the jurisdiction of the United

14   States."  ESA § 3(13), 16 U.S.C. § 1532(13).  Meanwhile, "action" is defined as "all

15   activities or programs of any kind authorized, funded, or carried out, in whole or in part, by

16   Federal agencies . . . .  Examples include, but are not limited to . . . (a) actions intended to

17   conserve listed species or their habitat . . . ."  50 C.F.R. § 402.02.

18       Here, in evaluating Fruit Growers' Habitat Conservation Plan, FWS found that

19   applicant Fruit Growers "will, to the maximum extent practicable, minimize and mitigate

20   the impacts of such taking" of the northern spotted owl.  AR 40137 (FWS's § 10

21   "Statement of Findings and Recommendations"); AR 40138 (finding the Plan "is expected

22   to effectively avoid, minimize, and to the extent take is likely to occur, mitigate the

23   impacts of take . . . and contribute to the recovery of the northern spotted owl population").

24   FWS reached this conclusion based on several factors, with the primary mitigation

25

26   _____

27   [4] While the HCP Handbook is not in the Administrative Record, KS Wild attached it as an
     exhibit to its summary judgment filing, Dkt. No. 54-1, and it is a publicly available
     document.  Additionally, the Services agree that the Court may take judicial notice of this
28   document.  Dkt. No. 63 at 19 n.6.  Accordingly, the Court takes judicial notice of the HCP
     Handbook.

measure involving the establishment of 24 Conservation Support Areas by Fruit Growers. Dkt. No. 63 at 20-22 (Services' cross-motion for summary judgment) (pointing to Conservation Support Areas as the main evidence for FWS's "minimize and mitigate" finding); Dkt. No. 76 (summary judgment hearing), Tr. at 11/19/14, 2:43-2:45 (counsel for the Services describing Conservation Support Areas as the "centerpiece" of FWS's five-part conservation strategy).

These Conservation Support Areas consist of Fruit Growers land located within the 24 approximately 3400-acre owl circles that Fruit Growers committed to maintaining and managing for the 50-year term of the Plan.  Specifically, Fruit Growers committed to preserve a varying number of acres within each of the 24 Conservation Support Areas.  For instance, within the owl circle labeled "SK002,"[5] Fruit Growers would maintain and manage 211 acres of owl habitat within the 500-acre core area—which consists of nesting and roosting habitat—and a total of 931 acres within the entire 3400-acre owl circle.  AR 36137 (table listing FGA habitat commitments in Conservation Support Areas).  In contrast, in owl circle "SK238," Fruit Growers committed to maintaining 0 acres of habitat within the 500-acre core area and 66 acres within the whole owl circle.  AR 36137.  For each of these 3400-acre circles, the U.S. Forest Service owns the bulk of the non-Fruit Growers land.  AR 34181-91.

Overall, FWS identified a total of 82 valid owl circles that would be affected by the Fruit Growers Plan.  FWS assigned each of these owl circles—which together support an estimated total of 158 individual northern spotted owls—a "conservation value."  AR 36190, 36194-96.  FWS assessed the conservation value of each owl circle—expressed as a numeric score—using a formula that considered four variables: (1) the activity center's

---

[5] The Habitat Conservation Plan refers to these labeled areas as "activity centers" and not "owl circles."  Nonetheless, each activity center is surrounded by a home range in the form of a circle with a radius of 1.3 miles.  In addition, the "Conservation Support Area Maps" in the Plan's appendix consist of images of circles for each of these numerically-labeled "activity centers."  AR 36401-25.  KS Wild in the glossary to their reply brief also describes "activity center" as a term referring to an "owl circle" or "spotted owl circle."  Dkt. No. 73 at v.  Thus, for the sake of simplicity, the Court will refer to these activity centers as "owl circles."

United States District Court
Northern District of California

1    proximity to designated critical habitat; (2) the owl circle's reproductive status and history;

2    (3) the proportion of private land in the owl circle's inner (0.5-mile radius) and outer (1.3-

3    mile radius) rings; and (4) the owl circle's predicted probability of occupancy.  AR 36193.

4    The scores range from the highest conservation value of 111 to the lowest value of 0.  AR

5    36104-96.  The higher the conservation value, the greater the importance of that owl circle

6    to preserving the northern spotted owl species.

7          As FWS concluded in its § 10 findings, Fruit Growers would establish Conservation

8    Support Areas on land owned by Fruit Growers that "focus primarily on activity centers

9    with the highest conservation value, to provide demographic support to owl populations"

10   on adjacent federal lands.  AR 40138.  FWS and Fruit Growers identified the locations of

11   the Conservation Support Areas in large part on the basis of those high conservation

12   values.  AR 36193.  And under the Plan, the Conservation Support Areas would serve as

13   "mitigation for incidental take of lower value activity centers."  AR 36193.

14         In the final analysis, according to FWS, the reason why the Conservation Support

15   Areas would serve as "mitigation for incidental take" is that the expected taking by Fruit

16   Growers on lower value owl circles "[would] be *offset* by the conservation of high quality

17   northern spotted owl habitat" located within owl circles with the highest conservation

18   values containing the Conservation Support Areas.  Dkt No. 63 at 20 (citing AR 40141

19   (emphasis added)).  The Services identified 24 such owl circles to be protected by

20   conservation support; 43 owl circles where incidental take would take place; and another

21   15 owl circles where incidental take would be unlikely.  AR 36200.  After determining the

22   conservation value of each of the 82 owl circles, the Services identified the percentage of

23   the total conservation value contributed by each category of owl circle:

24   //

1

**Table 1.  Total Conservation Values Contributed by Each Category of Owl Circle**

| Category of Owl Circle | Number of Owl Circles | Total Conservation Value Score (approximate #) | % of Total Conservation Value |
|---|---|---|---|
| Protected by Conservation Support (contains Conservation Support Areas) | 24 | 1,645 | 55% |
| Incidental Take is Unlikely | 15 | 808 | 27% |
| Incidental Take is Likely | 43 | 538 | 18% |
| Total | 82 | 2,991 | 100% |

AR 36194-96, 36200.

Looking at the data, and highlighting the 55 percent and 18 percent findings, FWS concluded that the "conservation value of the conserved CSAs is three times higher than the conservation value of the activity centers where take would be allowed (55:18 percent)." AR 40139.  FWS further combined the total conservation value percentages for (a) the owl circles that would be protected by conservation support, and (b) the circles where incidental take is unlikely.  It found that because "82 percent of the total conservation of all activity centers . . . would be retained and conserved under the [Plan]," AR 40139, any incidental take by Fruit Growers would be minimized and mitigated.

KS Wild attacks this analysis.  In particular, KS Wild believes FWS wrongly "credited" Fruit Growers for the conservation value that the Forest Service—someone other than 'the applicant'—would provide within the owl circles.  Dkt. No. 53 at 34.  Put differently, KS Wild argues that according to ESA § 10(a)(2)(B)(ii), FWS may only consider minimization and mitigation efforts of "the applicant," which here is Fruit Growers; FWS may not factor into its conservation value analysis the minimization and mitigation efforts by neighboring landowners, which in this case consists of the Forest Service.  By awarding Fruit Growers "credit" for preserving entire owl circles "even though most of the land in those areas is owned by someone other than [applicant Fruit Growers]," Dkt. No. 53 at 14, KS Wild contends that FWS "relied on factors which Congress has not intended it to consider": actions by someone other than the incidental-

1    take-permit applicant, Dkt. No. 53 at 14 (quoting *Motor Vehicles*, 463 U.S. at 43). As KS

2    Wild explains, this renders FWS's "minimize and mitigate" finding arbitrary and

3    capricious.

4          But according to the Services, there is no "credit" system by which FWS treated

5    Fruit Growers as if it owned acreage that belonged to the federal government or other

6    landowners. Dkt. No. 63 at 33-34. Indeed, the Services point out that the word "credit"

7    appears nowhere in the Plan. *Id.* at 34. The Services admit that FWS "simply included

8    federal lands in the calculation of each [owl circle's] conservation value to help . . .

9    identify which [owl circles] should be a priority for conservation." *Id.*

10         Yet according to the Services, just because adjacent federal lands happen to make

11   certain owl circles more valuable for owl conservation than others "does not mean that the

12   Forest Service is being treated as a co-applicant for the permit, or that incidental take

13   coverage extends to those federal lands." *Id.* Instead, the Services argue that "[b]ecause

14   the Conservation Support Areas are adjacent to designated critical habitat and other high

15   value habitat on federal lands, the protection of which is the linchpin to recovery of the

16   Northern Spotted Owl under the 2011 Revised Recovery Plan," FWS reasonably

17   calculated the conservation values of each owl circle, and properly applied that value in

18   developing the Conservation Support Areas. *See* Dkt. No. 63 at 34-35.

