UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KLAMATH-SISKIYOU WILDLANDS CENTER, CENTER FOR BIOLOGICAL DIVERSITY, and KLAMATH FOREST ALLIANCE,<br><br>    Plaintiffs,<br><br>    v.<br><br>NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION NATIONAL MARINE FISHERIES SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICE,<br><br>    Defendants,<br>    and<br><br>FRUIT GROWERS SUPPLY COMPANY,<br><br>    Defendant-Intervenor. | Case No. 13-cv-03717-NC<br><br>**ORDER VACATING INCIDENTAL TAKE PERMITS, BIOLOGICAL OPINION, AND ENVIRONMENTAL IMPACT STATEMENT; AND DENYING MOTION FOR INJUNCTION**<br><br>Re: Dkt. No. 78 |

Having determined that the defendant agencies improperly issued incidental take permits for two threatened species, the Court now considers the appropriate remedy. Vacatur is the standard remedy for unlawful agency decisions. To be sure, the Ninth Circuit does not mandate that district courts mechanically vacate an agency's action after a finding that it violates the Administrative Procedure Act. Yet courts within this circuit rarely remand without vacatur. Here, the key issue is whether or not this Court should vacate incidental take permits that violate the Endangered Species Act, when vacatur

Case No.: 13-cv-03717-NC

would also result in temporarily putting an end to permits for conservation efforts that benefit the threatened species.

At summary judgment, plaintiffs Klamath-Siskiyou Wildlands Center, Center for Biological Diversity, and Klamath Forest Alliance (collectively "KS Wild") alleged that defendants U.S. Fish and Wildlife Service and National Marine Fisheries Service (collectively "the Services") improperly issued 50-year incidental take permits to defendant-intervenor Fruit Growers Supply Company to take two "threatened" species: the northern spotted owl and the Southern Oregon/Northern California Coast coho salmon ("coho salmon").[1] KS Wild also alleged multiple violations of the Endangered Species Act and the National Environmental Policy Act.

On April 3, 2015, this Court granted in part KS Wild's motion for summary judgment against the Services and Fruit Growers. It held that the Services acted arbitrarily and capriciously, in violation of the Administrative Procedure Act, by issuing two deficient incidental take permits, failing to make a valid no-jeopardy finding in one of the biological opinions, and insufficiently analyzing the cumulative impacts of its proposed action in the Final Environmental Impact Statement. *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, No. 13-cv-03717 NC, 2015 WL 1738309, at *27 (N.D. Cal. Apr. 3, 2015) (summary judgment order).

KS Wild now moves the Court to vacate the incidental take permits, the NMFS biological opinion, the NMFS incidental take statement, the Final Environmental Impact Statement, and the records of decision on remand. Dkt. No. 78. In addition, KS Wild seeks to enjoin Fruit Growers from logging under state-approved harvesting plans. *Id.* at 16-19.

For the reasons explained below, the Court GRANTS KS Wild's motion to vacate

---

[1] NMFS determined that the Southern Oregon/Northern California Coast Evolutionarily Significant Unit (ESU) of coho salmon (*Oncorhynchus kisutch* ) is a "species" under the ESA. 62 Fed.Reg. 24588 (May 6, 1997). An ESU is a "distinct population segment." 62 Fed.Reg. at 24588. There are many distinct population segments of coho salmon. But for the purposes of this Order, the term "coho salmon" will refer only to the Southern Oregon/Northern California Coast ESU of coho salmon.

the incidental take permits, the NMFS biological opinion, the NMFS incidental take statement, and the Final Environmental Impact Statement, finding that the defendants' assertions of disruptive consequences and harm to the threatened species do not outweigh the seriousness of the agency's errors that this Court found.  But the Court DENIES KS Wild's motion to vacate the records of decision.  The Court also DENIES KS Wild's request for an injunction against the Services and Fruit Growers.  Finally, the Court DISMISSES KS Wild's third claim for relief because of its failure to brief the issue at summary judgment.

## I.   BACKGROUND

In 2009, Fruit Growers submitted an application to FWS for authorization under ESA § 10 to take northern spotted owls on the company's lands in connection with timber harvest operations.  *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *5.  Fruit Growers also submitted an incidental take permit application to NMFS for authorization to take coho salmon.  *Id.*  FWS and NMFS eventually issued incidental take permits to Fruit Growers, allowing the company to take northern spotted owls and coho salmon during the course of its timber harvest activities.  The permits last for 50 years.  *Id.*  Because Fruit Growers intended to take the northern spotted owl and the coho salmon, it developed a Habitat Conservation Plan that presented separate strategies on how to conserve each species.