19         Counsel for the Services summed up the Services' position at oral argument: "At

20   the end of the day, what is being analyzed and 'credited,' to the extent that is happening, is

21   what Fruit Growers is doing on its own land. Period." Dkt. No. 76, Tr. at 11/19/14, 2:44-

22   2:49 .

23         The Court is not persuaded by this characterization, and finds that FWS improperly

24   attributed the conservation values of entire owl circles containing the Conservation

25   Support Areas to applicant Fruit Growers, despite the fact that Fruit Growers' ownership

26   makes up only a fraction of entire owl circles. In doing so, the Services considered the

27   minimization and mitigation efforts of an entity other than "the applicant."

28         "It is well established that when the statute's language is plain, the sole function of

the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. U.S. Trustee.*, 540 U.S. 526, 534 (2004) (internal quotation marks and citations omitted); *Caminetti v. U.S.*, 242 U.S. 470, 485 (1917) ("[T]he meaning of the statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms.").

Here, ESA § 10(a)(2)(B)(ii) states plainly that when issuing an incidental take permit, the Secretary must find that "*the applicant* will . . . minimize and mitigate the impacts of such taking" of an endangered or threatened species. ESA § 10(a)(2)(B)(ii), 16 U.S.C. § 10(a)(2)(B)(ii) (emphasis added). An "applicant," in turn, is someone "who requires formal approval or authorization from a Federal agency as a prerequisite to conducting the action." 50 C.F.R. § 402.02. The "applicant" in this case is not the Forest Service or any other government entity. Fruit Growers is the only "applicant" under ESA § 10—it alone seeks formal authorization from FWS to pursue actions (e.g., logging) on its own lands without the risk of violating the ESA. AR 35942 ("[Fruit Growers] is applying to USFWS and NMFS for permits allowing incidental take of federally listed threatened species.").

Nonetheless, in evaluating the applicant's minimization and mitigation, FWS factored in the efforts by entities other than applicant Fruit Growers. This is best illustrated by looking at the conservation values for two specific owl circles: out of the 24 owl circles with Conservation Support Areas, the circles labeled "SK378" and "SK238" (attached to this Order as Exhibits 1 and 2, respectively) have the lowest number of acres that Fruit Growers committed to preserving—62 and 66, respectively—yet have the third highest and the highest conservation values—100 and 111, respectively. AR 36137, AR 36194.

For SK378, Fruit Growers committed to preserve 33 acres of habitat in the core nesting and roosting area, and a total of 62 acres of habitat in the entire 3400-acre owl circle. AR 36137. This means that for committing to preserve less than two percent of an

United States District Court
Northern District of California

owl circle, Fruit Growers nevertheless benefited by having that circle's high conservation value score of 100 factored into FWS's calculation of the total conservation value for owl circles with Conservation Support Areas. This, despite the fact that the Forest Service owns over 2,500 acres (or nearly 75 percent) of that circle. AR 34188.

Similarly, owl circle SK238 presents stark results. The Plan required Fruit Growers to preserve 0 acres of core-area habitat, and only 66 acres of habitat for the entire 3400-acre circle. AR 36137. As KS Wild points out, despite Fruit Growers' marginal commitment to preserve less than two percent of the 3400-acre owl circle, and despite the fact that the federal government owns over 2,400 acres (or 70 percent) of that circle, AR 34184, FWS attributed the conservation value of 111 to Fruit Growers.

The Court summarizes these figures in the table below using approximate numbers:

**Table 2. Fruit Growers-Supported Owl Circles with Lowest Habitat Commitments**

| Owl Circle | Total Acres in Owl Circle | Acres Owned by Forest Service | Acres Fruit Growers Committed to Preserve | % of Circle Owned by Forest Service | % of Circle Fruit Growers Committed to Preserve | Conservat-ion Value |
|---|---|---|---|---|---|---|
| SK378 | 3400 | 2500 | 62 | 73.5% | 1.8% | 100** |
| SK238 | 3400 | 2400 | 66 | 70.5% | 1.9% | 111* |

*Tied for highest conservation value out of 82 valid owl circles affected by Plan.
**Fourth highest conservation value out of 82 valid owl circles affected by Plan. And third highest among the 24 owl circles with Conservation Support Areas.

Highlighting these two owl circles is not cherry picking. For 17 of the 24 owl circles supported by Conservation Support Areas, Fruit Growers' Conservation Support Areas make up less than 15 percent of the total owl circle. AR 36194-96 (listing conservation value for all circles); AR 36137 (listing number of acres Fruit Growers committed to preserving in circles with Conservation Support Areas). Yet FWS attributed the conservation value of these owl circles to Fruit Growers by adding them to the total conservation value points in owl circles with Conservation Support Areas. *Compare* AR 36194-96 (listing conservation values for all circles and sum total conservation value) *with* AR 36200 (showing percentage of total conservation value contributed by each category of owl circle).

FWS then weighted the total conservation value for these 24 owl circles against the

1    total conservation value of owl circles where take is expected to occur.  Even though for

2    all but seven of the 24 owl circles, the Conservation Support Areas comprise less than 15

3    percent of the 3400-acre circle, the "82 percent of the total conservation" figure touted

4    earlier by the Services inure to the benefit of Fruit Growers.  AR 40139.  This is so even

5    though 27 percent of that 82 percent total conservation value figure does not involve owl

6    circles with Fruit Growers-established Conservation Support Areas; rather they comprise

7    the 15 owl circles where take is not even likely to occur.  AR 36200.

8            Significantly, the conservation value calculations themselves do not factor in Fruit

9    Growers' specific mitigation efforts—its development of the Conservation Support Areas.

10   Instead, the formula for the conservation value relies on four other factors.  Admittedly,

11   one of these factors includes examining the proportion of private land within the owl

12   circle.  AR 36193.  None of these factors, however, involve a consideration of what

13   impact, if any, Fruit Growers' Conservation Support Areas would have on the final

14   conservation value.

15          In other words, the record leaves open the possibility that the conservation values

16   for the highest value owl circles are what they are regardless of whether Conservation

17   Support Areas are ever created in those circles by Fruit Growers.  AR 36193.

18          Contrary to what the Services claimed at oral argument, the Court finds it arbitrary

19   and capricious to conclude: "what is being analyzed and credited . . . is what Fruit Growers

20   is doing on its own land."  *See* Dkt. No. 76, Tr. at 11/19/14, 2:44-2:49.  In finding that "82

21   percent of the total conservation of all [owl circles] . . . would be retained and conserved

22   under the [Plan]," AR 40139, FWS assumes that it is Fruit Growers' *actions* that would

23   provide the beneficial conditions to the owls, which then generates high conservation

24   values.  This is an arbitrary and capricious assumption.

25          FWS's weighing of owl-circle conservation values relied on the conservation efforts

26   of entities other than applicant Fruit Growers, namely the Forest Service.  It is the Forest

27   Service that owns the overwhelming majority of acreage within the 3400-acre owl circles.

28   Because the Forest Service is not an incidental-take-permit "applicant," FWS erred when it

1    failed to rely solely on Fruit Growers' minimization and mitigation efforts.  *See Sierra*

2    *Club v. Babbitt*, 15 F. Supp. 2d 1274, 1282 (S.D. Ala. 1998) ("FWS cannot comply with

3    the strict ESA mandate that the HCP 'minimize and mitigate' the effects of the projects 'to

4    the maximum extent practicable' simply by relying on speculative future actions by [non-

5    applicant] others.").

6            Additionally, the Services' own guidance, the HCP Handbook at 7-3, states that the

7    Services may only consider habitat conservation measures that are provided by the

8    incidental-take-permit applicant.  In those instances where an HCP covers activities

9    implicating multiple landowners, the permit holder must "have specific authority over the

10   other parties affected by the HCP and be willing to exercise that authority, or must secure

11   commitments from them that the terms of the HCP will be upheld."  HCP Handbook at 7-5

12   to 7-6.  Here, Fruit Growers possesses no such "specific authority" over the U.S. Forest

13   Service or any other landowner to guarantee that those non-applicants will uphold the

14   terms of the Plan.

15           In the final analysis, an agency decision is "arbitrary and capricious if the agency

16   has relied on factors which Congress has not intended it to consider."  *Motor Vehicles*, 463

17   U.S. at 43.  By relying on the minimization and mitigation efforts by the U.S. Forest

18   Service, an entity other than the applicant Fruit Growers, FWS improperly found that Fruit

19   Growers satisfied the "minimize and mitigate" requirement in ESA § 10(a)(2)(B)(ii).

20           Consequently, the decision to issue the incidental take permit was arbitrary and

21   capricious.  Applicant landowners seeking to perform actions that would lead to a taking of

22   an endangered or threatened species should not be permitted to obtain incidental take

23   permits by piggybacking off of already-existing conservation efforts by their non-applicant

24   neighbors.