To further evaluate the Plan and the incidental take permit application, Fruit Growers and the Services prepared a Draft Environmental Impact Statement as required by NEPA.  *Id.* at *6 (citing 42 U.S.C. § 4321 *et seq.*).  The Services subsequently published the Final Environmental Impact Statement.  *Id.*  During this time, both FWS and NMFS assessed whether issuing an incidental take permit to Fruit Growers would likely jeopardize the continued existence of an endangered or threatened species, or destroy or adversely modify designated critical habitat.  *See* ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).  In making this determination, FWS and NMFS issued biological opinions.  Both concluded that the proposed permit would not jeopardize the northern spotted owl or coho salmon or

1    adversely modify the species' critical habitat.  *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL
2    1738309, at *7.

3        KS Wild challenged the incidental take permits, the associated biological opinions,
4    and the Final Environmental Impact Statement.  This Court agreed in part with KS Wild
5    that the Services violated the Administrative Procedure Act, the Endangered Species Act,
6    and the National Environmental Policy Act.  It granted KS Wild's summary judgment
7    motion and invalidated the incidental take permits issued by the Services, the biological
8    opinion issued by NMFS, and the Final Environmental Impact Statement.  *Id.* at *27.  The
9    Court also invalidated the NMFS incidental take statement concerning coho salmon.  *Id.* at
10   *20 ("[T]he Court invalidates NMFS's biological opinion as well as the accompanying
11   incidental take statement.").

12       In response to the Court's order for additional briefing as to potential remedies, KS
13   Wild now asks the Court to vacate the incidental take permits, the NMFS biological
14   opinion, the Final Environmental Impact Statement, and the records of decision on
15   remand.  Dkt. No. 78.  Additionally, KS Wild seeks to enjoin Fruit Growers from logging
16   under any state agency-approved harvesting plans.  KS Wild also seeks an order directing
17   the Services to determine how much take has occurred under the now-invalid permits and
18   whether Fruit Growers must provide post-termination mitigation to offset impacts of that
19   take.  *Id.* at 16-19.

20       The Services and Fruit Growers oppose KS Wild's requested remedies.
21   Specifically, defendants argue that the Court should remand the Services' actions to the
22   agencies without vacatur because the disruptive consequences of vacatur outweigh the
23   seriousness of the errors the Court identified at summary judgment.  Dkt. Nos. 81, 84.
24   Finally, KS Wild and defendants disagree over whether KS Wild waived claim 3 of its
25   complaint because of KS Wild's failure to brief the issue at summary judgment.  Both
26   sides request a favorable summary judgment order as to this claim.

27       This Court has jurisdiction under 28 U.S.C. § 1331.  Plaintiffs, defendants, and
28   defendant-intervenors consented to the jurisdiction of a magistrate judge under 28 U.S.C.

Case No.: 13-cv-03717-NC      4

1  § 636(c). Dkt. Nos. 10, 18, 28.

2  **II.  DISCUSSION**

3      **A.  Vacatur**

When a court finds an agency's decision unlawful under the Administrative Procedures Act, vacatur is the standard remedy. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"; *Se. Alaska Conserv. Council v. U.S. Army Corps of Eng'rs*, 486 F.3d 638, 654 (9th Cir. 2007) ("Under the APA, the normal remedy for an unlawful agency action is to 'set aside' the action. In other words, a court should vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.") (internal quotation marks and citation omitted), *rev'd on other grounds sub nom. Coeur Alaska v. Se. Alaska Conserv. Council*, 557 U.S. 261 (2009); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("Ordinarily when a regulation is not promulgated in compliance with the APA, the regulation is invalid."); *accord Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (relief for APA error "normally will be a vacatur of the agency's order"); *Reed v. Salazar*, 744 F. Supp. 2d 98, 119 (D.D.C. 2010) ("default remedy is to set aside [agency] action" taken in violation of NEPA).