25           Were the Court to affirm FWS's "minimize and mitigate" finding, Fruit Growers

26   would be permitted to log more than 36,000 acres of suitable northern spotted owl habitat,

27   and take 83 northern spotted owls, while only preserving and protecting 7,100 acres.  AR

28   36191, 36202-04, 36255.  The Court finds that FWS failed to "articulate a rational

connection" between these facts and its § 10(a)(2)(B)(ii) finding.  *See Or. Natural Res. Council*, 109 F.3d at 526.

### ii.    Fruit Growers' Unenforceable Commitments

In their § 10 findings, the Services identified five proposed mitigation measures for the owl taking, the first of which involves the creation of Conservation Support Areas. Another mitigation measure involves increasing the northern spotted owl's dispersal habitat.  According to the Services' findings: "The changes in timber management practices identified in the proposed [the Plan] are expected to result in an increase in northern spotted owl foraging and dispersal habitat across [Fruit Growers] ownership over the permit term due to a decrease in clearcutting and other even-aged management practices."  AR 40140.  The presence of adequate dispersal habitat is essential for the northern spotted owl's population growth as it can provide protection from predators and minimal foraging opportunities.  *See* 77 Fed. Reg. at 71884-85; AR 34093 ("Dispersal habitat is essential to the dispersal of juvenile, non-territorial, or displaced northern spotted owls").

KS Wild argues that the Services' § 10 "minimize and mitigate" finding is arbitrary and capricious because Fruit Growers' promise to increase dispersal habitat through a decrease in clearcutting is unenforceable.  KS Wild contends that the Plan does not actually obligate Fruit Growers to reduce clearcutting or increase dispersal habitat.  Dkt. No. 53 at 41-42.  The Plan also does not set forth objective criteria by which to measure compliance; instead, the Plan only states that Fruit Growers will merely "promote" practices that develop and maintain dispersal habitat.  *Id.*

While the Services concede that the Plan does not explicitly require Fruit Growers to reduce clearcutting as part of its mitigation efforts, the Services point out that "the Plan does expressly require [Fruit Growers] to 'promote forest management practices that *develop and maintain dispersal habitat across its ownership* to provide connectivity between the [Conservation Support Areas] and nearby federal lands.'"  Dkt. No. 63 at 26 (quoting AR 36139) (emphasis added by Services).  The Services further explain that a

1  decrease in clearcutting is "an expected outcome of [the] Plan due in part to the

2  enforceable obligation of [Fruit Growers] to *implement* forest management practices that

3  'develop and maintain dispersal habitat across its ownership.'"  *Id.* (emphasis added).

4         Contrary to what the Services contend in their summary judgment cross-motion, the

5  Plan does not require Fruit Growers to "implement" practices that develop and maintain

6  dispersal habitat.  Rather, the Plan only states that Fruit Growers will "promote" such

7  practices.  AR 36139.  Despite any good faith effort on the part of Fruit Growers to

8  promote or encourage certain forest practices, the Court agrees with KS Wild that the Plan

9  lacks specific obligations to reduce clearcutting.

10         Moreover, the Plan is bereft of any objective criteria to give it the teeth needed to

11  ensure, through enforcement by the Services or the public, that Fruit Growers' practices

12  will lead to an actual increase in dispersal habitat.  *See Southwest Ctr. for Biological*

13  *Diversity v. Bartel*, 470 F. Supp. 2d 1118, 1140 (S.D. Cal. 2006) (enjoining incidental take

14  permit after finding applicant's duty to "avoid" vernal pool habitat "toothless" because the

15  "avoidance standard allows the City or developer to unilaterally determine that a particular

16  development project cannot avoid the vernal pools").  Indeed, there is a difference between

17  "promoting" or expecting the development and maintenance of dispersal habitat, and

18  actually developing and maintaining dispersal habitat.

19         Finally, the Plan itself, in a section of the appendix entitled "Monitoring Protocols,"

20  expressly states: "Because [Fruit Growers] will maintain a forested landscape on their

21  ownership, the biological objective for dispersal habitat will be met.  *No compliance*

22  *monitoring or additional reporting is required to document compliance with this*

23  *measure*."  AR 36449 (emphasis added).  As for that statement's conclusory first sentence,

24  the Services in their Final Environmental Impact Statement went on to admit that the

25  statement that "almost any forested landscape can provide dispersal opportunities" is "an

26  oversimplified, if not incorrect, characterization of dispersal habitat."  AR 38942

27  (responding to public comment from KS Wild regarding Draft Environmental Impact

28  Statement).

1    The fact remains that ESA § 10(a)(2)(B)(ii) requires the Secretary to find that "the

2    applicant *will* . . . minimize and mitigate the impacts" of a taking.  ESA § 10(a)(2)(B)(ii),

3    16 U.S.C. § 1539(a)(2)(B)(ii) (emphasis added).  The Secretary cannot make this ESA

4    § 10(a)(2(B)(ii) finding by relying on mitigation that the Services cannot enforce.  Here,

5    without concrete, objective criteria to enforce Fruit Growers' commitments to increase

6    dispersal habitat, the Court finds the Services' conclusion that "the applicant will" in fact

7    mitigate the taking of owls by reducing clearcutting to be arbitrary and capricious.

8                        **b.    Biological Opinion**

9    In addition to the Secretary's responsibility to review incidental-take-permit

10   applications under ESA § 10, the Secretary must insure that issuance of a permit complies

11   with ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).  Under § 7, a federal agency must "insure that

12   any action authorized, funded, or carried out by such agency . . . is *not likely to jeopardize*

13   the continued existence of any endangered species or threatened species or result in the

14   destruction or adverse modification of [critical] habitat of such species . . . ."  ESA

15   § 7(a)(2), 16 U.S.C. § 1536(a)(2) (emphasis added).  In considering whether to issue an

16   incidental take permit, the Service—in this case FWS—must prepare a "biological

17   opinion" addressing whether jeopardy is likely to occur for any protected species.  *Ctr. for*

18   *Biological Diversity v. U.S. BLM*, 698 F.3d 1101, 1107 (9th Cir. 2012) (citing 50 C.F.R. §

19   402.14).  An action will result in "jeopardy" if it will "reduce appreciably the likelihood of

20   both the survival and recovery of a listed species . . . ."  50 C.F.R. § 402.02.  In this regard,

21   the "no jeopardy finding required by ESA § 7(a)(2) is identical to the survival finding

22   required under          § 10(a)(2)(B)(iv)."  *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d

23   1274, 1286 (E.D. Cal. 2000) (quoting §10(a)(2)(B)(iv), which requires the Secretary to

24   find "the taking will not appreciably reduce the likelihood of the survival and recovery of

25   the species in the wild").

26   If FWS concludes that jeopardy or adverse modification is likely, then any take

27   resulting from the proposed action is subject to ESA § 9 liability.  *Ctr. for Biological*

28   *Diversity*, 698 F.3d at 1107 (citations omitted) (noting that while an applicant can

United States District Court
Northern District of California

technically disregard the biological opinion, "it does so at its own peril").  On the other hand, if FWS "concludes in its biological opinion that no jeopardy or adverse modification is likely, but that the project is likely to result only in the 'incidental take' of members of listed species, then the FWS will provide, along with its biological opinion, an incidental take statement authorizing such takings." *Id.* (citing 50 C.F.R. § 402.14(i)).  This incidental take statement "functions as a safe harbor provision immunizing persons from Section 9 liability and penalties for takings committed during activities that are otherwise lawful and in compliance with its terms and conditions." *Id.* (internal quotation marks and citations omitted).

Here, KS Wild challenges the validity of FWS's biological opinion.  KS Wild argues first that FWS's reliance on Fruit Growers' "unenforceable promise to reduce clearcutting" renders its 'no jeopardy' findings under the biological opinion arbitrary and capricious. Dkt. No. 53 at 43.  And secondly, that these "no jeopardy" findings are arbitrary and capricious because FWS relied on the incorrect assumption that the forests surrounding Fruit Growers land will remain unchanged during the incidental take permit's 50-year term. *Id.* at  46.