The Ninth Circuit, however, does not mandate vacatur. *Cal. Communities Against Toxics v. U.S. Envtl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) ("A flawed rule need not be vacated."). Indeed, "[w]hen equity demands, [a flawed action] can be left in place while the agency follows the necessary procedures to correct its action." *Id.* (quoting *Idaho Farm*, 58 F.3d at 1405 (internal quotation marks omitted)).

In these instances, to determine whether it should vacate an agency decision, a court must look at two factors: (1) the seriousness of an agency's errors and (2) the disruptive consequences that would result from vacatur. *Cal. Communities Against Toxics*, 688 F.3d at 992 ("Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be

changed.") (internal quotation marks omitted) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). Put differently, "courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 2012 U.S. Dist. LEXIS 190899, at \*6 (D. Or. Dec. 10, 2012). In balancing these factors in ESA cases, courts will tip the scales in favor of the endangered species under the "institutionalized caution" mandate. *Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (citation and quotation omitted); *see also Native Fish Soc'y & McKenzie Flyfishers v. Nat'l Marine Fisheries Serv.*, 2014 U.S. Dist. LEXIS 33365, at \*8 (D. Or. Mar. 14, 2014) (noting "institutionalized caution" mandate in weighing *Allied-Signal* factors).

But courts in the Ninth Circuit decline vacatur only in rare circumstances. *See Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("In rare circumstances, when we deem it advisable that the agency action remain in force until the action can be reconsidered or replaced, we will remand without vacating the agency's action."); *Ctr. for Food Safety v. Vilsack*, No. 08-cv-00484 JSW, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury.").

In *California Communities Against Toxics*, for example, the Ninth Circuit found that the Environmental Protection Agency violated the APA's notice-and-comment requirements during the rule-making process when it failed to disclose certain documents in the electronic docket concerning a soon-to-be completed power plant. *Cal. Communities Against Toxics*, 688 F.3d at 993. Nevertheless, the court found the technical error harmless. *Id.* And while it also did find substantive errors, the court balanced these errors with the "significant public harms" that would result from vacatur: community blackouts, efforts on the part of the California legislature to pass a new bill, and economic disaster from stopping construction of a "billion-dollar venture employing 350 workers." *Id.* at 994. Applying the *Allied-Signal* standard, the Ninth Circuit declined to vacate the

Case No.: 13-cv-03717-NC              6

agency decision and permitted the plant's construction to continue while the EPA made corrections on remand. *Id.*

The *Allied-Signal* approach also accords with earlier Ninth Circuit cases involving remand without vacatur. *Idaho Farm*, for instance, involved FWS's proposal listing the Bruneau Hot Springs Snail, a rare snail species in southwest Idaho, as an endangered species under the ESA. 58 F.3d at 1395. Yet FWS failed to provide the public with an opportunity to review a provisional report concerning the snails before the comment period's close. *Id.* at 1402-04. Even though the Ninth Circuit recognized the procedural error, it held that the district court erred in vacating the rule listing the snail as endangered: vacatur risked contributing to "the potential extinction of an animal species." *Id.* at 1405. Moreover, the agency's error was unlikely to alter the agency's final decision. *Id.* at 1405-06.

Such cases highlight the "significant disparity between the agencies' relatively minor errors, on the one hand, and the damage that vacatur could cause the very purpose of the underlying statutes, on the other." *League of Wilderness Defenders*, 2012 U.S. Dist. LEXIS 190899, at *9.

Here, KS Wild contends that this Court should apply the default vacatur remedy. The Services and Fruit Growers disagree. In particular, defendants argue that vacating the FWS incidental take permit, the NMFS incidental take permit, the NMFS biological opinion, the NMFS incidental take statement, and the Final Environmental Impact Statement would disrupt conservation efforts and negate any benefits that would accrue to the northern spotted owl and the coho salmon under the Habitat Conservation Plan.

In determining whether to vacate the above documents, the Court applies the two-part *Allied-Signal* test.

### 1. Seriousness of Agency's Errors

According to the Services, the errors this Court identified in its summary judgment order are "not so serious that reworked incidental take permits and associated documents are 'unlikely' following remand." Dkt. No. 84 at 3 (quoting *Fox Television Stations, Inc.*

Case No.: 13-cv-03717-NC          7

*v. F.C.C.*, 280 F.3d 1027, 1049 (D.C. Cir.) (vacatur inappropriate where court "cannot say it is unlikely the [agency] will be able to justify a future decision")). In particular, the Services highlight this Court's criticism of the way the Services calculated the owl circles' conservation values. *See Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *13 ("[T]he record leaves open the possibility that the conservation values for the highest value owl circles are what they are regardless of whether Conservation Support Areas are ever created in those circles by Fruit Growers."). The Services contend that on remand, FWS could show that it reached the conservation values for the highest value owl circles "only because Fruit Growers is preserving nearby conservation support areas." Dkt. No. 84 at 4.