### i.    FWS's "No Jeopardy" Findings

Under Ninth Circuit law, a wildlife agency may rely on mitigation or conservation measures in issuing a "no jeopardy" biological opinion.  Such measures, however, must involve  "specific and binding plans" as well as "a clear, definite commitment of resources for future improvements." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 935-36 (9th Cir. 2008) (finding agency's "sincere general commitment to future improvements" inadequate to support no-jeopardy conclusion).  What is more, mitigation measures supporting a biological opinion's no-jeopardy conclusion must be "reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002) (citing *Sierra Club v. Marsh*, 816

1   F.2d 1376 (9th Cir. 1987)).

2          Here, FWS issued a biological opinion concluding that implementation of the Plan

3   "is not likely to jeopardize the continued existence of the northern spotted owl or impede

4   its recovery, and will not destroy or adversely modify designated critical habitat."  AR

5   34258.  The biological opinion then summarized the various bases for its determination

6   under four categories: (1) the relative impacts to populations (within the "Action Area," on

7   a regional scale, on a provincial scale, and rangewide); (2) the relative impact of habitat

8   modification; (3) the role of conservation planning and mitigation; and (4) impacts to the

9   northern spotted owl critical habitat.  AR 34258-34261.

10          KS Wild argues that FWS's no-jeopardy finding relies on a mitigation measure that

11   fails to meet the Ninth Circuit's standards.  Specifically, KS Wild contends that Fruit

12   Growers' promise to mitigate the taking by reducing clearcutting lacks specific and

13   binding plans, and does not lead to an increase in dispersal and foraging habitat.  To

14   support its position, KS Wild cites primarily to *Nat'l Wildlife Federation v. NMFS*, which

15   involved a biological opinion in which NMFS relied on an action agency's intention to

16   mitigate impacts from building a dam by installing fish passage structures "where

17   feasible."  524 F.3d at 936.  The Ninth Circuit invalidated the biological opinion because it

18   was "not persuaded that even a sincere general commitment to future improvements may

19   be included in the proposed action in order to offset its certain immediate negative effects,

20   absent specific and binding plans."  *Id.*

21          Here, the Court already ruled it was arbitrary and capricious to conclude that Fruit

22   Growers' promise to reduce clearcutting constitutes enforceable mitigation, and agrees

23   with KS Wild that Fruit Growers failed to present "specific and binding plans" as to this

24   particular mitigation measure.

25          But the Court finds *National Wildlife* distinguishable because of a difference in the

26   degree to which the Service's biological opinion in that case relied on the applicant's

27   mitigation measure.  There, the Ninth Circuit found that NMFS had "relied *significantly* on

28   [the] future [mitigation measures]" at issue.  *Id.* (emphasis added).  Other courts have

United States District Court
Northern District of California

1   refused to invalidate biological opinions when the allegedly defective mitigation measures

2   cited by plaintiffs do not constitute the *primary* reason behind a wildlife service's no-

3   jeopardy finding. *See, e.g.*, *Grand Canyon Trust v. U.S. Bureau of Reclamation*, 2010 WL

4   2643537, at *21 (D. Ariz. June 29, 2010) (rejecting argument to invalidate biological

5   opinion where alleged unenforceable mitigation measure did not constitute the "primary

6   reason" for the no jeopardy or adverse modification); *cf. Rumsfeld*, 198 F. Supp. 2d at

7   1152 (finding biological opinion arbitrary and capricious where consulting agency's no-

8   jeopardy finding was "*based entirely* on the successful and prompt implementation of the

9   [deficient mitigation measure]") (emphasis added); *see also id.* (mitigation measures "were

10  critical to the 'no jeopardy' finding").

11          In contrast, FWS in this case relied on several factors to reach its no-jeopardy

12  finding. For instance, FWS looked at the expected percentage reduction in nesting and

13  roosting habitat within various regions, the impact of the taking on the overall conservation

14  value of the area, and the finding that no critical habitat will be directly impacted or

15  adversely modified. AR 34258-34261. FWS also considered how much it expected Fruit

16  Growers' actions would reduce the owl population. AR 34259.

17          To be sure, in the conclusion section listing the bases for its no-jeopardy

18  determination, the biological opinion does discuss the expected increase in foraging habitat

19  across Fruit Growers land. AR 34260. Elsewhere, the biological opinion also does

20  recognize that "[a]n important aspect of the [Plan] is the ownership-wide increase in

21  foraging and dispersal habitat that is predicted to occur due to changes in [Fruit Growers']

22  management practices." AR 34241.

23          But after examining the entirety of the biological opinion, the Court does not find

24  that this mitigation measure constituted a critical, primary, or relatively significant factor

25  in FWS's finding that the Plan is "not likely to jeopardize the continued existence of the

26  northern spotted owl or impede its recovery." So on the one hand, KS Wild claims that

27  "FWS expressly and repeatedly relies on expected increases in . . . dispersal habitat" to

28  make its no-jeopardy finding. Dkt. No. 53 at 44. On the other hand, however, neither the

1   word "clearcutting" nor the term "dispersal habitat" appear in subsection "6.1 Northern

2   Spotted Owl" of the "Conclusion" section as an identified factor that served as a basis for

3   the no-jeopardy determination.  AR 34258-61.

4         Accordingly, the Court does not find the no-jeopardy conclusions made in FWS's

5   biological opinion to be arbitrary and capricious.

6             **ii.**    **FWS's Inconsistent Assumptions**

7         KS Wild argues that FWS's "no jeopardy" findings are also arbitrary and capricious

8   because "FWS assumed that northern spotted owl habitat outside of Fruit Growers land

9   would persist unchanged for the entire 50-year term even though FWS's own [biological

10  opinion] predicts significant declines in spotted owl habitat on surrounding Forest Service

11  lands due to logging, fire, disease, and competition from barred owls."  Dkt. No. 53 at 47.

12  In other words, because the biological opinion's no-jeopardy conclusion rests on

13  "internally inconsistent assumptions," this Court should invalidate and vacate the

14  biological opinion.  *Id.* at 13, 47.  To support this position, KS Wild relies on *Wild Fish*

15  *Conservancy v. Salazar*, 628 F.3d 513, 527 (9th Cir. 2010), which KS Wild characterizes

16  as having found a biological opinion invalid because of its reliance on "conflicting

17  findings to reach its conclusion . . . ."  Dkt. No. 53 at 49.

18        KS Wild's reliance on *Wild Fish* for that proposition is misplaced.  There, the

19  agency knew that a private fish hatchery's operation caused the decline in the bull trout

20  population.  In fact, the consulting agency already determined that the hatchery's

21  continued operation would likely "at least reduce, and in some years preclude," migratory

22  bull trout spawning and that the local bull trout population would continue to decline.

23  *Wild Fish*, 628 F.3d at 527.  Yet the agency concluded that the hatchery's operation would

24  not reduce appreciably the likelihood of both the survival and recovery of the population,

25  without reconciling the fact that the necessary spawning is likely to be precluded in some

26  years. *Id.*

27        Consequently, the Ninth Circuit invalidated the no-jeopardy finding.  The court held

28  that the facts the agency determined did not support its obvious contradictory conclusion

United States District Court
Northern District of California

Case No.: 13-cv-03717-NC         33

1    that operational changes at the hatchery would improve the contribution of a local

2    population of threatened bull trout to the survival of the species. *Id.* at 520, 528.

3    According to the court, "the bottom line of the Service's findings is that as a result of the

4    [challenged] action, the local bull trout population will continue to decline." *Id.* at 528.

5        To summarize, the infirmity in *Wild Fish* involved a contradiction between an

6    agency's findings in its biological opinion and its ultimate conclusion. It did not involve a

7    contradiction between assumptions in its findings. *See* Dkt. No. 53 at 47 (describing

8    "internally inconsistent assumptions").

9        Moreover, portions of the biological opinion here suggest that FWS did consider

10   changes in habitat conditions. For instance, as KS Wild itself concedes, FWS's biological

11   opinion noted: "[t]hreats to the northern spotted owl in this region included habitat loss due

12   to fires, Federal and private management activities, displacement by barred owls, forest

13   health (insect outbreaks and disease), and potential for avian disease." AR 34194.

14       Accordingly, because KS Wild cites to no authority for the proposition that an

15   agency's "reli[ance] on conflicting findings" renders a biological opinion arbitrary and

16   capricious, the Court will not invalidate FWS's biological opinion on this basis.

17       **2.    Coho Salmon**

18       KS Wild offers two main arguments about why this Court should invalidate the

19   incidental take permit issued by the National Marine Fisheries Service. First, KS Wild

20   asserts that the biological opinion itself should be invalidated because NMFS's no-

21   jeopardy finding failed to evaluate the Plan's short-term impacts on coho salmon. Second,

22   KS Wild argues that NMFS erred by finding that the Plan met the requirements under ESA

23   § 10. In addition to failing to meet the no-jeopardy requirement, ESA § 10(a)(2)(B)(iv), 16

24   U.S.C. § 1539(a)(2)(B)(iv), KS Wild contends that the Plan improperly relied on

25   unenforceable mitigation efforts and did not adequately analyze whether the Plan

26   minimizes and mitigates the impacts "to the maximum extent practicable," ESA §

27   10(a)(2)(B)(ii), 16 U.S.C. § 1539(a)(2)(B)(ii).