As to coho salmon, the Services also state that NMFS's failure to perform a short-term-impact analysis should not lead the Court to conclude that "these documents are flawed beyond repair," *id.*; rather, because NFMS "may be able readily to cure [the] defect in its explanation of a decision" the Court should weigh the first *Allied-Signal* factor in NMFS's favor, *id.* (quoting *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009)).

Likewise, Fruit Growers states that "all the errors identified by the Court can be corrected during remand" and stressed its commitment to remedy the legal deficiencies. Dkt. No. 81 at 4.

Despite this commitment, the Court does not find defendants' views persuasive. The Court's summary judgment order details the flaws in the incidental take permits, the NMFS biological opinion and accompanying incidental take statement, and the Final Environmental Impact Statement; therefore, the Court need not repeat its analysis here. Nonetheless, the Court underscores three examples that demonstrate the seriousness of the Services' errors.

First, FWS violated the ESA by factoring the conservation efforts of non-permit-applicant U.S. Forest Service into its § 10 analysis of applicant Fruit Growers' mitigation efforts. ESA § 10(a)(2)(B)(ii), 16 U.S.C. 1539(a)(2)(B)(ii) ("*the applicant* will ... minimize and mitigate the impacts of such taking") (emphasis added). Specifically, the

Case No.: 13-cv-03717-NC             8

1  Court examined the conservation values of high value owl circles and found that "[f]or 17 of the 24 owl circles supported by Conservation Support Areas, Fruit Growers' Conservation Support Areas make up less than 15 percent of the total owl circle." *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *13. Yet FWS attributed the conservation value of these 3400-acre owl circles—the majority acreage of which are owned by the Forest Service—to Fruit Growers. *Id.*

Second, NMFS arbitrarily and capriciously issued an incidental take permit to Fruit Growers to take coho salmon. NMFS found Fruit Growers could adequately minimize and mitigate the impacts likely to result from take and concluded that the benefits of Fruit Growers' mitigation efforts would occur over the permit's 50-year term. But NMFS failed to evaluate the proposed action's short-term impacts to coho salmon, which have only a three-year life cycle. *See Pac. Coast Fed'n v. BOR*, 426 F.3d 1082, 1094 (9th Cir. 2005) (rejecting agency's no-jeopardy conclusion for failure to provide adequate analysis of short-term impacts on endangered coho salmon) (citing *Pac. Coast Fed'n v. NMFS*, 265 F.3d 1028, 1037-38 (9th Cir. 2001)); *see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 934-35 (9th Cir. 2008) (finding biological opinion "did not adequately demonstrate that [the impacts of the planned mitigation] would not affect the fishes' survival and recovery, in light of their short life-cycles and current extremely poor habitat conditions"). Thus, the Court invalidated the NMFS incidental take permit, the NMFS biological opinion, and the NMFS incidental take statement. *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *19-20.

Third, the Services failed to conduct a cumulative effects analysis as to Fruit Growers' timber harvest projects, use of herbicides, and water withdrawal projects. *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *21 ("Under this statute, agencies considering 'major Federal actions significantly affecting the quality of the human environment' must prepare and issue an environmental impact statement.") (citing 42 U.S.C. § 4332(2)(C); *Nw. Envtl. Advocates v. NMFS*, 460 F.3d 1125, 1133 (9th Cir.2006)). "This failure to sufficiently catalog past, present, and future projects or actions related to

Case No.: 13-cv-03717-NC          9

1  these three areas and how they impact the environment renders the Final Environmental
2  Impact Statement invalid." *Id.* at *27.