28   //

United States District Court
Northern District of California

a.   **Incidental Take Permit and Biological Opinion**

i.   **NMFS's Failure to Evaluate Short-Term Impacts**

In three ESA cases involving salmon, the Ninth Circuit stressed that NMFS "must consider near-term habitat loss to populations with short life cycles," including populations with only a three-year life cycle. *Pac. Coast Fed'n v. BOR*, 426 F.3d 1082, 1094 (9th Cir. 2005) (rejecting agency's no-jeopardy conclusion for failure to provide adequate analysis of short-term impacts on endangered coho salmon) (citing *Pac. Coast Fed'n v. NMFS*, 265 F.3d 1028, 1037-38 (9th Cir. 2001)); *see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 934-35 (9th Cir. 2008) (finding biological opinion "did not adequately demonstrate that [the impacts of the planned mitigation] would not affect the fishes' survival and recovery, in light of their short life-cycles and current extremely poor habitat conditions").

In those cases, the Ninth Circuit faulted the agency for only considering the impact of the planned actions for periods of 10 years or more. *See Pac. Coast Fed'n v. NMFS*, 265 F.3d at 1037-38 (analyzed impact over a 10-year period); *Pac. Coast Fed'n v. BOR*, 426 F.3d at 1094 (analyzed impact over eight to 10 years); *Nat'l Wildlife Fed'n*, 524 F.3d at 934 (finding analysis of six-year period insufficient). Indeed, "[g]iven the importance of the near-term period on listed species survival it is difficult to justify NMFS's choice not to assess degradation over a time frame that takes into account the actual behavior of the species in danger." *Pac. Coast Fed'n v. BOR*, 426 F.3d at 1094 (quoting *Pac. Coast Fed'n v. NMFS* 265 F.3d at 1038).

Here, NMFS failed to analyze the short-term impacts of Fruit Growers' plan to harvest timber on nearby threatened coho salmon, even though NMFS's biological opinion recognized that coho salmon have only a three-year life cycle. AR 37658 ("Adult coho salmon reach sexual maturity at 3 years, and die after spawning."). In reaching its no-jeopardy finding, NMFS relied on broad references to certain impacts to coho salmon habitat expected to occur "[o]ver the course of the 50-year permit term . . . ." AR 37783; *see, e.g.*, AR 37779 ("NMFS anticipates that over the 50-year duration of the proposed action . . . there will be management-related occurrences that result in adverse effects to

1    covered species and their habitats."); AR 37783 ("NMFS anticipates a limited extent of

2    habitat supporting covered species could be harmed over the 50-year duration of the permit

3    and such harm would occur stochastically without any predictability."); *see also* AR 37745

4    ("Impacts to salmonids or designated critical habitat could occur during the period between

5    permit issuance and treatment if road sites fail and deliver sediment . . . .  However, we

6    believe sediment delivery will occur at lower rates and quantities within the first 15 years

7    than would be expected without implementation of the HCP.").  This contravenes Ninth

8    Circuit law.

9            Nonetheless, the Services attempt to distinguish those cases, which limited their

10   analysis to a particular time, and argue "NMFS has not limited its analysis to any particular

11   timeframe, but rather, has analyzed both short- and long-term impacts from the

12   undertaking of activities, whenever those activities occur during the permit term."  Dkt.

13   No. 63 at 38.  Even so, this decision to not limit the time frame still "disregard[s] [the

14   Ninth Circuit's] clear instruction" to consider impacts to habitat loss in an applied, time-

15   specific manner that reflects the life cycle of the endangered or threatened species.  *Nat'l*

16   *Wildlife Fed'n v. NMFS*, 524 F.3d at 934 (citing *Pac. Coast Fed'n v. BOR*, 426 F.3d at

17   1094).

18           The Services also attempt to distinguish the analysis in its biological opinion from

19   *Pacific Coast Federation of Fishermen's Associations v. NMFS*, 265 F.3d at 1037, where

20   "the agency evaluated distinct planned timber sales on federal land."  Dkt. No. 63 at 38.  In

21   contrast, here, the Services stress that the "exact location of future timber harvests on

22   [Fruit Growers'] lands is not yet known" and suggest they would have to speculate.  *Id.*

23   This may be so.  But the fact remains that ESA § 7 "imposes a substantive duty on [federal

24   agencies] to ensure that its actions are not likely to jeopardize the continued existence of

25   the listed fish or result in destruction or adverse modification of critical habitat."  *Ctr. for*

26   *Biological*, 698 F.3d at 1127 (citing ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2)).  If NMFS

27   does not have the information to satisfy this duty, then it simply cannot issue a finding of

28   no jeopardy.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    In any case, because NMFS concluded that long-term benefits would outweigh any

2    short-term impacts of logging, without actually adequately analyzing those short-term

3    impacts, the Court finds that NMFS's no-jeopardy conclusion was arbitrary and capricious.

4    Accordingly, the Court invalidates NMFS's biological opinion as well as the

5    accompanying incidental take statement.

6    The Services do seek summary judgment on this incidental take statement's

7    validity. In its complaint, KS Wild's sixth claim alleges that NMFS violated ESA § 7

8    when it failed to prepare a legally sufficient incidental take statement. Dkt. No. 1 at ¶¶

9    139-142. The Services argue that KS Wild waived this claim by failing to pursue it at

10   summary judgment. Dkt. No. 63 at 50. But because an invalid biological opinion

11   necessarily invalidates the accompanying incidental take statement, the Court will deny the

12   Services' motion as to the validity of NMFS's incidental take statement. *See Or. Natural*

13   *Res. Council v. Allen*, 476 F.3d 1031,1036-37 (9th Cir. 2007) ("Without the 'no jeopardy'

14   determination contained in the underlying [biological opinion], the Incidental Take

15   Statement potentially pre-authorizes take for an action that could subsequently be

16   determined to jeopardize the existence of an endangered species.").

17   Likewise, because the no-jeopardy finding required by ESA § 7(a)(2) is identical to

18   the survival finding required under § 10(a)(2)(B)(iv), *Babbitt*, 128 F. Supp. 2d at 1286, the

19   Court also finds that NMFS's issuance of the incidental take permit was arbitrary and

20   capricious.

21              **ii.    NMFS's "Minimize and Mitigate" Finding**

22   KS Wild also argues that NMFS's no-jeopardy and § 10(a)(2)(B)(ii) findings as to

23   the coho salmon are arbitrary and capricious for another reason: NMFS relied on numerous

24   voluntary and unenforceable provisions in the Plan intended to serve as mitigation for the

25   take. Dkt. No. 53 at 51. For instance, KS Wild argues NMFS relied on aspirational and

26   unenforceable assurances that Fruit Growers' "road management plan will result in the

27   gradual reduction of native road mileage across the plan area." AR 37744. In response,

28   the Services contend the Plan does include, among other measures, a detailed road

1   management plan and slope protection measures, both of which will reduce and prevent

2   sedimentation.  Dkt. No. 63 at 29.  As stated earlier, sedimentation can adversely affect

3   coho salmon.

4   　　　　The Court declines to take up this issue of mitigation enforceability at this time

5   because, as a threshold matter, it finds NMFS arbitrary and capriciously concluded that

6   Fruit Growers satisfied the "minimize and mitigate" requirement under § 10.  In fact, in

7   reaching this conclusion in its § 10 finding, NMFS explicitly relied upon the biological

8   opinion's findings.  But just as such findings failed to consider the short-term impacts of

9   the Plan, NMFS in its § 10 finding also failed to consider the short-term impacts on coho

10   salmon when determining whether Fruit Growers' proposed conservation measures would

11   mitigate the taking.

12   　　　　Indeed, NMFS states in the "minimize and mitigate" section of its § 10 finding:

13

14   　　　　　　NMFS concludes in the Biological Opinion that although [Fruit
　　　　　　Growers'] continued timber management activities are likely to

15   　　　　　　result in continued anthropogenic contributions of sediment to
　　　　　　streams that support covered species, *over the duration of the

16   　　　　　　50-year permit*, improvements to habitat will occur as the level
　　　　　　of sediment input to fish-bearing streams declines due to the

17   　　　　　　HCP's sediment reduction strategies.

18   NMFS AR 150905 (emphasis added).  NMFS goes on to state that "the Biological Opinion

19   concludes that as the conservation measures of the HCP are implemented *over time*,

20   riparian stands along fish-bearing watercourses are likely to improve in their long term

21   functionality for providing salmonid habitat . . . ."  NMFS AR 150905 (emphasis added).

22   From this, the § 10 finding concludes that Fruit Growers "has minimized and mitigated the

23   impacts of authorized take to the maximum extent practicable."  NMFS AR 150906.

24   　　　　To be sure, the Plan does include efforts to implement road management measures

25   to prevent and control erosion production and sediment delivery to streams.  AR 36126-27.