3  These errors involve more than mere technical or procedural formalities that the
4  Services can easily cure. Instead, the substantive errors under the ESA include, among
5  others, the very factors FWS chose to use as the basis for its conservation-value
6  calculations for 82 owl circles. *Cf., e.g.*, *Cal. Communities Against Toxics*, 688 F.3d at
7  993 (finding procedural error harmless); *Idaho Farm*, 58 F.3d at 1402-04 (finding
8  procedural error involved failure to provide public review of a report). And the Court
9  cannot simply accept defendants' reassurances that they can readily cure these errors.
10 *League of Wilderness Defenders*, 2012 U.S. Dist. LEXIS 190899, at *9 ("The [agency]
11 cannot use declarations before this Court to relitigate the summary judgment motions or to
12 substitute for the missing analysis in the [flawed agency action]."). As to the NEPA
13 issues, the Services failed to perform a cumulative impacts analysis—an integral part of
14 fulfilling NEPA's purpose—of its proposed actions in three different areas. "[A] failure to
15 analyze cumulative impacts will rarely—if ever—be so minor an error as to satisfy this
16 first Allied-Signal factor." *Id.* at *10.

17 In light of the above, the Court finds that the first *Allied-Signal* factor tips towards
18 vacatur.

### 2. Disruptive Consequences

20 The Services and Fruit Growers identify a series of harms to the northern spotted
21 owl and coho salmon that would result from vacatur. Ultimately, according to the
22 Services, "it is vacatur, not the incidental take permits, which threatens conservation of
23 protected species." Dkt. No. 84 at 8. Specifically, as to the northern spotted owl, the
24 Services argue that vacatur would "effectively nullify the underlying [Habitat
25 Conservation Plan], handicapping local and regional efforts to conserve the species." *Id.* at
26 5. Among the benefits to the northern spotted owl under the Plan that would "vanish," the
27 Services point to the Plan's requirement that Fruit Growers preserve 24 Conservation
28 Support Areas, preserve vegetation standards, and help develop a barred owl control study.

Case No.: 13-cv-03717-NC          10

*Id.* at 5-6 (citing Williams Decl.).

But these assertions of disruptive consequences, even if taken as true, do not outweigh the seriousness of FWS's errors. For instance, the Services emphasize Fruit Growers' efforts to preserve 24 Conservation Support Areas. But as explained in the summary judgment order, it is not clear whether those efforts actually minimize and mitigate the taking allowed under the permit to the maximum extent practicable. *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *10-14. Indeed, according to the Services' own evidence, 12 northern spotted owls—nearly 15 percent of the number of owls FWS allowed Fruit Growers to take—were assumed to have already been taken as a result of covered activities under a now invalid incidental take permit. *See* Dkt. Nos. 85-1 at 3 (identifying 6 takes in 2014 monitoring report); 85-2 at 2 (identifying 6 takes in 2015 monitoring report); *see also* AR 40109 (incidental take permit allowing take of 83 individual northern spotted owls). Balancing the harm that would result from vacatur with the harm that would result from covered activities under a permit that does not satisfy ESA § 10, the Court finds that the scales tip in favor of vacatur.

Additionally, the Services' own evidence refutes its assertions that vacatur would disrupt conservation efforts. For instance, on the one hand, the Services argue that "Fruit Growers has agreed to remove barred owls . . . after locating barred owls through surveys which have already begun." *Id.* at 6 (citing Williams Decl.) On the other, they present two annual monitoring reports stating that Fruit Growers did not complete barred owl surveys in 2013 and 2014. Dkt. Nos. 85-1 at 3 (March 31, 2014 report); 85-2 at 2 (March 31, 2015 report); *see also* AR 40109 (incidental take permit stating date effective as November 27, 2012). No disruption can come to a process that has either not started or has just barely begun. *Cf. Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (remanding without vacatur because "the egg has been scrambled and there is no apparent way to restore the status quo ante").

As to the coho salmon, the Court acknowledges that the Plan includes actions that benefit the species. For instance, the Plan does include efforts to implement road