26   For instance, under one part of the Plan to minimize and mitigate the taking, Fruit Growers

27   describes its "objective [to] reduce road-related erosion delivery potential by 50 percent in

28   the first 10 years of the Permits."  AR 36100; *see also* AR 36127 ("All drainage level road

1   erosion inventories will be completed within 10 years of issuance of the Incidental Take

2   Permits, with the top five priority drainages [out of 20] . . . completed in the first 5

3   years.").

4          But without considering the three-year life cycle of the coho salmon—and by

5   relying on a biological opinion that only considered the long-term impacts—NMFS

6   arbitrarily and capriciously made its "minimize and mitigate" finding.  NMFS's § 10

7   finding states that the benefits of Fruit Growers' mitigation efforts—in the form of

8   improvements to habitat—will occur "over the duration of the 50-year permit."  NMFS AR

9   150906.  In other words, the amount of time it would take for the benefits of Fruit

10  Growers' "sediment reduction strategies" to have a positive impact on coho salmon may

11  far exceed the coho salmon's life-span.  *See Pac. Coast Fed'n v. BOR*, 426 F.3d at 1094

12  (finding that without an analysis of short-term impacts, the 10-year project at completion,

13  under one scenario, "will not protect the coho, for there will be none to protect").

14         Accordingly, because NMFS's "minimize and mitigate" finding was arbitrary and

15  capricious, the Court will not reach the question of whether Fruit Growers' proposed

16  mitigation measures are enforceable.

17         For this same reason, the Court will neither decide the question of whether the

18  biological opinion improperly relied upon unenforceable mitigation measures, nor will it

19  decide whether the Plan minimizes and mitigates the impacts "to the maximum extent

20  practicable" under ESA § 10(a)(2)(B)(ii).

21      **B.    National Environmental Policy Act**

22         In addition to its claims under the ESA, KS Wild alleges that the Services also

23  violated the National Environmental Policy Act.  Under this statute, agencies considering

24  "major Federal actions significantly affecting the quality of the human environment" must

25  prepare and issue an environmental impact statement.  42 U.S.C. § 4332(2)(C); *Nw. Envtl.*

26  *Advocates v. NMFS*, 460 F.3d 1125, 1133 (9th Cir. 2006).  The statement "shall provide

27  full and fair discussion of significant environmental impacts and shall inform

28  decisionmakers and the public of the reasonable alternatives which would avoid or

United States District Court
Northern District of California

1    minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R.

2    § 1502.1; *Nw. Envtl. Advocates*, 460 F.3d at 1134. Thus, the environmental impact

3    statement is more than a mere "disclosure document." 40 C.F.R. § 1502.1. The Court's

4    job in reviewing an environmental impact statement "is to ensure that the agency has taken

5    a 'hard look' at the potential environmental consequences of the proposed action."

6    *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004) (citing

7    *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir. 2001)). By focusing on the

8    environmental effects of the proposed agency action, "NEPA ensures that the agency will

9    not act on incomplete information, only to regret its decision after it is too late to correct."

10   *Marsh*, 490 U.S. at 371 (1989).

11       In reviewing the proposed action, NEPA requires an agency to consider the

12   proposed action's impact in the context of all relevant circumstances, such that where

13   "several actions have a cumulative . . . environmental effect, this consequence must be

14   considered in an [environmental impact statement]." *Neighbors of Cuddy Mountain v.*

15   *U.S. Forest Serv.*, 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting *City of Tenakee Springs v.*

16   *Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990)). A cumulative effect is "the impact on the

17   environment which results from the incremental impact of the action when added to other

18   *past, present, and reasonably foreseeable future actions* regardless of what agency

19   (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7

20   (emphasis added).

21       Therefore, an environmental impact statement "must analyze the combined effects

22   of the actions in sufficient detail to be 'useful to the decisionmaker in deciding whether, or

23   how, to alter the program to lessen cumulative impacts.'" *Muckleshoot Indian Tribe v. U.S.*

24   *Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999) (citation omitted). "General statements

25   about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a

26   justification regarding why more definitive information could not be provided." *Te-Moak*

27   *Tribe of W. Shoshone of Nev. v. U.S. Dept. of the Interior*, 608 F.3d 592, 603 (9th Cir.

28   2010) (citation omitted).

United States District Court
Northern District of California

1.     **Cumulative Effects Analysis in Environmental Impact Statement**

a.     **Timber Harvests**

KS Wild first asserts that the Services' Final Environmental Impact Statement section on cumulative effects lacks "any analysis [] on the cumulative impacts of the timber harvest proposed by [the Plan] and timber harvest on proximate federal and nonfederal lands." Dkt. No. 53 at 59. The Court agrees. The section only generally describes the history of timber operations within the area affected by the Plan. *See* AR 38609 (describing how logging operations in the early 1900s used "'steam donkeys'" (steam-powered hoists), log chutes, horses, and oxen to transport logs."). "But there is no catalog of past projects and no discussion of how those projects (and differences between the projects) have harmed the environment." *Lands Council*, 395 F.3d at 1027; *see also Muckleshoot*, 177 F.3d at 809-10 (environmental impact statement "must catalog[ ] adequately the relevant past projects in the area") (internal citation and quotation marks omitted)). In fact, according to the Final Environmental Impact Statement:

> Timber harvest operations and fire suppression activities continue to occur today and will continue into the future. Timber harvest occurs in the Plan Area and on adjacent lands, both public and private. These activities are regulated by plans and policies as described below.

AR 38610.

While the Statement goes on to describe various state and federal regulatory regimes that govern timber projects, AR 38610-12, it fails to discuss what the timber harvest operations are that have taken place and "continue to occur today[.]" AR 38610. These omissions do not satisfy NEPA. *See Lands Council*, 395 F.3d at 1028 ("[T]he general rule under NEPA is that, in assessing cumulative effects, the Environmental Impact Statement must give a sufficiently detailed catalog[ ] of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.") (citations omitted). The need to inform "decisionmakers and the public" about the Plan's cumulative effects is

1    especially crucial in this case, where the Services, in weighing Fruit Growers' mitigation

2    efforts, relied upon the conservation value of entire owl circles, the bulk of which are made

3    up of vast acres of land that does not belong to Fruit Growers.

4        For the public and Services personnel to adequately evaluate the cumulative effects

5    of the timber harvests, the Final Environment Impact Statement should have provided

6    "adequate data about the time, type, place, and scale of [past, present, and to the extent

7    known, future] timber harvests and should have explained in sufficient detail how different

8    project plans and harvest methods affected the environment. The [ ] Service[s] did not do

9    this, and NEPA requires otherwise." *See id.* (citing *Muckleshoot*, 177 F.3d at 809-10).

### b.  Herbicides

11       KS Wild also argues that the Final Environmental Impact Statement fails to analyze

12   the cumulative effects of herbicide use on coho salmon in areas affected by the Plan. The

13   Services, however, contend that they had no obligation to analyze use of these materials

14   because Fruit Growers never requested herbicide and chemical use be covered under the

15   incidental take permits. Dkt. 63 at 48; *see* NMFS AR 150901 (stating in § 10 findings that

16   "[a]ctivities not covered by the [incidental take permit] include herbicide and insecticide

17   applications").

18       Nonetheless, the Services do concede that while NMFS did not evaluate forest

19   chemical use in the Final Environmental Impact Statement, it did evaluate chemical use as

20   an "interrelated and interdependent effect of the proposed action" in its biological opinion.

21   *Id.* (citing AR 38923). The Services also stated in their Final Environmental Impact

22   Statement that the "applicant [Fruit Growers] periodically applies herbicides that are

23   approved for forestry use" by the California Department of Pesticide Regulation and the

24   Environmental Protection Agency. AR 38389. The regulations define cumulative effect

25   as "the impact on the environment which results from the incremental impact of the

26   action." 40 C.F.R. § 1508.7.

27       Here, while "the action" consists generally of Fruit Growers' timber harvesting,

28   NMFS itself found herbicide application—to control vegetation and damaging insects—

1    not only "reasonably foreseeable," but also "interrelated and interdependent with the

2    [Plan]."  AR 37753.  In fact, NMFS's biological opinion went on to identify over a dozen

3    chemicals, their various applications, the ingredients involved, and their effects.  AR

4    37753-62.  In light of these considerations, the Court does not see why the decision over

5    whether to analyze the cumulative impact of herbicide use in the Final Environmental

6    Impact Statement hinges on whether or not Fruit Growers requested "coverage" under the

7    permit to use those chemicals.