1   management measures to prevent and control erosion production and sediment delivery to
2   streams. *Klamath-Siskiyou Wildlands Ctr.*, 2015 WL 1738309, at *21. But the
3   consequences of ceasing these beneficial conservation efforts does not outweigh the
4   seriousness of NMFS's error—its failure to consider coho salmon's three-year life cycle in
5   its § 10 finding. The fact remains that NMFS has yet to make a valid finding that Fruit
6   Growers' actions are "not likely to jeopardize the continued existence of the listed fish or
7   result in destruction or adverse modification of critical habitat." *Ctr. for Biological*, 698
8   F.3d at 1127 (citing ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2)). At this stage, the Court simply
9   cannot predict whether Fruit Growers' long-term beneficial conservation efforts will
10  effectively mitigate the taking of coho salmon allowed under the 50-year incidental take
11  permit.
12      Aside from harm to the two species, defendants also assert that vacatur would create
13  economic harms to Fruit Growers and the greater Siskiyou region. For example, Fruit
14  Growers discusses a recent fire that consumed 13,500 acres of Fruit Growers' property
15  located within land covered by the Habitat Conservation Plan. Dkt. No. 81 at 5. Fruit
16  Growers asserts that the Court would jeopardize Fruit Growers' efforts to reforest and
17  restore the damaged land—using a technique known as salvage harvest—if it vacated the
18  FWS incidental take permit, and result in millions of dollars in economic loss to the
19  company. *Id.* at 8. This assertion, however, is undermined by Fruit Growers' own
20  assertion that without the Plan's incentives, Fruit Growers would immediately schedule for
21  timber harvest many Conservation Support Areas "because they are economically valuable
22  and would be legally available" under state law. *Id.* at 7.
23      Still, Fruit Growers also asserts that the Siskiyou County economy would suffer just
24  as much from vacatur. For instance, Fruit Growers states that "[c]eased salvage operations
25  . . . would result in substantial impacts to Fruit Growers' customers (e.g. mills) . . . [as well
26  as to] logging contractors and trucking companies" that depend on Fruit Growers'
27  operations. *Id.* at 8. Yet Fruit Growers' assertion does not rise to the concrete, foreseeable
28  economic harm like that found in *California Communities Against Toxics*, where vacatur

Case No.: 13-cv-03717-NC               12

1    meant halting construction of a power plant that would lead to 350 layoffs, blackouts to the
2    community, and additional action from the California legislature. 688 F.3d at 994.
3          In short, the Court finds that despite the asserted disruptive consequences, the scale
4    still tips in favor of vacatur in light of the seriousness of the errors the Services committed.
5    Hitting the pause button on the Plan while the Services correct their errors may lead to
6    harms; but the Court does not find that these harms constitute "serious and irremediable
7    harms that significantly outweigh the magnitude of the agency's error." *See League of*
8    *Wilderness Defenders*, 2012 U.S. Dist. LEXIS 190899, at *6. And while Fruit Growers
9    emphasizes that vacatur would provide it with an economic incentive to harvest timber in
10   certain areas with northern spotted owls, the Court believes vacatur would also provide
11   strong incentives to Fruit Growers and the Services to quickly correct the errors the Court
12   identified at summary judgment.
13         Accordingly, the Court VACATES the Services' two incidental take permits, the
14   NMFS biological opinion, the NMFS incidental take statement, and the Final
15   Environmental Impact Statement.
16         As to the records of decision, the Court will not vacate those documents. KS Wild
17   cites *League of Wilderness Defenders v. Pena*, 2015 WL 1567444, at *4 (D. Or. April 6,
18   2015) for the proposition that "[a]bsent a lawful [environmental impact statement], the
19   Services' decisionmaking [sic] in the records of decision lacks a rational basis and is
20   inherently arbitrary and capricious." Dkt. No. 78 at 14. The *Pena* decision, however,
21   involved a prior summary judgment order finding that the Forest Services acted arbitrarily
22   and capriciously in issuing both the record of decision and environmental impact
23   statement. *Pena*, 2015 WL 1567444, at *1. Conversely, in this case, while the Court did
24   find the Final Environmental Impact Statement invalid, the Court made no such finding as
25   to the records of decision. In fact, none of the parties made an issue of the records of
26   decision at summary judgment. Because this Court has not found the Services' issuing of
27   the records of decision arbitrary and capricious, the Court will DENY KS Wild's request
28   to vacate those documents.

Case No.: 13-cv-03717-NC          13

### B.   Injunctive Relief

A court's decision to issue an injunction constitutes an unwarranted "extraordinary remedy" if a less drastic remedy, such as vacatur, could sufficiently redress plaintiff's injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Thus, under the traditional test, "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *see also Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (finding plaintiff need not establish likelihood of success on the merits if plaintiff can demonstrate "serious questions" going to the merits combined with a balance of hardships that tips strongly in their favor). Where injury to the environment, however, is "sufficiently likely . . . the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

And in cases involving the ESA, the balance of hardships tilts in favor of injunctive relief even further than in other matters involving environmental harm. *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508, 1510-11 (9th Cir. 1994). Indeed, "[i]n cases involving the ESA, Congress removed from the courts their traditional equitable discretion in injunction proceedings of balancing the parties' competing interests." *Id.* at 1511(citations omitted). "In Congress's view, projects that jeopardize the continued existence of endangered species threaten incalculable harm; accordingly, it decided that the balance of hardships and the public interest tip heavily in favor of endangered species" and this court "may not use equity's scales to strike a different balance." *Sierra Club*, 816 F.2d at 1383.