8         Thus, the Court finds that the Services erred when they failed to analyze the

9    cumulative effects of herbicide use—which the Services themselves admit to be

10   "interrelated and interdependent" with the Plan—in the Final Environmental Impact

11   Statement.

12                        c.    Water Withdrawal

13        Finally, KS Wild contends that the Services failed to discuss the cumulative effects

14   of water withdrawals on coho salmon, and on lands affected by the Plan, including nearby

15   federal and nonfederal lands.  Dkt. No. 53 at 61.  KS Wild points out that on the one hand,

16   the Services state that the "amount and timing" of water drafting is "unquantified," AR

17   38504, and provide no information as to the proposed use of the withdrawals, the amount

18   of withdrawal, the season of withdrawal, or other related characteristics.  *See* AR 38626.

19        On the other hand, the Final Environmental Impact Statement includes a series of

20   maps displaying the proposed "water drafting sites" within three regions of Fruit Growers

21   lands subject to the Plan.  AR 38449, 38451, and 38453.  And shortly after it stated that the

22   amount and timing of water withdrawals from certain stream channels for silvicultural

23   operations or fire suppression purposes are "unquantified," the Services stated that the

24   "applicant does not divert substantial quantities of water from streams in the Plan Area."

25   Instead, the applicant typically "conducts water drafting from Class II streams with

26   [greater flows] . . . or more commonly, from off-channel water holes."  AR 38504.

27        The Services respond by arguing that Fruit Growers' water withdrawals over the

28   permit term "cannot be known with certainty because the timing and quantity of such

1    withdrawals depends on where timber and road usage is occurring, which is highly

2    variable." Dkt. No. 63 at 49 (citing AR 35943). Put differently, "[s]uch information need

3    not be analyzed under NEPA because it is speculative." *Id.* (citing *Envtl. Prot. Info. Ctr. v.*

4    *U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006).

5            The Court disagrees with the Services' response as to future actions involving water

6    withdrawal. Although "[i]t is not appropriate to defer consideration of cumulative impacts

7    to a future date when meaningful consideration can be given now," *Kern v. BLM,* 284 F.3d

8    1062, 1075 (9th Cir.2002), nor does the court "require the government to do the

9    impractical," if not enough information is available to permit meaningful consideration,

10   *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1215 (9th

11   Cir.1998) (citation omitted).

12           Still, projects that are "reasonably foreseeable" should be included in the

13   cumulative effects analysis. 40 C.F.R. § 1508.7. "NEPA requires that an EIS engage in

14   reasonable forecasting. Because speculation is . . . implicit in NEPA, [ ] we must reject

15   any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all

16   discussion of future environmental effects as crystal ball inquiry." *N. Plains Res. Council,*

17   *Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011) (internal quotation marks

18   and citation omitted).

19           Here, the part of the record the Services cite for the proposition that the "amount

20   and location of [Fruit Growers'] water withdrawals over the next fifty years . . . cannot be

21   known with certainty" simply states that Fruit Growers "may buy, sell, or exchange

22   timberlands" in the area covered by the Plan during the 50-year term. AR 35943. But the

23   Services have already identified the water drafting sites, and provided detailed maps

24   displaying those locations. AR 38449, 38451, 38453. Even if factors change over the long

25   term, with proposed locations already identified, the Court finds it reasonable for Fruit

26   Growers and the Services to be able to identify some parameters of these withdrawals,

27   such as the proposed use of the withdrawals and its effects on nearby lands, even if only in

28   the foreseeable short term.

United States District Court
Northern District of California

Case No.: 13-cv-03717-NC          44

Additionally, the Court finds that the Services are capable of identifying past and current projects that involve water withdrawals as part of its cumulative effects analysis. The Final Environmental Impact Statement makes references to present water-drafting activities. *See, e.g.*, AR 38504 (stating "applicant does not divert substantial quantities of water from streams in the Plan Area" and typically "conducts water drafting from . . . off-channel water holes"); AR 38548 ("Water drafting for road construction and maintenance, as well as for local fire suppression activities, would continue under the No Action Alternative."). These statements suggest the Services were capable of, but failed to "give a sufficiently detailed catalog[ ] of past [and] present . . . [water drafting] projects . . . ." S*ee Lands Council*, 395 F.3d at 1028.

In sum, for the public and Service personnel to adequately evaluate the cumulative effects of past, present, and future water withdrawal activities, the Final Environmental Impact Statement should have provided an adequate analysis about how these projects, and differences between the projects, are thought to impact the environment." *Id.* Its failure to do so was arbitrary and capricious.

### 2. Other NEPA Issues

#### a. Economic Data

KS Wild raises two other NEPA issues. First, KS Wild asserts that the Services violated NEPA by failing to disclose "relevant economic data" in its Final Environmental Impact Statement. In particular, KS Wild argues that the Services failed to give the public "economic information regarding the applicant [Fruit Growers], its harvest plans, business models, and other information necessary to determine whether the minimal beneficial aspects of [the Plan] will be funded and implemented." Dkt. No. 53 at 56-57.

The Court does not find that the Services violated NEPA by failing to disclose economic data. As an initial matter, KS Wild's claim is vague—it is not clear if by "economic information," KS Wild means internal business models, profit-making strategies, or information related to the economic benefits to the wider community (e.g., jobs). In any case, as the Services emphasize, nothing in NEPA or its regulations require a

1    Final Environmental Impact Statement to disclose or analyze the applicant's economic

2    information.

3          The Court also does not read the cases that KS Wild cites as standing for the

4    proposition that an agency issuing an environmental impact statement must disclose

5    economic information or data about the applicant.  *See Seattle Audubon Soc'y v. Lyons*,

6    871 F. Supp. 1291, 1324 (W.D. Wash 1994), *aff'd sub nom. Seattle Audubon Soc'y v.*

7    *Moseley*, 80 F.3d 1401 (9th Cir. 1996) (finding that "where economic analysis forms the

8    basis of choosing among alternatives, that the analysis must not be misleading, biased, or

9    incomplete," not that economic data must be included in an environmental impact

10   statement); *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir.

11   2005) (holding that environmental impact statement relying on market demand economic

12   information must not be misleading, not that economic data must be included in an

13   environmental impact statement); *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic*

14   *Energy Comm'n*, 449 F.2d 1109, 1113 (D.C. Cir. 1971) (finding NEPA requires that any

15   "economic and technical considerations" considered by a federal agency must be weighed

16   against conflicting "environmental amenities," not that economic data must be included in

17   an environmental impact statement).

18         For these reasons, the Court denies KS Wild's request that the Court find the

19   Services acted arbitrarily and capriciously in failing to disclose certain economic

20   information or data about applicant Fruit Growers in the Final Environmental Impact

21   Statement.

22              **b.    Quantification of Environmental Consequences**

23         KS Wild next contends that "the Services violated NEPA in failing to disclose and

24   discuss the quantitative direct, indirect, and cumulative environmental consequences of the

25   proposed action."  Dkt. No. 53 at 58.  To support the proposition that NEPA requires an

26   agency to quantify its analysis of a proposed action's environmental consequences, KS

27   Wild cites a series of cases, including *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,

28   137 F.3d 1372 (9th Cir. 1998).  There, the Ninth Circuit held that defendant U.S. Forest

Service failed to comply with NEPA because its analysis was "very general" and did not discuss in detail the mitigating measures regarding the affected lands. *Neighbors*, 137 F.3d at 1379-80. Notably, the *Neighbors* court stated that "[t]o 'consider' cumulative effects, some quantified or detailed information is required." *Id.* "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id.* at 1380.

The Services counter by stating that *Neighbors* does not require the Services to provide quantified information, but only that they provide "either" quantified "or" detailed information for a cumulative-impacts analysis. Dkt. No. 63 at 45. The Services highlight KS Wild's reliance on *Klamath-Siskiyou*, 387 F.3d at 994-95, which expressly found that "[f]or some of the [environmental] factors, it is understandable why a *qualitative description* such as 'improved' or 'degraded' is suitable." *Id.* at 994 n.1 (emphasis added). The Services state this case undermines KS Wild's argument that NEPA requires a quantitative analysis of environmental effects.

While the Services quoted the *Klamath-Siskiyou* sentence correctly, they left out the rest of the passage, which distinguished between effects that could and could not be quantified. After stating that qualitative descriptions are suitable at times, the *Klamath-Siskiyou* court stated: "For example, the factor 'Balance of community condition' is probably not susceptible to easy measurement. Factors such as 'Amount of suitable and dispersal spotted owl habitat' and 'Road density,' on the other hand, are clearly variables that can be quantified." *Id.*

Here, KS Wild contends that the Final Environmental Impact Statement contains only a relative comparison of the alternative actions without providing measurable or quantifiable differences. The Court does not agree completely with this representation. As examples, the Court looks to the two sample variables from *Klamath-Siskiyou* that can be quantified: the amount of suitable owl habitat and road density.