Here, KS Wild seeks to enjoin Fruit Growers from logging under any Timber Harvesting Plan approved on the basis of the incidental take permits this Court invalidated. Dkt. No. 78 at 18. Fruit Growers submitted these Timber Harvest Plans to California's Department of Forestry and Fire Protection. Dkt. No. 79-1. According to defendants, KS

Case No.:13-cv-03717-NC                 14

1    Wild fails to demonstrate that irreparable harm would result from logging under these
2    plans absent an injunction.  Dkt. No. 81 at 10.  Without establishing the likelihood of
3    irreparable harm, the Court will not issue an injunction.  *Becker v. Wells Fargo Bank, NA,*
4    *Inc.*, 2012 U.S. Dist. LEXIS 152369, at *12-15 (E.D. Cal. Oct. 22, 2012) (analyzing only
5    irreparable-harm factor in recommending district court deny injunction motion), *adopted*
6    *by Becker v. Wells Fargo Bank, NA, Inc.*, 2013 U.S. Dist. LEXIS 4177, at *2 (E.D. Cal.
7    Jan. 10, 2013)).
8          The Court agrees with defendants.  To begin with, the Court notes that it upheld
9    FWS's no-jeopardy finding as to the northern spotted owl.  *See Klamath-Siskiyou*
10   *Wildlands Ctr.*, 2015 WL 1738309, at *17; *cf. Sierra Club,* 816 F.2d at 1383 ("projects
11   that jeopardize the continued existence of endangered species threaten incalculable harm").
12   Thus, while defendants' evidence show logging resulted in the taking of 12 owls, KS Wild
13   has not established that logging under the Timber Harvest Plans would jeopardize the
14   northern spotted owl's continued existence.  Moreover, "[n]o court has held that as a
15   matter of law, the taking of a single animal or egg, no matter the circumstance, constitutes
16   irreparable harm."  *Wild Equity Inst. v. City & Cnty. of San Francisco*, No. 11-cv-00958
17   SI, 2011 WL 5975029, at *7 (N.D. Cal. Nov. 29, 2011) (citations omitted); *see also*
18   *Defenders of Wildlife v. Salazar*, 812 F. Supp. 2d 1205, 1209 (D. Mont. 2009) ("[T]o
19   consider any taking of a listed species as irreparable harm would produce an irrational
20   result" because the ESA allows for incidental take permits.).  To be sure, this Court did
21   find NMFS's no-jeopardy finding invalid as to coho salmon.  *Klamath-Siskiyou Wildlands*
22   *Ctr.*, 2015 WL 1738309, at *20.  Nonetheless, KS Wild has not shown how logging
23   specifically under the state-approved Timber Harvest Plans would jeopardize the coho
24   salmon's continued existence.
25         In addition to seeking to enjoin logging by Fruit Growers under the Timber Harvest
26   Plans, KS Wild also seeks injunctive relief "ordering the Services to determine how much
27   take of northern spotted owls and coho salmon has occurred under the unlawfully issued
28   permits, and to determine whether [Fruit Growers] must provide post-termination

Case No.: 13-cv-03717-NC               15

1    mitigation to offset the impacts of that take." Dkt. No. 78 at 18-19.  Yet other than two

2    sections of Wildlife and Fisheries regulations that say nothing about post-termination

3    mitigation pending a court's remand of a habitat conservation plan, *id.* (citing 50 C.F.R

4    § 17.32 ("Permits—General"), 50 C.F.R. § 222.301 ("General requirements")), KS Wild

5    offers no other supporting authority that would convince this Court to grant its distinct

6    request.

        Accordingly, the Court DENIES KS Wild's motion for injunctive relief.