As to owl habitat, the *Klamath-Siskiyou* court stated that while a "calculation of the total number of acres to be harvested . . . is a necessary component of a cumulative effects

United States District Court
Northern District of California

1    analysis, [ ] it is not a sufficient description of the actual environmental effects that can be

2    expected from logging those acres." *Id.* at 994-95.  Here, the Services did more than

3    restate the number of acres to be harvested.  As they point out, the Final Environmental

4    Impact Statement's analysis of the northern spotted owl includes objective data depicting

5    the projected acreage of suitable habitat under different alternative actions, including the

6    "No Action Alternative" and the "Proposed Action."  AR 38562-67.  The Court finds this

7    satisfies the "quantified or detailed" standard under *Neighbors* and is consistent with

8    *Klamath-Siskiyou.*

9         As to road density, "stating the total miles of roads to be constructed is similar to

10   merely stating the sum of the acres to be harvested—it is not a description of *actual*

11   environmental effects." *Klamath-Siskiyou*, 387 F.3d at 995.  Here, the Final

12   Environmental Impact Statement describes a plan for road construction under the "No

13   Action Alternative" and states that "[n]ew road construction is anticipated to average less

14   than 1 mile per year."  AR 38541.  Under this alternative, because there will be a "gradual

15   reduction in active road mileage over the next 50 years," the "road density in the Plan Area

16   would decrease slightly in the future compared to existing conditions."  AR 38541.  Even

17   though road density is "clearly a variable[] that can be quantified," *Klamath-Siskiyou*, 387

18   F.3d at 994 n.1, the Final Environmental Impact Statement does not do so.  It also fails to

19   quantify the road density under the various alternative plans, including the "Proposed

20   Action."  The Services needed to do more.

21        In sum, the Court agrees partly with KS Wild that there are certain environmental

22   effects in the Final Environmental Impact Statement that should have been quantified.

23   Instead, of using "[g]eneral statements about possible effects," *Neighbors*, 137 F.3d at

24   1380—like the claim that road density will "decrease slightly"—the Services must

25   quantify environmental effects "susceptible to easy measurement," *Klamath-Siskiyou*, 387

26   F.3d at 994 n.1.  The Services' failure to do was arbitrary and capricious.

27   //

28

1

**V.    CONCLUSION**

2

        For the reasons explained in this Order, the Court GRANTS KS Wild's summary

3

judgment motion and finds the incidental take permits issued by the Services, the

4

biological opinion issued by NMFS, and the Final Environmental Impact Statement

5

invalid.  But the Court DENIES KS Wild's summary judgment motion to invalidate the

6

FWS biological opinion.  Accordingly, the Services' cross-motion for summary judgment

7

is DENIED as to all issues except the claim involving the FWS biological opinion's

8

validity.  As to that claim, the Services' cross-motion is GRANTED.

9

    **A.    Summary of Findings**

10

        **1.    Endangered Species Act Claims: Northern Spotted Owl**

11

    •  Incidental Take Permit Invalid: The Fish and Wildlife Service violated the

12

        Endangered Species Act by factoring the conservation efforts of non-applicant

13

        Forest Service into its § 10 analysis of applicant Fruit Growers' mitigation

14

        efforts.  ESA § 10(a)(2)(B)(ii), 16 U.S.C. 1539(a)(2)(B)(ii) ("*the applicant* will

15

        . . . minimize and mitigate the impacts of such taking") (emphasis added).

16

        Incidental-take-permit applicants should not be permitted to piggyback off of the

17

        conservation efforts of their non-applicant neighbors.

18

    •  FWS Biological Opinion Affirmed: The Fish and Wildlife Service did not

19

        violate the Endangered Species Act when it issued a biological opinion that

20

        found Fruit Growers' Plan is not likely to jeopardize the continued existence of

21

        the northern spotted owl or result in the destruction or adverse modification of

22

        critical habitat.  FWS relied on several factors to reach this "no jeopardy"

23

        finding.  FWS did not base its analysis primarily on Fruit Growers'

24

        unenforceable commitment to reduce clearcutting and increase dispersal habitat.

25

        **2.    Endangered Species Act Claims: Southern Oregon/Northern
                California Coast Coho Salmon**

26

    •  Incidental Take Permit Invalid: The National Marine Fisheries Service violated

27

        the Endangered Species Act when it found Fruit Growers could adequately

28

United States District Court
Northern District of California

minimize and mitigate the impacts likely to result from the taking.  NMFS concluded that the benefits of Fruit Growers' mitigation efforts would occur over the duration of the permit's 50-year term.  But because coho salmon have only a three-year life cycle, NMFS should have evaluated the proposed action's short-term impacts.

- <u>NMFS Biological Opinion Invalid</u>: The National Marine Fisheries Service violated the Endangered Species Act when it issued a biological opinion containing a "no jeopardy" conclusion without first evaluating the proposed action's short-term impacts on coho salmon.  The Ninth Circuit has stressed that NMFS must consider near-term habitat loss to populations with short life cycles. NMFS failed to do this here.

### 3.    National Environmental Policy Act Claims

- <u>Environmental Impact Statement Invalid</u>: The Services failed to conduct a cumulative effects analysis as to Fruit Growers':

  a.  timber harvest projects;

  b.  use of herbicides; and

  c.  water withdrawal projects.

This failure to sufficiently catalog past, present, and future projects or actions related to these three areas and how they impact the environment renders the Final Environmental Impact Statement invalid.

- <u>Failure to Quantify Environmental Effects</u>: The Final Environmental Impact Statement is also invalid because the Services failed to quantify certain environmental effects susceptible to measurement.  General statements that possible effects will be "reduced" or "minimized" is not enough.

- <u>No Requirement to Disclose Economic Data</u>: The Final Environmental Impact Statement is not invalid because it failed to disclose economic data related to applicant Fruit Growers.  The Court could not find any case law or language in the statute that persuasively suggests the Services must provide this information

United States District Court
Northern District of California

1   in the environmental impact statement.

**B.   Additional Briefing**

3   The Court orders the parties to brief two more issues.

**1.   Remedy**

5   KS Wild and the Services requested an opportunity for additional briefing on

potential remedies.  Dkt. Nos. 63 at 60, 73 at 25.  The Court GRANTS the request for

additional briefing on the remedy issue.

**2.   Claim Three**

9   The Services request summary judgment on claim three of KS Wild's complaint.

Dkt. No. 63 at 43.  In their cross-motion, the Services assert that they are entitled to

summary judgment as to this claim because KS Wild failed to pursue it at summary

judgment.  Indeed, KS Wild failed to brief this claim, which alleges that FWS violated

ESA § 7 by failing to prepare a legally sufficient incidental take statement.  Dkt. No. 1 at

28.

In support of its position, the Services cite to *Greater Los Angeles Council on*

*Deafness, Inc. v. Zolin*, 812 F.2d 1103, 1115-16 (9th Cir. 1987), where the court found

plaintiffs  "waive[d] their constitutional claims by failing to press them adequately before a

court."  *Id.*  The Court's tentative view, however, is that the case is distinguishable—it

involved a plaintiffs' failure to pursue constitutional claims during trial, not at summary

judgment.  *Id.*

In response, KS Wild states that whether it addressed claim three or not, the result is

the same: because it demonstrated that the FWS biological opinion's no-jeopardy

conclusion was arbitrary and capricious, both the biological opinion and the incidental take

statement are invalidated.  Dkt. No. 73 at 24. (citing *Or. Natural Res. Council v. Allen*, 476

F.3d at 1037).

But in light of the fact that the Court did not invalidate FWS's biological opinion,

and given the parties' cursory treatment of this incidental-take-statement issue, the Court

seeks additional briefing as to why it should not grant summary judgment to the Services

United States District Court
Northern District of California

on KS Wild's third claim.  Additionally, the Court seeks additional briefing concerning why the *Zolin* case—or any other case articulating the waiver principle—should apply.

### 3. Briefing and Hearing Schedule

Both KS Wild and the Services will be permitted to submit a maximum of 15 pages to brief these two issues.  How each side decides to allocate its writing space is entirely up to it.  KS Wild must submit its brief within 14 days of this order.  The Services must submit their brief within 14 days after KS Wild's brief has been filed.  Fruit Growers may also submit a brief (no more than 10 pages) within 14 days after KS Wild's brief has been filed.  No reply briefs will be permitted absent leave of court.

A hearing will be held on May 6, 2015, at 11:30 a.m. in Courtroom A, 15th Floor, U.S. District Court, 450 Golden Gate Avenue, San Francisco, California.

Given this Court's request for additional briefing, this Order is not a final appealable order.

**IT IS SO ORDERED.**

Dated:  April 3, 2015

_____
NATHANAEL M. COUSINS
United States Magistrate Judge

United States District Court
Northern District of California