### C.   Claim 3 Waiver

In their cross-motion for summary judgment, the Services contend that KS Wild waived claim 3 of their complaint by failing to brief that claim at summary judgment.  Dkt. No. 63 at 50.  According to KS Wild's third claim, FWS violated ESA § 7 by failing to prepare a legally sufficient incidental take statement.  Dkt. No. 1 at 28.  The Services, however, did not address the actual merits of the incidental take statements' validity at summary judgment; rather, the Services stated that KS Wild's failure to brief the issue was sufficient for the Court to grant summary judgment for the Services as to the third claim.  *Id.*  In their remedy brief, the Services continue to argue that KS Wild's waiver is "equivalent to a grant of summary judgment for Defendants, since a waived claim, by definition, cannot satisfy the APA's demanding burden" imposed on KS Wild to demonstrate that the FWS's action was arbitrary and capricious.  Dkt. No. 84 at 15.

In response, KS Wild argues that because of the "legal infirmities that are plain on the face of the incidental take statement," the Court should enter summary judgment on KS Wild's third claim.  Dkt. No. 78 at 20.  According to KS Wild, FWS's reliance on an arbitrary and capricious incidental take permit and Habitat Conservation Plan makes the incidental take statement that it issued "necessarily arbitrary and capricious" as well.  *Id.*  Furthermore, KS Wild points out that the Court would err in entering summary judgment for FWS; the Services failed to establish that the incidental take statement is valid as a matter of law with "one cursory paragraph" that does not discuss claim 3's merits.  *Id.*

The Court finds that KS Wild's failure to raise the third claim on their summary

Case No.: 13-cv-03717-NC          16

1    judgment motion constitutes a waiver.  *See, e.g.*, *USA Petroleum Co. v. Atl. Richfield Co.*,
2    13 F.3d 1276, 1284 (9th Cir. 1994) ("It is a general rule that a party cannot revisit theories
3    that it raises but abandons at summary judgment.").  Still, KS Wild's waiver does not
4    absolve defendants of their obligation to "articulate a rational connection between the facts
5    found and the conclusions made" that resulted in FWS's issuing an incidental take
6    statement.  *See Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997) (citing
7    *U.S. v. Louisiana-Pac. Corp.*, 967 F.2d 1372, 1376 (9th Cir. 1992));

8         Thus, while this Court will not grant summary judgment to the Services as to KS
9    Wild's third claim, it DISMISSES KS Wild's third claim for failure to prosecute.  Fed. R.
10   Civ. P. 41(b); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 689 (9th Cir.
11   2005) ("the consensus among our sister circuits, with which we agree, is that courts may
12   dismiss under Rule 41(b) sua sponte") (citing *Olsen v. Mapes,* 333 F.3d 1199, 1204 n. 3
13   (10th Cir. 2003) ("[T]he Rule has long been interpreted to permit courts to dismiss actions
14   sua sponte for a plaintiff's failure to prosecute or comply with the rules of civil procedure
15   or court's orders.")); *see also* Rutter Group Cal Prac. Guide Fed. Civ. Pro. Before Trial Ch.
16   16-H ("Although Rule 41 nominally requires a motion by defendant, the court possesses
17   inherent power to dismiss sua sponte, without notice or hearing, "to achieve the orderly
18   and expeditious disposition of cases.") (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-
19   632 (1962)).
20   //

Case No.:13-cv-03717-NC                17

## III. CONCLUSION

Based on the discussion above, the Court VACATES the northern-spotted-owl incidental take permit issued by FWS, the coho-salmon incidental take permit issued by NMFS, the coho-salmon biological opinion issued by NMFS, the coho-salmon incidental take statement issued by NMFS, and the Final Environmental Impact Statement issued by both FWS and NMFS. The Court finds that the seriousness of the Services' errors significantly outweighs the asserted disruptive consequences that would result from vacatur. This case is therefore REMANDED to the Fish and Wildlife Service and the National Marine Fisheries Service for further proceedings consistent with this Order.

The Court, however, DENIES KS Wild's motion to vacate the records of decision. The Court also DENIES KS Wild's request for an injunction against the Services and Fruit Growers; in particular, KS Wild has not satisfied the irreparable-harm requirement. Finally, the Court DISMISSES KS Wild's third claim because of its failure to brief the issue at summary judgment.

**IT IS SO ORDERED.**

Dated: May 29, 2015

_____
NATHANAEL M. COUSINS
United States Magistrate Judge